UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

CRAIG FRIEDMAN, Individually and on
Behalf of All Others Similarly Situated,

Plaintiff,

vs.

ENDO INTERNATIONAL PLC, RAJIV
KANISHKA LIYANAARCHCHIE
DE SILVA, SUKETU P. UPADHYAY and
PAUL CAMPANELLI,

Defendants.

_____ x

: Civil Action No. 1:16-cv-03912-JMF
:
: CLASS ACTION
:
: SECOND AMENDED COMPLAINT FOR
: VIOLATIONS OF THE FEDERAL
: SECURITIES LAWS
:
:
: DEMAND FOR JURY TRIAL
:
:
:
:

Lead Plaintiff Steamfitters' Industry Pension Fund and Steamfitters' Industry Security Benefit Fund (together, "Plaintiff" or "Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, allege the following based upon the investigation of their counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings made by Endo International PLC ("Endo" or the "Company"), as well as securities analysts' reports and advisories, press releases, media reports and other public statements issued by or about the Company and interviews of former employees of Endo.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth after reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of Endo securities between May 11, 2015 and May 6, 2016, inclusive (the "Class Period"), seeking to pursue remedies under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      Defendant Endo describes itself as a global specialty pharmaceutical company which develops, manufactures and distributes pharmaceutical products and devices worldwide.  During the Class Period, the Company had four major business segments: Branded Pharmaceuticals, Generic Pharmaceuticals, International Pharmaceuticals and Medical Devices.   Endo markets its pharmaceuticals to physicians, retail pharmacies, healthcare professionals and wholesalers.

3.      During the second half of 2012, Endo reported disappointing financial results as drug manufacturers introduced generic versions of the Company's main branded pharmaceuticals, Lidoderm and Opana ER, and started taking market share from Endo.  Exacerbating the issues facing the Company in its core pharmaceutical business, Endo's medical device division, American Medical Systems ("AMS"), was mired in tens of thousands of product liability suits associated with

- 1 -

various surgical mesh products marketed and sold by AMS – most notably vaginal mesh products, as detailed herein (the "Vaginal Mesh Litigation").   The Vaginal Mesh Litigation exposed the Company to enormous financial liability and new suits were being filed every day.

4.      In early 2013, Endo began taking steps to address its sagging business prospects.  On February 25, 2013, Rajiv De Silva ("De Silva" or "Defendant De Silva"), former Chief of Operations of Valeant Pharmaceuticals International, Inc. ("Valeant"), was appointed as Endo's Chief Executive Officer ("CEO").   De Silva publicly announced his plans for an aggressive turnaround of Endo emphasizing his desire to reshape the Company through "organic and sustainable growth."  It soon became clear, however, that Defendant De Silva's plan was to fashion Endo in the image of Valeant.  De Silva re-domiciled Endo in Ireland to lower the Company's tax rate; cut research and development ("R&D") costs; and acquired numerous other pharmaceutical businesses in order to provide an immediate revenue boost.

5.      Between 2013 and 2015, Endo rapidly acquired the following pharmaceutical companies: (i) Boca Pharmacal LLC; (ii) Paladin Labs; (iii) Litha Healthcare Group Limited; (iv) Grupo Farmaceutico Somar, Sociedad Anonima Promotora de Inversion de Capital Variable ("Somar"); (v) DAVA Pharmaceuticals Inc.; (vi) Innoteq, Inc.; and (vii) Auxilium Pharmaceuticals Inc.  During this same period, the Company's long-term debt increased from $3.324 billion in 2013 to $8.252 billion in 2015.

6.      By 2015, De Silva was focused on further growing Endo's generic business.  On May 18, 2015, Endo announced that it had agreed to purchase privately-held Par Pharmaceuticals Inc. ("Par") from TPG Capital in a transaction valued at $8.05 billion including the assumption of Par debt.  Upon completion, the Par acquisition would increase Endo's generics-related revenues by a reported 46%.  According to the announcement, the purchase price would consist of 18 million

shares of Endo stock and $6.5 billion in cash consideration.  On September 28, 2015, Endo closed the Par acquisition.

7.      Throughout the Class Period, Defendants repeatedly assured investors that they were turning Endo around by successfully marketing the Company's branded products and by growing the Company's business through numerous strategic acquisitions.  Defendants represented that this approach was leading to "sustainable growth" that would enable the Company to de-leverage its balance sheet by mid-2016 and generate earnings growth.

8.      Unbeknownst to investors, however, Endo's business was in far worse condition than Defendants were publicly representing.  The Company's pre-class period acquisition spree had left it with an amalgam of unrelated and disjointed pharmaceutical businesses, which were failing to generate meaningful sales growth and were of diminishing value.  In order to artificially stimulate sales growth of certain branded products, Endo was engaging in improper sales practices which exposed the Company to the heightened risk that it would find itself having to answer to government regulators for its actions, as it had many times in the past.

9.      Furthermore, the Company's generics business was not as well-positioned as Defendants were leading the market to believe and the acquisition of Par would come at the expense of Endo's "legacy" generics business Qualitest Pharmaceuticals ("Qualitest") as upon consummation of the acquisition, Defendants planned to, among other actions, fire key Qualitest sales executives, abandon Qualitest's retail and wholesale accounts business, fire the related sales force and restructure the way Qualitest bid and priced contracts for its customers which would cause Endo to lose generics business.  Indeed, when the Par acquisition was consummated and Qualitest sales executives were fired, accounts were abandoned and Qualitest's bidding and contract procedures were restructured, Qualitest suffered a significant loss of business.

- 3 -

Defendants, however, publicly portrayed the integration of Par as a success and represented that Qualitest's business was growing under the leadership of Defendant Campanelli.

10. The problems with Endo and its business were revealed to the market in a series of announcements. On February 29, 2016, Endo issued a press release reporting its financial results for the fourth quarter of 2015. For the quarter, Endo reported a net loss of $118.46 million, or $0.52 per diluted share, on revenue of $1.07 billion, compared to a net loss of $53.48 million, or $0.34 per diluted share, on revenue of $662.88 million for the same period in the prior year. In discussing these results, Defendants acknowledged that Endo's generics business was negatively impacted by "increased pricing pressure due to increased competition across pain and other commoditized products within the legacy Qualitest portfolio."

11. In response to this news, on February 29, 2016, the price of Endo stock declined from $50.47 per share to close at $39.97 per share – a decline of 21%, on extremely heavy trading volume. Although Defendants acknowledged some issues in Endo's generics business they continued to conceal the extent of the weakness in its generic segment by reaffirming Endo's year-end earnings guidance and assuring investors that it was experiencing "strong generics growth in the mid teens to high teens."

12. On March 17, 2016, Endo further admitted that it had seen a more than expected softness in its generics business but remained confident in its full year earnings guidance, which projected revenues between *$4.32 billion to $4.52 billion*. In response to this news, the price of Endo stock declined from $32.40 per share to close at $27.45 per share – a decline of 15% on extremely heavy trading volume.

13. On May 5, 2016, Endo issued a press release announcing its financial results for the first quarter of 2016, the period ended March 31, 2016. In the press release, Endo reported a loss

of $0.40 per diluted share, down from earnings of $0.11 per share in the first quarter of 2015. Additionally, ***Endo significantly cut its 2016 earnings and revenue guidance, announcing targeted revenue in the range of $3.87 billion and $4.03 billion, down from the range of $4.32 billion to $4.52 billion that the Company had reaffirmed in March, less than two months earlier.***

14.     Following the Company's downward guidance revision, during a conference call to discuss the Company's results, Defendant De Silva admitted that there had been pricing pressure in the Company's generic segment and a "deeper than expected erosion in the legacy Qualitest business."

15.     In response to this news, the price of Endo stock dropped from $26.67 per share to $16.17 per share – a decline of 39%, on heavy trading volume.

16.     That same day, Endo issued a press release announcing changes to its board and management structure, including the resignation of Brian Lortie ("Lortie"), President of the Company's U.S. Branded Pharmaceuticals segment.

17.     Finally, on May 6, 2016, after the market closed, Endo filed a Quarterly Report on Form 10-Q for the quarter ended March 31, 2016, with the SEC.  The Form 10-Q revealed that Endo was subject to a governmental investigation related to Frova, one of Endo's main branded pharmaceutical products.  The Form 10-Q stated, in pertinent part, as follows:

*Pricing Matters*

In March 2016, [Endo Pharmaceuticals] received a CID from the U.S. Attorney's Office for the Southern District of New York.  The CID requests documents and information regarding contracts with Pharmacy Benefit Managers regarding Frova®. We are currently cooperating with this investigation.  We are unable to predict the outcome of these matters or the ultimate legal and financial liability, if any, and at this time cannot reasonably estimate the possible loss or range of loss, if any, for these matters but will explore all options as appropriate in our best interest.

18.     On this news, on May 9, 2016, the next trading day, the price of Endo stock fell an additional $0.90 per share, or more than 5.57% to close at $15.25.

- 5 -

19.     Thereafter, Endo continued to report disappointing news.  In June 2016, Endo announced a delay in the approval process for an abuse-deterrent version of Opana ER and subsequently withdrew the application in August 2016.

20.     Then, on September 23, 2016, Endo issued a press release announcing that Defendant De Silva was resigning his positions at the Company and Defendant Campanelli was elevated to President and CEO of the Company.  Thus, Defendant De Silva's "turnaround" of Endo officially came to an end.

## JURISDICTION AND VENUE

21.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

23.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).

24.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

25.     Plaintiff, as set forth in the certifications previously filed in this litigation and incorporated by reference herein, purchased Endo securities during the Class Period and has been damaged thereby.

26.     Defendant Endo develops, manufactures, and distributes pharmaceutical products and devices worldwide. The Company's stock is listed and trades on the NASDAQ Global Exchange under the ticker symbol "ENDP."

27.     Defendant Rajiv Kanishka Liyanaarchchie De Silva ("De Silva") served as Chief Executive Officer, President and a Director of Endo from February 25, 2013 to September 23, 2016, when he was replaced by Defendant Campanelli.

28.     Defendant Suketu P. Upadhyay ("Upadhyay") served at all relevant times as Chief Financial Officer and Executive Vice President of Endo.

29.     Defendant Paul Campanelli ("Campanelli") served as President of the Par Pharmaceuticals segment of Endo from September 25, 2015 through the end of the Class Period. On September 23, 2016, Campanelli was appointed as CEO of the Company.

30.     The defendants referenced above in ¶¶27-29 are sometimes collectively referred to herein as the "Individual Defendants," collectively with Endo, "Defendants."

31.     During the Class Period, Defendants were privy to confidential and proprietary information concerning Endo, its operations, finances, financial condition and present and future business prospects. Because of their positions with Endo, Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

32.     Defendants are liable as direct participants in the wrongs complained of herein.  In addition, Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, Defendants were able to and did, directly or indirectly, control the conduct of Endo's business.

33.     Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, Defendants had the opportunity to commit the fraudulent acts alleged herein.

34.     As controlling persons of a publicly-traded company whose stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ and governed by the federal securities laws, Defendants had a duty to promptly disseminate accurate and truthful information with respect to Endo's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Endo securities would be based upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

35.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Endo securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme:

(i) deceived the investing public regarding Endo's business, operations, and the intrinsic value of Endo securities; (ii) enabled Endo to sell more than $2 billion in Endo ordinary shares to the public and sell more than $1.6 billion in debt for the Par acquisition; and (iii) caused Plaintiff and other members of the Class to purchase Endo securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Endo and Its Business

36.     Defendant Endo describes itself as a global specialty pharmaceutical company which is focused on both branded and generic pharmaceuticals.  The Company has offices in Huntsville, Alabama, Chestnut Ridge, New York, Dublin, Ireland and Malvern, Pennsylvania. Endo is presently comprised of three business segments: U.S. Branded Pharmaceuticals, Generic Pharmaceuticals and International Pharmaceuticals.

37.     During the Class Period, the Company also produced and marketed medical devices through AMS.  In August 2015, Endo sold AMS's men's division to Boston Scientific Corporation and in February 2016, the Company announced that it would be discontinuing AMS's women's division and running off that business.

38.     Endo markets and distributes its products to physicians, retail pharmacies, healthcare professionals and wholesalers (*e.g.*, Cardinal Health, McKesson and AmerisourceBergen Corporation).  Endo also derives revenue from its relationships with specialty pharmacies, product licensing and royalties from the Company's third party collaboration partners.

39.     Endo's U.S. Branded Pharmaceutical segment includes a variety of branded prescription products related to the treatment and management of pain as well as urology, men's health, endocrinology and orthopedic products.  Endo's branded portfolio includes: Lidoderm, OPANA ER, Voltaren Gel, Percocet, BELBUCA, Aveed, Supprelin LA, Sumavel DosePro, XIAFLEX and Frova, among others.

40.     Endo's non-branded Generic Pharmaceutical segment includes pharmaceuticals for pain management, urology, central nervous system disorders, immunosuppression, oncology, women's health and cardiovascular disease.  In November 2010, Endo gained critical mass in the generics market when it acquired Qualitest, a privately held manufacturer and distributor of generic drugs and over-the-counter pharmaceuticals, for $769.4 million plus a debt repayment of $406.8 million.

41.     Endo's International Pharmaceutical segment includes a variety of specialty pharmaceutical products from the Canadian, Mexican, South African and world markets.  Endo has grown this division through numerous acquisitions as follows: (i) in February 2014, Endo acquired Paladin, a Canadian pharmaceutical company that has a portfolio which serves growing therapeutic areas, including ADHD, pain, women's health and oncology; (ii) in July 2014, Endo acquired Somar, which is based in Mexico City and develops, manufactures and markets generic, branded generic and over-the-counter products, including dermatology and anti-infectives; (iii) in February 2015, Endo acquired Litha, a South African company, which is a diversified healthcare group providing services, products and solutions to public and private hospitals, pharmacies, general and specialist practitioners, as well as government healthcare programs; and (iv) in May 2015, Endo acquired Aspen Holdings, a South African pharmaceutical company with a portfolio focused on pain, anti-infectives and cardiovascular treatments.

42.     As a pharmaceutical company, Endo's revenue stream relies in part on the Company's ability to negotiate favorable arrangements with pharmacy benefit managers ("PBMs").  PBMs are companies that manage prescription drug benefits for members of health plans.  Because PBMs have the power to determine which drugs are covered by a health plan, pharmaceutical companies often offer certain incentives to have their drugs listed on a PBM's

formulary.  Recently, there has been increased regulatory scrutiny of such agreements under the Federal Anti-Kickback statute, a criminal statute which prohibits the exchange of (or offer to exchange), of anything of value in an effort to induce (or reward) the referral of federal health care program business.  *See* 42 U.S.C. Section 1320(a)-7b.

43.     A typical pharmaceutical company will generate revenue by developing new pharmaceutical products in their pipeline to cure and treat diseases and will typically expend approximately 15%-20% of revenues on R&D.  A pharmaceutical company's R&D spending bears fruit when the company's branded pharmaceutical products receive patent protection and the company is granted a limited period of exclusivity.

44.     A pharmaceutical company can bring a patented branded drug to the generic market via a fairly simple regulatory process.  Pursuant to the Hatch-Waxman Act, enacted by Congress in 1984, a company seeking to bring a generic drug to market is not required to file a complex New Drug Application ("NDA") to obtain U.S. Food and Drug Administration ("FDA") approval and does not need to conduct duplicative clinical trials.  Rather, the Company is only required to file an Abbreviated New Drug Application ("ANDA"), which allows other generic drug manufacturers to rely on the safety and efficacy data provided by the original NDA holder.

45.     Generic drugs are exact substitutes for branded pharmaceutical products.  Generic drugs contain the same active ingredient(s), in the same dosage form, in the same strength, and are bioequivalent to the original FDA approved brand name version of the drug.  Under the FDA rules, pharmaceutical products that are classified as equivalent can be substituted with the full expectation that the substituted product will have the same clinical effect and safety profile as the branded product.

46.     To provide an incentive for generic companies to supply consumers with generic options which are affordable, the first generic manufacturer to file a substantially complete ANDA becomes the "authorized generic" and is allowed to exclusively market its generic drug for a set period.  When the period of patent protection and ANDA protection expires, third parties then have an opportunity to introduce generic counterparts to the branded product.  When multiple generic products enter the market, the price of the drug (both retail and generic) falls precipitously.

**Endo Engages in an Acquisition Spree in an Effort to Revitalize Its Business**

47.     When Defendant De Silva assumed his role as CEO of the Company in February 2013, Endo was struggling with shrinking revenues and declining business prospects.  At the end of the third quarter of 2012, Endo reported a 1% decrease in total revenues to $750 million, compared with $759 million in the same quarter of 2011.  Branded Pharmaceutical sales of $417 million for the quarter represented a decrease of 2% as compared to the prior year. At this time, Endo was also struggling to overcome the introduction of generic competition for its major pain products, Lidoderm and Opana ER, which represented $947.3 million and $299.3 million of the Company's revenue, respectively, for the year ended December 31, 2012.

48.     In discussing his view on rehabilitating Endo's business, Defendant De Silva underscored the importance of shareholder value creation, organic growth and R&D "efficiency." During the Company's June 5, 2013 earnings conference call, De Silva articulated his plan to transform the Company stating, in pertinent part, as follows:

> First we intend to reinvigorate *organic growth through a more focused and disciplined execution.  Second, we will explore options for assets that do not fit within our new model, including exploring strategic alternatives for our HealthTronics business and early-stage pharmaceutical discovery platform.*  Third, we are implementing a new lean operating model designed to generate significant cost savings, drive greater accountability, and allow us to focus more effectively on key priorities. Fourth, *we will improve R&D efficiency by concentrating our spend on lower-risk, near-term, revenue-generating projects*.  Fifth, we will *pursue select accretive and strategic external growth opportunity where we can identify a clear*

*path to cost and revenue synergies*.  Sixth, we will continue to optimize our capital structure.  And, seventh, we intend to continue strengthening our talent and organizational capabilities.

49.     During the Company's conference at Stifel Nicolaus Weisel Healthcare, on September 12, 2013,  De Silva further told investors that he "expect[ed] to return the business to organic growth starting in 2014."

50.     In truth, however, De Silva's plan for transforming the Company had little to do with "organic growth" or "discipline and focused execution."  Instead, under De Silva's management, Defendants grew Endo by sharply reducing R&D, initiating an aggressive buying spree (which increased the Company's debt to unprecedented levels) and fostered an environment that encouraged improper sales practices.

51.     The first step of De Silva's turnaround plan was to increase the Company's tax "efficiency."  On October 31, 2013, Endo became incorporated in Ireland as a private limited company and re-registered effective February 18, 2014 as a public company.  The Company's tax inversion facilitated the later business combination between Endo's subsidiary, EHSI, and the Canadian company, Paladin Labs.

52.     The second phase was to reduce R&D expenditures and instead acquire new products via corporate acquisitions.   Under De Silva, Endo reduced R&D expenditures dramatically, spending $116.8 million in 2013, $115.8 million in 2014, and $93 million in 2015, which represented 4.4%, 4.1% and 2.8% of the Company's revenue, respectively.  Rather than invest in Endo's growth through development of the Company's pharmaceutical pipeline, the Company acquired various pharmaceutical companies in a series of transactions which increased the Company's long term debt from $3.324 billion in 2013 to $8.252 billion in 2015.   The following companies and assets were acquired, among others:

- 13 -

- On February 3, 2014, Endo acquired **Boca Pharmacal LLC**, a specialty generics company that focuses on niche areas, commercializing and developing products in categories that include controlled substances, semisolids and solutions, for $236.6 million in cash;

- On February 28, 2014, Endo acquired **Paladin Labs Inc.,** a Canadian pharmaceutical company in a stock and cash transaction valued at approximately $2.7 billion;

- On May 19, 2014, Endo acquired the worldwide rights to **Sumavel DosePro** a needle free delivery system for sumatripin from Zogenix Inc. for consideration of $89.7 million and contingent cash consideration;

- On July 24, 2014, Endo acquired Grupo Farmaceutico Somar Anonima Promotora de Inversion de Capital Variable ("**Somar"**), a leading privately owned specialty pharmaceuticals company based in Mexico City, for $270.1 million in cash consideration;

- On August 6, 2014, Endo acquired **DAVA Pharmaceuticals, Inc.,** a privately held company specializing in marketed pre-launch and pipeline generic pharmaceuticals based in Fort Lee, New Jersey, for consideration of $590.1 million;

- On December 9, 2014, the Company acquired the rights to **Natesto** (nasal gel), a testosterone nasal gel for replacement therapy for adult males diagnosed with hypogonadism, from Trimel BioPharma SRL, a wholly-owned subsidiary of Trimel Pharmaceuticals for an upfront payment of $25.0 million, with an additional cash payment to be made by EPI, a subsidiary of Endo, based on certain clinical and commercial milestones;

- On January 29, 2015, Endo acquired **Auxilium Pharmaceuticals** ("Auxilium"), a fully integrated biopharmaceutical company focusing orthopedics, dermatology and other therapeutic areas, in a transaction valued at $2.6 billion. Through the Auxillium transaction, the Company also acquired the branded products, Testim, Stendra and Natesto.

**Endo Engages in Improper Sales Practices**

53.     By the start of the Class Period, Defendants knew or recklessly disregarded that the Company's pre-class period acquisition spree had left it with an amalgam of unrelated and disjointed pharmaceutical businesses, which were failing to generate meaningful sales growth and were of diminishing value. In order to artificially stimulate sales growth of certain branded products, Endo was encouraging its sales force to engage in undisclosed and improper sales practices which heightened the risk that it would run afoul of its obligations under a deferred

prosecution agreement, which it had entered into on February 21, 2014 as a result of improper sales and marketing practices of Lidoderm (the "Lidoderm DPA") as detailed herein.

54.    Endo has a long history of involvement in improper sales practices.  Beginning in 2002, Endo was engaging in improper and illegal activities in order to market and sell its core pain product, Lidoderm, a patch that is used to relieve pain associated with post-herpetic neuralgia.  At the time, Endo's business plan focused entirely on the Company's efforts to develop additional therapeutic indications for Lidoderm.  Endo launched a marketing campaign urging people to "put the patch where the pain is."  Certain sales representatives were instructed to encourage off-label discussion with physicians, including asking physicians about the different types of pain their patients experience and talking to physicians about Lidoderm's "mechanism of action" to broaden the sales base to conditions other than post-herpetic neuralgia.  In the course of 2002, Lidoderm sales for off-label use markedly increased.

55.    In 2003, Endo's management called for a 100% increase in Lidoderm sales and Endo published an internal report for a study, initiated in 2001, meant to assess the effectiveness of Lidoderm to treat lower back pain in approximately 130 patients.  The results showed a statistically significant improvement in lower back pain intensity and an increase in patient quality of life.  However, a December 2003 follow-up study which employed a more scientifically rigorous method (a multicenter, multiple dose, double-blind, randomized, placebo controlled, parallel group pilot study that enrolled 100 patients) failed to confirm these results.  Despite the failure to confirm the efficacy of Lidoderm for alternative therapeutic indications, certain sales representatives promoted the use of Lidoderm for lower back pain, carpal tunnel pain, osteoarthritis pain, diabetic neuropathy, and other neuropathic pain, and provided physicians with unsolicited restricted materials to further their promotional efforts.  In June of 2006, a multicenter,

multiple dose, double-blind, randomized, placebo controlled, parallel study again failed to show Lidoderm's efficacy for treating conditions other than post-herpetic neuralgia. Notwithstanding these findings, Endo sales representatives ordered thousands of reprints of the original study supporting Lidoderm's alternative uses for other therapeutic indications to distribute to healthcare professionals.

56.     On February 21, 2014, Endo announced that it had reached a resolution of criminal and civil claims with the federal and participating state authorities and the District of Columbia regarding its investigation of Endo's sales, marketing and promotional practices related to Lidoderm. The Company announced that it would be paying a total of up to $194 million to settle these actions. As part of the settlement, Endo entered into the Lidoderm DPA with the United States Department of Justice for a period of up to 2 1/2 years and a corporate integrity agreement with the United States Department of Health and Human Services, Office of Inspector General, for a period of five years.

57.     The DPA included the Company's Enhanced Compliance Program which provided, *inter alia*, that:

> Endo has in place and will maintain policies and procedures that prohibit Endo and its employees and representatives from engaging in any conduct that violates the federal anti-kickback statute, unless that conduct is excluded from coverage of the statue by any exception or regulatory safe harbor, including, but not limited to, the offering or paying of any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to prescribe any Endo branded pharmaceutical product for which payment may be made in whole or in part under Federal health care program.

*     *     *

> Endo will establish and maintain policies and procedures that shall (i) require that financial incentives do not inappropriately motivate field facing sales representatives or their direct managers to engage in improper promotion, sales, and marketing of Endo's branded pharmaceutical products;

58.     Commenting on the announcement of the settlement, Defendant De Silva stated: "We are pleased to resolve this matter and are confident that we have robust programs in place to assist us in satisfying our legal and regulatory agreements.  We are committed to a company culture that supports the conduct of our business in a compliant and ethical manner."

59.     Despite the Company's purported elevated commitment to legal and ethical marketing practices under the Lidoderm DPA, as alleged further below, before and during the Class Period, Defendants persisted in engaging in undisclosed improper sales practices in order to inflate revenues from its branded pharmaceutical segment.

60.     Endo's branded sales representatives were under extreme pressure to push its branded products such as the migraine drugs, Sumavel DosePro and Frova.  Sumavel DosePro was acquired in May 2014 for consideration of $89.7 million and contingent cash consideration.  The Company marketed Frova pursuant to its licensing agreement with Vernalis starting in mid-August 2004.

61.     Sumavel DosePro was particularly difficult to market because it was sold by the Company for $2,700.00 for six units.  By comparison, the generic form of this medication, which was administered via needle, was sold for only $7 for five units.  Moreover, physicians were wary of prescribing Sumavel DosePro because patients complained about the pain of administering a neoprene injection.  Further, to prescribe Sumavel DosePro, a physician would have to show that at least two other triptans that the patient tried were ineffective.  As a result,  it was difficult to obtain coverage for Sumavel DosePro.

62.     In order to boost revenues associated with Sumavel DosePro, the Company improperly marketed the drug by encouraging doctors to prescribe it even though a cheaper generic existed.  Sumavel DosePro is administered via a needle-free delivery system.  Endo sales

representatives were instructed to push for reimbursement for Sumavel DosePro by distributing to physicians reimbursement forms that were pre-filled with all the necessary reimbursement codes and with a box indicating "needle phobia" already checked off so that the physician then only needed to input the patient name. The indication of "needle phobia" presumably would make the more expensive branded version of Sumavel DosePro indicated and therefore reimbursable. Ultimately, sales personnel were instructed to stop this practice and shred any of the Sumavel DosePro prefilled forms.

63.    Further, during the Class Period, Defendants offered improper incentives to PBMs in order to cause the PBMs to list Frova on their formularies.

64.    As alleged herein, Endo's sales practices have continued to draw the interest of government regulators. On May 6, 2016, Endo disclosed that it was subject to a governmental investigation related to Frova, one of Endo's main branded pharmaceutical products.

**Endo Acquires Par and Unbeknownst to Investors**
**Plans to Radically Change Qualitest's Business**

65.    By the start of the Class Period, Defendants knew or recklessly disregarded that the Company's generics business was not as well-positioned as they were leading the market to believe and the acquisition of Par would come at the expense of its existing generic business, Qualitest. As detailed herein, upon consummation of the Par acquisition, Defendants fired key Qualitest sales executives, abandoned Qualitest's retail and wholesale accounts business and fired the related sales force and restructured the way Qualitest bid and priced customer contracts which would cause Endo to lose business.

66.    On May 18, 2015, Endo issued a press release announcing that it would acquire privately-held Par from TPG in an acquisition valued at $8.05 billion. Defendant De Silva commented on the announcement stating, in pertinent part, as follows: "We believe the acquisition

of Par underscores the continued execution of Endo's value-driven M&A strategy and helps deliver on our goal of achieving double-digit revenue growth for the overall business over the long-term."   According to the press release, "the acquisition would generate $175 million in operational and tax synergies that are expected to be realized within the first 12 months following the completion of the transaction, while strategically preserving investment in the R&D pipeline to help drive long term organic growth."

67.    Par is a pharmaceutical company that specializes in developing, licensing, manufacturing, marketing and distributing generic drugs in the United States.  According to Par, it focuses on high-barrier to entry products that are difficult to formulate, difficult to manufacture or face complex legal or regulatory challenges.  Par's product portfolio was intended to augment the Company's Generic Pharmaceutical segment portfolio, which was acquired from Generics International (formerly d/b/a Qualitest Pharmaceuticals, hereafter referred to as "Qualitest").  Upon completion of the acquisition, Endo's generics business was expected to grow by 46%.

68.    In September 2012, Par was taken private by TPG.  At that time, Defendant Campanelli was Par's Chief Operating Officer and received approximately $5.4 million for his Par stock and unvested options.  Following the going private transaction, Defendant Campanelli entered into an employment agreement with TPG that provided him with a healthy raise, elevated him to CEO of Par and provided him with a new equity-based management incentive plan.  This equity incentive plan entitled Campanelli to receive as much as 1.725% of Par's outstanding shares, subject to vesting and the achievement of certain performance goals.

69.    As a result of this incentive plan, Defendant Campanelli held 1.2% of Par's outstanding shares (9,341,403 shares in total) shortly before Endo acquired Par and would receive at least $68.77 million in connection with Endo's purchase of Par.

70.     In June 2015, to finance the Par transaction, Endo conducted a follow-on public offering of ordinary shares selling 27,672,628 ordinary shares at $83.25 per share, generating proceeds of $2.3 billion.  One month later, in July 2015, Endo issued and sold $1.64 billion in aggregate principal amount of 6.00% senior notes due July 2023 (the "2023 Notes").  The 2023 Notes were issued in a private offering for resale for qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended.

71.     On September 25, 2015, Endo completed its acquisition of Par for total consideration of $8.14 billion, including the assumption of Par debt.  The consideration included 18,069,899 ordinary shares valued at $1.33 billion and cash consideration of $6.5 billion.

72.     Throughout the Class Period, Defendants positively portrayed the Par acquisition and subsequent integration of Par. Unbeknownst to investors, however, as a result of the Par acquisition, Defendants planned to fire key Qualitest sales executives, abandon Qualitest's retail and wholesale accounts business and fire the related sales force and restructure the way Qualitest bid and priced contracts for its customers which would cause Endo to lose business.  Upon consummation of the acquisition, Defendants did just that and Qualitest's business dramatically declined.  Defendants, however, publicly represented that the "integration [was] going extremely well" and the Qualitest business was "on track."  Ultimately, as detailed herein, Endo was forced to announce significant revenue and earnings shortfalls in its Generics division due to sales issues at Qualitest.

73.     Upon consummation of the Par acquisition, Par fired two key sales/relationship managers for Qualitest: Trey Propst ("Propst") (the son of Qualitest founder) and Mike Rainey ("Rainey") (the son-in-law of Qualitest founder) both of whom had strong and long-standing relationships with Qualitest customers.  Many Qualitest customers no longer wanted to do business

with the Company when Propst and Rainery were fired.  For example, CVS and Walmart reduced

and or ceased doing business with Qualitest following the firings.

73.    Furthermore, following the Par acquisition, Qualitest had issues with their existing

customer base because some Qualitest customers had previously had bad experiences with Par and

simply did not want to deal with them.  Accordingly, following the acquisition, certain Qualitest

customers put their contracts out to bid because they did not want to do business with Par.

75.    In addition to firing two key Qualitest sales/relationship managers, upon

consummation of the Par acquisition, in the fourth quarter of 2015, Par fired all Qualitest retail

sales and small wholesaler sales persons and stopped doing business with those accounts.  Prior to

these firings, Qualitest had approximately 1,500 customers and only four of them were major

buyers (*e.g.*, Mckesson, CVS, Walmart, and Walgreens).  By eliminating Qualitest's retail

customers, Par eliminated Qualitest's ability to benefit from retail contracts – retail customers had

been targeted by Qualitest to take short-dated and over-stocked items in addition to contract items

and the margin on retail customers were greater than that of the wholesalers.

76.    Upon consummation of the Par acquisition, Par changed the way that Qualitest bid

and contracted for business.  Historically, Qualitest used what is referred to as "basket pricing"

meaning that the contract incorporates loss leaders with the goal of earning a profit on the bid as a

whole.  Furthermore, Qualitest inventory was sold to customers using a "wholesale acquisition

cost" after which the customer can apply for rebate or chargeback.  While wholesale acquisition is

more expensive upfront, the cost is evened out by rebates.

77.    Following the acquisition, Par had Qualitest change its bidding and contract

practices.  Specifically, Par eliminated the use of loss leaders and priced contracts according to the

actual manufacturing costs per item as opposed to "wholesale acquisition cost" pricing.  In

addition, Par did not offer rebates/chargebacks to the extent that Qualitest had been.  Lastly, Par had the practice of pushing slow moving drugs on customers in exchange for allowing the customer to purchase a high demand drug.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

### Q1 2015 10-Q and Earnings Conference Call

78.     On May 11, 2015, Endo issued a press release announcing its financial results for the first quarter of 2015, the period ended March 31, 2015.  For the quarter, Endo reported a net loss of $75.72 million, or $0.43 per diluted share, on revenue of $714.13 million, compared to a net loss of $436.91 million, or $3.41 per diluted share, on revenue of $470.84 million for the same period in the prior year.  For U.S. Branded Pharmaceuticals, Endo reported net revenues of $284.51 million, compared to net revenues of $234.17 million for the same period in the prior year.  De Silva commented on the announcement stating, in pertinent part, as follows:

> We continued to make progress during the first quarter toward achieving a number of our strategic priorities for the year. . . .  Our diversified business helped us deliver strong financial results for the quarter and helps us to provide the flexibility to re-invest and re-deploy capital to drive growth. . . .  We also believe that we have attractive development opportunities to support further organic growth across each of our business units.

Further, De Silva stated that the "U.S. Generic Pharmaceuticals continues strong growth in the first quarter with 68 percent revenue increase over first quarter 2014."

79.     Following the issuance of the earnings release, Endo held a conference call with analysts and investors to discuss the earnings release and its business operations.  Defendants De Silva and Upadhyay participated in the call, which other members of the executive management team joined.  In his opening remarks, De Silva represented that Endo was experiencing positive business trends stating, in pertinent part, as follows:

we continue to make good progress in addressing our near-term strategic priorities, that we believe will support our objective of becoming a leading global specialty-pharmaceutical Company.  First, we are enhancing our operational focus in order to help drive *organic growth.*

\*       \*       \*

*we remain focused on delivering strong and sustainable financial performance.* We had a solid first quarter, and are raising our guidance for full-year 2015 adjusted diluted EPS from continuing operations. First-quarter revenues were collectively in line with expectations, and we are maintaining our full-year 2015 financial guidance for revenue.   *The relative strength of revenues from our US Generics Pharmaceuticals business in the first quarter was a highlight of the value of our increasingly diversified business.*

80.    During the conference call, Defendant Upadhyay positively described the Company's operations and the integration of its recent acquisitions stating: "We believe the strength of our increasingly diversified portfolio, the efficiency of our integration of Auxilium Pharmaceuticals, and our favorable corporate structure have us well positioned to support our key organic growth drivers, and to access the capital we need to pursue value-creating M&A opportunities."  Along those lines, Upadhyay described the Company's results:

We are holding our revenue guidance and raising EPS, despite FX headwinds, and a slower than expected start to the year for STENDRA.  The continued diversification of our portfolio should enable continued growth for the Company in 2015 and beyond.  We expect full-year 2015 revenues of between $2.9 billion and $3 billion.

81.    De Silva again underscored the Company's focus on "organic growth" and "financial discipline."  De Silva stated, in pertinent part, as follows:

Second, we are investing to support current and *future organic growth*, as we have detailed in today's presentation.  Third, we are focused on deploying capital to accretive value-creating transactions, and we believe our objective to complete two to three value-creating deals in 2015 is achievable.  We continue to evaluate a robust set of small- to medium-size transactions across all of our Businesses, and we continue to be willing to opportunistically pursue larger transformative deals.  What is important to emphasize is that *financial discipline* remains the key in all of our transactions.

82.     The statements referenced above in ¶¶78-81 regarding the Company's positive results, organic growth, sustainable strategy and financial discipline were materially false and misleading when made as they failed to disclose that Endo's acquisitions had left the Company with an amalgam of unrelated and disjointed pharmaceutical businesses, which were failing to generate meaningful sales growth and were of diminishing value.

83.     In discussing the reasons for the purportedly successful quarter, Upadhyay pointed to the Company's "increased promotional investment in U.S. Branded Pharmaceuticals." Upadhyay stated as follows:

> The combination of *improved price and volume performance in generics*, and *increased promotional investments in US Branded Pharmaceuticals*, along with the additional months of Auxilium sales in the second half of 2015, gives us confidence in achieving our full-year guidance for revenues.

84.     The statement referenced above in ¶83 was materially false and misleading as it failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them, as follows:

(a)     that Endo's acquisition spree had left the Company with an amalgam of unrelated and disjointed pharmaceuticals businesses which were failing to generate meaningful growth and were of diminishing value; and

(b)     that Endo was continuing to engage in improper sales practices which heightened the risk that the Company would run afoul of the DPA and draw increased regulatory scrutiny, as detailed herein.

85.     During the conference call, Defendant De Silva was asked by an analyst from Deutsche Bank about Endo's generics strategy and did not disclose that Endo was then in negotiations to purchase Par.  The following exchange took place:

**Gregg Gilbert** – *Deutche Bank- Analyst*

. . . . And my last question is for you, Rajiv, on generic strategy, and I know you're not trying to be broad based generic company, but you do already get a large portion of your revenues from the US generics market, so my question is are you comfortable increasing your exposure to US generics as a portion of your total revenues, or do you think you're about right when you consider how diverse you would like to be?  Thanks.

*      *      *

**Rajiv De Silva** – *Endo International PLC- President & CEO*

. . . . In terms of your question on generics, as I reflect on the last two years at Endo that I've been here and certainly before that, Qualitest has been a continued sustained high performer, with mid-teens organic growth.  So in that regard, we would not be opposed to adding to our exposure to US generics.  ***I think as we said, we are unlikely to want to become a broad-based provider of generics, but we do like special niches and more protected areas like controlled substances.***  So if we have an opportunity to add assets to Qualitest, that add other niches, other high barrier to entry types of areas, we would certainly be open to it.

**May 18, 2015 Press Release and Conference Call Regarding the Par Acquisition**

86.     On May 18, 2015, Endo issued a press release announcing that it had entered into a definitive agreement under which Endo would acquire privately held Par from TPG in a transaction valued at $8.05 billion, including the assumption of Par debt.  The purchase price consisted of approximately 18 million shares ($1.55 billion of value based on the 10-day volume weighted average share price of Endo ending on May 15, 2015) of Endo equity and $6.50 billion cash consideration to Par shareholders.  Endo stated that it secured fully committed financing from Deutsche bank and Barclays to fund the cash consideration.  Commenting on the Par acquisition, De Silva stated: "[t]he combination will create a leading specialty pharmaceutical company with a generics business that is one of the industry's fastest growing and among the top five as measured by U.S. sales. It is also expected to help drive long-term double-digit revenue growth for Endo." De Silva further explained the purported benefits of this transaction as follows: "We believe the acquisition of Par underscores the continued execution of Endo's value-driven M&A strategy and

- 25 -

helps deliver on our goal of achieving double-digit revenue growth for the overall business over the long-term."

87.    Following the issuance of the press release, Endo held a conference call with analysts and investors to discuss the Par acquisition.  Defendants De Silva, Upadhyay and CEO Campanelli participated in the call, which other members of the executive management team joined.  In his opening remarks, De Silva reiterated the positive performance of the generics segment stating, in pertinent part, as follows:

> More recently in the first quarter of this year our ***Generics business delivered impressive results with sales of $357 million delivering 68% growth versus the prior year***.  These first-quarter results benefited from our strategic acquisitions of DAVA Pharmaceuticals and Boca Pharmacal, but more importantly were driven by robust underlying organic growth of 39%. ***Underlying growth was a product of both volume and price and we are confident in the double-digit growth rate we expect for this business for the full year.***

88.    During the conference call, Defendant De Silva also made positive statements about the outlook of Qualitest, stating that "Qualitest is well positioned for continued growth but we see the addition of Par's specialized high margin product portfolio and extremely attractive and productive R&D pipeline as a transformational opportunity, not only for our Generics business but for Endo overall."

89.    During the conference call, Defendant Campanelli positively portrayed Par's generics business as overwhelmingly successful.  Campanelli described the Par business stating, in pertinent part, as follows:

> Importantly, like Qualitest, ***Par has been achieving impressive growth that out paces the overall generic space***.  We achieved $1.3 billion in revenue in 2014.  That is a compound annual growth rate of approximately 12% for revenues and more than 20% for adjusted EBITDA over the last three years.

90.    During the conference call, Defendant Upadhyay stated that Endo and Par were both growing at a rate above their peers stating, in pertinent part, as follows:

On slide 23, you'll see the combined net revenues of Par and Endo for the last four full years. Recall that the overall Generic space is growing at a compounded annual growth rate in the mid single digits. *However, Endo and Par have grown at a combined compounded annual growth rate of 18% from 2011 to 2014. And in 2014, at pro forma combined revenues of nearly $2.5 billion.*

Growth across both Companies resulted from a combination of volume, new products, prudent pricing strategies and accretive acquisitions. *In addition to impressive revenue growth, both Companies have realized meaningful margin gains since 2011 as a result of greater manufacturing efficiencies, favorable mix and through the optimization of pricing across a more specialized product portfolios.*

91.     During the conference call, with respect to synergies associated with the business combination, Upadhay stated that "[o]ur anticipated operational and tax synergies are projected to be approximately $175 million and we are committed to strategically maintaining R&D investments to support future growth."

92.     During the question and answer period of the conference call, Defendant De Silva was asked about the combination of Qualitest and Par.  The following exchange took place:

**Annabel Samimy** – *Stifel Nicolaus – Analyst*

Hi. Thanks for taking my question, congratulations. Rajiv, one of the criteria you use for acquisitions is that you could possibly run a business better than the former owners. So it looks like Paul has done a pretty good job in terms of bringing this Company back into strong growth and profitability, but what more can you bring to the table in terms of driving this business forward. You mentioned the injectables?

**Rajiv De Silva** – *Endo International PLC - President and CEO*

Perfect.  So this is a transformational opportunity for us and this is less about us adding value specifically to Par and more about how Paul and his team can help transform the combined Generics business, right? So I think this is a deal where there's substantial industrial logic for it.  *And I think the combination of Par and Qualitest can do a lot more than either Company could do by itself.*  So that is the fundamental basis of the value creation that we see.

93.     De Silva further highlighted the combined company's focus on organic growth:

Importantly, this transaction firmly positions Endo for long-term double-digit organic growth and ultimately we believe this acquisition establishes a transformative M&A platform for Endo moving forward.

94.     The statements referenced above in ¶¶86-93 were materially false and misleading when made as they failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them:

(a)     that Endo's acquisition spree had left the Company with an amalgam of unrelated and disjointed pharmaceutical businesses, which were failing to generate meaningful sales growth and were of diminishing value;

(b)     that upon consummation of the Par acquisition, Endo planned to, among other actions, fire key Qualitest sales executives, abandon Qualitest's retail and wholesale accounts business and fire the related sales force and restructure the way Qualitest bid and priced contracts for its customers which would cause Endo to lose business; and

(c)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Par acquisition and the synergies to be derived therefrom.

### May 20, 2015 Conference Call

95.     On May 20, 2015, De Silva, Upadhyay and Campanelli gave a presentation on behalf of Endo at the UBS Global Healthcare Conference.  Defendant De Silva positively portrayed the Company's acquisition of Par and highlighted Endo's delevering plan stating, in pertinent part, as follows:

> Let me talk a little bit more about the specific value creation levers in this transaction.  I've already talked about the diversity of capability and products that Par brings to us. ***In terms of growth profile, double-digit revenue growth pro forma from the near to medium term as we look out over the next five-year horizon and we also expect our bottom line growth to be in excess of that topline growth in this period.***
>
> ***We expect the transaction to be substantially accretive.  We expect it to be accretive in the mid-teens in 2016.*** I know there is some uncertainty around exactly where the 2016 accretion number will fall simply because the actual close of the transaction is unknown and synergy capture will be an important part of what that ultimate accretion in 2016 would look like.  ***However, we are very confident that we would***

*have fully captured our synergies by 2017 and for 2017 we see the accretion being higher around 20% and that is on a fully synergized basis for the full year of 2017.*

\*     \*     \*

We talked about delevering.  This is how we expect the delevering profile of the transaction to work.  Roughly around five times leverage at the close of the transaction.  Delever into 4.5 times based on the use of proceeds from our sale of AMS, which we expect to close in the third quarter.  ***And then within 12 months post close, [we expect] around four times or less.***  And certainly if you can over-deliver on operational synergies and/or the performance of the business, we will get there even faster.

96.      During the presentation, De Silva reiterated the Company's prior guidance regarding

the synergies stemming from the Par acquisition, stating, in pertinent part, as follows:

We expect ***operational and tax synergies of $175 million***, but just to be clear, obviously from a EBITDA standpoint, we are only including cost synergies, operational synergies, and our calculation of EBITDA and that number is likely to be in the range of around $100 million of the $175 million. ***And ultimately, we are very confident given the growth of Par's assets that when fully synergized in 2016, the acquisition multiple will be in the range of 10 to 11 times EBITDA in 2016.***

97.      During the presentation, in response to a question by an analyst, Defendant Upadhyay

related a positive view of the synergies of the Par acquisition stating, in pertinent part, as follows:

**Suky Upadhyay** – *Endo International plc – EVP & CFO*

Sure, so as Rajiv said, we're currently estimating ***$175 million of total synergies with about $100 million in OpEx and $75 million in tax.  In the OpEx synergies, that's simply cut across SG&A as well as R&D.***  We do see there being significant opportunity across the G&A portions of the business obviously as you don't need to duplicate a lot of the back office sort of support within the selling aspect of the business.

There's going to be some opportunity there and then also within R&D, there's the opportunity to leverage a lot of what Par has already started to do from a vertical integration standpoint around API clinical development etcetera.  So we think the $100 million is a fair proportion. ***There could be some potential upside to that, but we're going to do a lot more planning over the coming months as we do the integration planning for the transaction.***

98.     When questioned by analysts, Defendant Campanelli further assured the market of the combined Company's ability to compete in the generics space. The following exchange took place:

**Marc Goodman** – *UBS – Analyst*

So, also on the generics, obviously the customers have consolidated partners whatever you want to call it supply everything's gotten much more bigger on the other side, so negotiating with them is more difficult, obviously, you know, we hear from other generics companies that they're pushing back on price quite a bit. I was curious just from Par's angle, number one, how much of that was happening with price and how much you could offset with volume and now in a much bigger company, you know, how that will change?

**Paul Campanelli** – *Par Pharmaceuticals Companies, Inc. – CEO*

Yes. So it's a great question. So I think anybody that played in the generic world all took a little bit of a hair cut last year with the consortiums and you had to build your portfolios up to kind of get pass that. *I would tell you from the Par point of view, we're pass that, right?*

*So the consortiums have kind of settled out. When I look at on a go-forward basis taking on the Qualitest division and adding mass, the two things that are important to me are mass and quality and I think that's two things that we're going to now have and better position us to – to position ourselves up against some of the consortiums*. Clearly they have buying and selling powers amongst themselves, but having strength with more product portfolios is certainly going to place us in a better position to differentiate ourselves going forward. So volume, quality, and a diversified portfolio. I think that's very important. That's going to help and drive Par's ability to have long-term growth.

99.     The statements referenced above in ¶¶95-98 were materially false and misleading for the reasons set forth in ¶94.

## June 2, 2015 Offering

100.     On June 2, 2015, Endo filed a Form S-3 registration statement and prospectus using a "shelf" registration, or continuous offering process (No. 333-204657) with the SEC.

101.     On June 3, 2015, the Company filed a Prospectus Supplement with the SEC and announced that it was offering $1.74 billion ordinary shares of Endo and would use a portion of

the net proceeds, together with the net proceeds of the debt financing, to finance the acquisition of Par, refinance certain outstanding debt and to pay related fees and expenses.

102.    On June 8, 2015, Endo priced the offering at $83.25 per share and filed its final prospectus, which formed part of the registration statement, pursuant to which Endo would sell 24,327,268 ordinary shares to the public (including the underwriters' overallotment of 3,603,603 shares).

103.    The offering was successful for the Company and the underwriters.  27,627,628 shares of Endo common stock were sold to the public at $83.25 per share, raising more than $2.3 billion in gross proceeds for Endo.

104.    The  Registration Statement, including the materials incorporated therein by reference, and the final Prospectus are collectively referred to as the "Registration Statement."

105.    The Registration Statement stated that the Company is  "committed to driving organic growth at attractive margins by improving execution, optimizing cash flow and leveraging our strong market position, while maintaining a streamlined cost structure throughout each of our businesses."  The Registration Statement further stated as follows:

- U.S. Branded Pharmaceuticals: Enhancing performance of organic growth drivers, increasing profitability from our mature brands and investing in key late-stage pipeline opportunities.

- U.S. Generic Pharmaceuticals: Capitalizing on encouraging demand trends for a differentiated portfolio of controlled substances and liquids and more effective research and development ("R&D") investment by targeting low-risk, high-return opportunities in generics.  We believe the acquisition of Par will enhance our existing generics platform, adding scale and diversity in products, capabilities and R&D infrastructure.

- International Pharmaceuticals: Investing in high growth business segments with durable revenue streams and where physicians play a significant role in choosing the course of therapy.

106.    The statements referenced above in ¶105 were materially false and misleading for the reasons set forth in ¶94.  Additionally, these statements failed to disclose that in order to artificially stimulate sales growth of certain branded products, Endo was encouraging its sales force to engage in undisclosed and improper sales practices by instructing sales people to prescribe its branded product, Sumavel DosePro, over lower cost generic alternatives and offering improper incentives to PBMs in exchange for listing Frova as a formulary.

107.    The Registration Statement described the Company's "*Targeted sales and marketing infrastructure*."  The Registration Statement stated, as follows:

Targeted sales and marketing infrastructure.  We market our branded products directly to physicians primarily in the United States through a sales force of over 600 individuals in the pharmaceutical product and device markets.  We market our products to primary care physicians and specialty physicians, including those specializing in pain management, orthopedics, neurology, rheumatology, surgery, anesthesiology, urology and pediatric endocrinology.  Our sales force also targets retail pharmacies and other healthcare professionals throughout the U.S.  We distribute our products principally through independent wholesale distributors, but we also sell directly to retailers, clinics, government agencies, doctors and retail and specialty pharmacies.  *Our marketing policy is designed to assure that products and relevant, appropriate medical information are immediately available to physicians, pharmacies, hospitals, public and private payers, and appropriate healthcare professionals throughout the U.S.  We work to gain access to healthcare authority, pharmacy benefit managers and managed care organizations' formularies (lists of recommended or approved medicines and other products), including Medicare Part D plans and reimbursement lists by demonstrating the qualities and treatment benefits of our products within their approved indications.*

108.    Defendants' statement above regarding its sales and marketing structure was materially false and misleading when made as it failed to disclose that Defendants were engaging in improper sales practices by instructing its sales force to encourage doctors to prescribe its branded product, Sumavel DosePro, over lower cost generic alternatives and offering improper incentives to PBMs in exchange for listing Frova as a formulary.

109.    Under the rules and regulations governing the preparation of the Registration Statement, the Registration Statement was required to disclose the adverse facts detailed herein. No such disclosure was made.

### Q2 2015 10-Q and Earnings Conference Call

110.    On August 10, 2015, Endo issued a press release announcing its financial results for the period ended June 30, 2015.  For the quarter, Endo reported a net loss of $250.42 million, or $1.35 per diluted share, on revenue of $735.17 million, compared to net income of $21.16 million, or $0.13 per diluted share, on revenue of $592.85 million for the same period in the prior year.  For U.S. Branded Pharmaceuticals, Endo reported net revenues of $315.91 million, compared to net revenues of $248.55 million for the same period in the prior year.

111.    Commenting on these results, Defendant De Silva stated as follows:

Our diversified business delivered strong financial results for the quarter and demonstrated the value that we expect to create through the continued execution of our strategy.

***We are close to completing the integration planning for our acquisition of Par and we remain excited by the strategic expansion of our product portfolio***, R&D pipeline and long-term growth profile that the Par assets and Par talent joining Endo are expected to help provide. Looking ahead to the second half of 2015 and beyond, ***we are focused on accelerating growth in our current U.S. Branded Pharmaceuticals portfolio and continue to expect that our strategic M&A and pipeline development efforts will yield future growth drivers.***

112.    Defendants' statements regarding ¶¶110-111 were materially false and misleading for the reasons set forth in ¶106.

113.    Following the issuance of the earnings press release, Endo held a conference call with analysts and investors to discuss its earnings release and its business operations.  Defendants De Silva and Upadhyay participated in the call.  In his opening remarks, De Silva reiterated the Company's purported focus on "organic growth" and the strength of the generics business stating as follows: "First, we are further enhancing our operational focus in order to help drive organic

- 33 -

growth.  Our US Generics business delivered strong underlying growth in the first half of 2015."

Along those lines, later in the call, De Silva remarked: "we are investing to support current and

future organic growth.  As we have detailed in today's presentation, we have attractive underlying

growth within Endo and we have a disciplined approach to supporting the current commercial

portfolio and pipeline opportunities for each business."  De Silva added that "Qualitest continues

to be an extremely attractive and effective growth driver for Endo.  The addition of Par will enable

us to achieve critical mass in our generics business unit expanding our scale and capacity and

building upon steady double-digit organic growth at Qualitest by adding a strong portfolio of

specialty high barrier to entry products with attractive gross margins."

114.    During the conference call, Defendant De Silva also made positive comments

regarding the growth that the Company would achieve as a result of the Par acquisition, stating, in

pertinent part, as follows:

> For Endo, the addition of Par will help us achieve our goal of delivering double-digit
> revenue growth for the overall business over the longer term.  We expect to deliver
> significant accretion to adjusted diluted earnings per share with a midteens
> percentage in 2016 and around 20% in 2017.  Anticipated financial synergies from
> the Par transaction of $175 million will help deliver that accretion and returns well in
> excess of our cost of capital.

115.    During the conference call, Defendant De Silva also discussed the generic pricing

market, which he characterized as "consistent," stating, in pertinent part, as follows:

> Our view on the ***pricing environment within generics remains consistent***.  We
> believe that commodity products face pressure while specialty products present
> sound strategic pricing opportunities depending on market conditions.  Given the
> focus of our (inaudible) business in specialty products including controlled
> substances we believe it can continue to outperform the broader market and the
> acquisition of Par will further increase the focus of our generics portfolio on
> specialty products.

116.    In response to a question by an analyst from RBC Capital markets, De Silva

commented positively regarding the Par integration, stating, in pertinent part, as follows:

- 34 -

***But what I would say is that we remain very confident in the aspirational guidance
that we put out for 2016 and 2017.*** As we have done more integration planning with
Par, we continue to be very impressed with the business. ***We are confident about
our synergy numbers that we put out there which is roughly $175 million of
financial synergies of which is about $100 million are operational. Plus we have
now become more confident that there is further upside to that number through
supply chain and cost of goods reductions which were not included in that number
as well.*** So net net all of that points us in the direction of being very confident about
the midteens accretion for 2016 and roughly 20% accretion in 2017 and the rest of
our business is progressing as expected.

117.    The statements referenced above in ¶¶113-116 were materially false and misleading

for the same reasons as set forth in ¶94.

### September 28, 2015 Conference Call Regarding the Par Acquisition

118.    On September 28, 2015, the Company held a conference call with analysts and

investors to discuss its acquisition of Par.   Defendants De Silva, Upadhyay and Campanelli

participated in the call.

119.    During the conference call, Defendant De Silva positively described the Par

acquisition stating, in pertinent part, as follows:

Moving to slide 3; first, we have emphasized the addition of Par ***strategically
expands our product portfolio, R&D pipeline capabilities and long-term growth
drivers.*** We see great value in Par's extensive range of dosage forms and delivery
systems and their focus on specialized, market leading products.

Second, ***we expect Par to immediately accelerate Endo's growth.*** Their addition
today will help us achieve double-digit revenue growth in the mid-term and be
accretive to adjusted diluted earnings per share. We expect to deliver $175 million
of financial synergies and to increase adjusted gross margins in our U.S. generics
business based on Par's high-value portfolio. Looking forward, we also expect Par's
strong R&D pipeline to fuel long-term organic growth.

Third, ***our new combined company has a strategically expanded corporate profile,
scope and size that provide a powerful platform for future M&A. Strong cash flow
is expected to lead to rapid de-levering with an objective of achieving a net debt-to-
EBITDA ratio of three times to four times in mid-2016.***

And fourth, we believe the addition of Par is aligned with Endo's strategy of
pursuing ***accretive value-creating growth opportunities*** and together, that we can
create shareholder value and drive benefits for patients and customers.

- 35 -

Moving to slide 4, the combination of Endo and Par is transformational for our Company and enhances scale in a number of measures. Enterprise pro forma revenues for 2014 were in excess of $4 billion and pro forma EBITDA for 2014 was more than $1.6 billion. We now have approximately 6,300 employees globally and our long-term value creation is expected to be fueled by operational synergies, double-digit revenue growth, and a transformative M&A platform.

Moving to slide 5, the combination of Qualitest and Par is transformational for our generics business as well. ***Together, they become a leader in specialty generics with greater scale. Pro forma revenues for generics in 2014 were approximately $2.4 billion and US generics now has approximately 3,500 employees, primarily focused on R&D, as well as on global manufacturing and supply chain operations.***

Combined, our new generics R&D pipeline includes approximately 300 programs, approximately two-thirds of which are in alternative dosage forms and more than 100 are expected to be Paragraph IV filings, including some with first-to-file or first-to-market opportunities. Reloading the pipeline is a focus as well and we expect our US generics business to file 20 to 30 new ANDAs per year.

120.    Furthermore, during the conference call, Defendant De Silva reiterated the

purported strategic strength of business combination, stating, in pertinent part, as follows:

. . . . as we have stated before, we believe the addition of Par will provide attractive accretion in 2016 and in 2017 relative to undisturbed consensus expectations prior to announcement of the acquisition in May. We stand by those prior statements, and today, we formalized them by providing initial financial guidance for 2016. In our view, we expect adjusted diluted earnings per share to be in the range of $5.85 to $6.15 for the full year of 2016. This growth is possible due to several key factors.

First, ***we expect double-digit underlying revenue growth for the total enterprise. Second, we are projecting strong and rapid synergy capture from the Par acquisition. And third, we continue to progress and execute on our tax strategy***.

***Endo is positioned for growth***. We have the resources to continue investing to support commercial opportunities that are key to our current and future growth and to advance our promising late-stage pipeline opportunities. ***This includes BELBUCA, where we are making good progress in our dialog with the FDA***. The PDUFA date for this product is October 23, leading to an anticipated launch in early 2016, assuming approval. We also expect our robust cash flow generation to facilitate rapid delevering and to enable continued execution of strategic M&A in 2016 and beyond.

121.    In his scripted remarks, with respect to the Par transaction and the Company's

financial guidance, Defendant Upadhyay stated as follows:

*Regarding Par, as I noted, financial results for Par were in line to slightly ahead of our expectations and we expect that trend to continue for the remainder of the year*. We'll provide more color on our overall third quarter revenue performance on our earnings call in early November.

Turning to our combined full year 2015 guidance, we now expect revenues to be between $3.22 billion and $3.27 billion. On an adjusted basis, we expect our full year 2015 gross margin, as a percentage of revenues, to be approximately 64%. This is slightly better than our original expectation and it's driven by improved margins in the combined generics business, as a result of a prioritization and optimization exercise with the objective of improving mix and margins.

122.    Campanelli further stated that there was positive generic growth in the business,

explaining as follows:

**Paul Campanelli –** *Par Pharmaceutical Companies, Inc. – CEO*

I think, Greg, a little bit more in terms of elaborate it and I think the way we're looking at, *when we see both the Qualitest and Par pipeline, we feel good and we feel that everything is right on track and as we're predicting, the approvals are anticipated and we have a good relationship with the FDA.* So overall, we're executing on the strategy and I feel as though that we will be launching products as we're predicting.

123.    In closing the conference call, Defendant De Silva summarized the purportedly

positive attributes of the Par acquisition, stating, in pertinent part, as follows:

Just in closing, let me just make a couple of comments just to summarize our conversation this morning. *We are very excited about moving forward and having Paul and his team as part of Endo. We are truly excited as we look forward into 2016 and beyond about the impact that Par is going to have on our business profile in terms of growth, margin expansion and the leadership position that we have in specialized generics.*

But as we've said, even more importantly for us, the Par transactions puts us at a point of scaled cash generation and organic growth that really allows us to expand our horizons and our aspirations. *Going forward, we will have a business that is growing double-digit organically, expanding margins and with an attractive tax rate and underlying tax strategies have an expanding cash conversion rate which makes our platform even more attractive and viable in terms of future M&A and we are looking forward to this next phase of the Company's growth at a much larger scale and cash generation capabilities so that we can continue to play out our M&A strategies alongside the many organic growth opportunities that we have, including the BELBUCA launch as well as XIAFLEX pipeline.*

- 37 -

124.    The statements referenced above in ¶¶118-123 regarding the Company's organic growth, the strength of both the Par and Qualitest portfolios, the Company's ability to de-lever its balance sheet and the synergies to be derived from the acquisition with Par were materially false and misleading for the reasons set forth in ¶94.

**Q3 2015 10-Q and November 5, 2015 Earnings Conference Call**

125.    On November 5, 2015, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2015.  For the quarter, Endo reported a net loss of $1.05 billion, or $5.02 per diluted share, on revenue of $745.73 million, compared to a net loss of $252.08 million, or $1.59 per diluted share, on revenue of $654.12 million for the same period in the prior year.  For U.S. Branded Pharmaceuticals, Endo reported net revenues of $304.78 million, compared to net revenues of $240.93 million for the same period in the prior year.  In commenting on these results, Defendant De Silva stated, in pertinent part, as follows:

> *Our diversified business delivered solid financial results this quarter and was further strengthened by our completed acquisition of Par Pharmaceutical Holdings, Inc.  As we continue to execute on our strategy of organic growth, de-risked pipeline development and creating shareholder value through accretive, strategic M&A, we believe Endo is positioned for overall double-digit revenue expansion over the mid- to long-term*. . . .

> Fundamentally, our business is more diversified and well positioned financially and strategically.  Following the recent FDA approval of BELBUCA™, we are conducting a strategic portfolio optimization process to expand our pain sales force and reallocate resources across key growth products in our U.S. Branded Pharmaceuticals business.  Moving forward, we remain focused on execution and value creation activities: the integration of Par, driving growth for our priority branded products, growing our international presence and strategic M&A.

126.    Following the issuance of the earnings release, Endo held a conference call with analysts and investors to discuss its earnings and business operations.  Defendants De Silva, Upadhyay and Campanelli participated.

127.   During the conference call, Defendant De Silva highlighted the Company's "sustainable growth" saying, in pertinent part, as follows:

> **First, we have optimized and refocused the Endo business for sustainable growth.** Our efforts have enabled us to successfully right-size our cost base and upgrade our management talent.  We have divested the non-core assets of HealthTronics and AMS Men's Health to sharpen the strategic focus on pharmaceuticals and our base business.  We completed bolt-on acquisitions like Boca, DAVA, and SUMAVEL DosePro that added near-term critical mass at key points in our corporate evolution. Finally, we expanded the R&D pipeline with the addition of AVEED, creating a new branded growth opportunity.

128.   Defendant De Silva also noted what he characterized as the "extremely attractive" generics market saying that "it is important to note that our **U.S. Generics business continues to be an extremely attractive and effective growth driver for Endo.**"  Further, De Silva stated that "with the acquisition of Par completed in the third quarter, we believe that we have created significant value and have achieved critical mass in our U.S. Generics business unit."

129.   Additionally, during the conference call, Defendant Upadhyay positively portrayed the performance of Qualitest, saying "[j]ust to reiterate on the generics piece, sequentially even excluding Par, the Qualitest business did grow from Q2 into Q3, and that's even with the backdrop of a steeper price decline in Lido AG than we originally anticipated, so the business fundamentally is still performing quite well."

130.   Defendant De Silva closed his remarks by positively characterizing the Company's growth and the success of the Par acquisition, as follows:

> **we are strongly positioned for growth in 2016** and today we reiterate our 2016 financial guidance of an estimated adjusted diluted earnings per share from continuing operations in the range of $5.85 to $6.15.  **We remain confident in our ability to deliver double-digit revenue growth, strong and rapid synergy capture, continued progression and execution of our tax strategy, and robust cash flows and rapid de-levering that enables continued execution of our M&A strategy.**

131.   The statements referenced above in ¶¶125-130 regarding the Company's organic growth, the strength of both the Par and Qualitest portfolios and the synergies to be derived from

- 39 -

the acquisition with Par were materially false and misleading when made as they failed to disclose

the following adverse facts which were known to Defendants or recklessly disregarded by them:

(a)    that Endo's acquisition spree had left the Company with an amalgam of

unrelated and disjointed pharmaceutical businesses, which were failing to generate meaningful sales

growth and were of diminishing value;

(b)    that upon consummation of the Par acquisition, Endo planned to, among other

actions, fire key Qualitest sales executives, abandon Qualitest's retail and wholesale accounts

business and fire the related sales force and restructure the way Qualitest bid and priced contracts for

its customers which would cause Endo to lose business; and

(c)    as a result of the foregoing, Defendants lacked a reasonable basis for their

positive statements about the Par acquisition and the synergies to be derived therefrom.

### December 2, 2015 Presentation

132.    On December 2, 2015, De Silva and Upadhyay made a presentation at the Piper

Jaffray Healthcare Conference on behalf of Endo.  During this call, De Silva represented that the

integration with Par was successful and "going extremely well," stating, in pertinent part, as

follows:

**Rajiv De Silva** – *Endo International plc – President, CEO, and Director*

Sure, thanks, David.  I think Par, for us, for multiple reasons, was a transformational
acquisition.  We are glad we got it completed at the time we did.  And it is one that it
is obviously transformational for our generics business.  But just the sheer scale and
growth potential of Par creates a true transformation for the Company overall, in
terms of growth potential and diversification, as well as margin profile as well.

And I would say this is one of those transactions, probably one of the few
transactions where you actually feel much better after the close, and you actually got
a closer look.  ***Because, oftentimes, you go through due diligence; you do a
transaction; and then things come up once you actually have it on your budget.
And in this case, I think we're even more positive, post- the transaction.***

I think one of the key aspects of why it is going so well is that we were able to retain Paul Campanelli to run the business. *And as importantly, Paul, in turn, was able to convince pretty much his entire team to stay with him. So, we have kept intact the core parts of Par success:* put it through the R&D group, the Paragraph IV capability, as well as obviously its commercial [prep now fronted].

*So, the integration is going extremely well*. For us, I think what really intrigued us about Par was its pipeline. And I think that's what differentiates Par, and now Endo, in terms of our generics business versus other generics businesses, which is that we have a product pipeline of roughly about 300 programs of which the vast majority are in differentiated categories.

We have a substantial number of Paragraph IV opportunities for us to file, for us to market. *So in many ways, as we look forward into the next several years, we think we're really well positioned from the standpoint of a generics business*.

133.   During the presentation, Defendant Upadhyay represented that Endo was realizing

its expected synergies from the merger, stating, in pertinent part, as follows:

Yes, sure, happy to do it. *So, first of all, the integration is going quite well; if anything, probably a little bit ahead of schedule. And when we announced the deal, we first talked about $175 million in financial synergies, broadly broken up about $100 million in OpEx synergies and $75 million in tax synergies*.

*On the OpEx synergies, we are right on track to deliver that full synergy run rate within the 12 months as we talked about at the deal, maybe even slightly faster than that. The tax synergies are playing through quite nicely. In fact, if anything, we are seeing positive momentum coming into the back end of 2015*. And it is lining us up really well to maintain a mid-teen tax rate, despite Par being a full US taxpayer, and that EBITDA base coming into us. So, we also think that there is opportunity improve that tax rate over time.

*And then the last piece that we haven't explicitly guided on, which is the OpEx and supply -- excuse me, manufacturing and supply chain synergies -- we do think that there is a sizable opportunity there after a couple months of integration, and working with Paul's team and the Qualitest team. And, the way we would think about that is somewhere about 100 to 300 basis points over the 2017 to 2018 and 2019 time frame*.

Those are a little bit longer in duration. And a little bit more work needs to be done to crystallize those, because there are other consequences of those, and enablers of that such as ERP systems, plant rationalization and footprint, supply chain, warehousing, things like that.

But where we stand today, we do believe that that's a very real opportunity, and we will crystallize that over time.

134.    The statements referenced above in ¶¶132-133 were materially false and misleading as they failed to disclose the following adverse facts which were known to defendants or recklessly disregarded by them.

(a)    that Endo's acquisition spree had left the Company with an amalgam of unrelated and disjointed pharmaceutical businesses, which were failing to generate meaningful sales growth and were of diminishing value;

(b)    that upon consummation of the Par acquisition, Endo had, among other actions, fired key Qualitest sales executives, abandoned Qualitest's retail and wholesale accounts business and fired the related sales force and restructured the way Qualitest bid and priced contracts for its customers which was causing Endo to lose business; and

(c)    as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Par acquisition and the synergies to be derived therefrom.

135.    Further, Upadhyay's statement that the Company was "even more positive, post-the transaction" and that the success of the integration was due to the Company's ability to retain Paul Campanelli and his team was misleading absent a disclosure regarding the impact of replacing the Qualitest team with the Par team as detailed herein.

### January 5, 2016 Conference Call

136.    On January 5, 2016, Defendant De Silva made a presentation at the Goldman Sachs Healthcare conference on behalf of Endo.   During this presentation, Defendant De Silva highlighted the Company's purported transformation under his leadership, stating, in pertinent part, as follows:

**Rajiv De Silva** – *Endo International plc- President, CEO, and Director*

Sure.  And first of all, Jami, thanks for having us here today. But as you've said, the company has changed dramatically since I took over in 2013.  And really, my mandate coming in was to reorient the company away from its prior strategy, which,

as you pointed out, was an integrated healthcare solutions concept to focus on urology with a device business, a pharmaceutical business, a generic and a service business.

And we reconstituted the strategy to reorient the company back towards a pharmaceutical footprint, and everything we have done essentially has been focused on that theme. And our aspiration is very simple, which is that we are setting out to build what we believe would be a leader in specialty pharmaceuticals.

*   *   *

So, as I look at 2015 and look at where our starting point was in 2012, we're very proud of what we achieved over the course of those, I don't know, two years, two-and-a-half years, and *really feel that we are entering 2016 with a fundamentally different and fundamentally stronger company than it ever has been.*

137.    Further, during the presentation, Defendant De Silva represented that the

Company's product pipeline was promising and that its integration of Par was "going very well."

Defendant De Silva stated, in pertinent part, as follows:

**Rajiv De Silva** – *Endo International plc - President, CEO, and Director*

Sure. So, the -- frankly, it comes back to the priorities that I mentioned, which is Par, XIAFLEX and BELBUCA. Right? The -- I mean, those are going to be the major contributors to that double-digit organic growth. *And what I would say is on Par, the integration is going very well. I'm very impressed with the team that Paul has kept around him. And early signs are very positive. Right?*

138.    During the presentation, Defendant De Silva represented that Qualitest would

experience an increase in sales volume in 2016, stating, in pertinent part, as follows:

**Jami Rubin** – *Goldman Sachs – Analyst*

Given the focus on pricing, can you take us through what has historically been the contribution of price to Endo's growth and how you think about that going forward?

**Rajiv De Silva** – *Endo International plc- President, CEO, and Director*

. . . . In our Generics business, Qualitest, historically, we've had about 15% organic growth of which about a third came from price.  But that, we always signal, was going to shift as it went into the future.  *So if you look at 2015, all the growth in Qualitest is going to come from volume and by and large it's because the positive price that we had is offset by some of the price penalties that we had to pay on some of the new price increase we took.  So net-net, if you look at 2015 year-to-date, the substantial majority of our growth is volume, not price.*

- 43 -

139.    During the presentation, Defendant De Silva further underscored the strategic nature of the Par acquisition and represented that Par was the "perfect complement to the Company" stating, in pertinent part, as follows:

**Jami Rubin** – *Goldman Sachs – Analyst*

The Par deal has transformed the Company into a major generics play. Is that your intention? Or is it your goal to be -- do you want to be a more diversified -- would you rather have a more diversified portfolio of businesses?

**Rajiv De Silva** – *Endo International plc – President, CEO, and Director*

That's a good question.  And I go back to where I began this commentary on what our aspiration was and is, which is to build a global specialty pharmaceutical leader with a footprint in all these three areas, right? -- which is generics, branded, as well as international. But clearly as a part of leadership, you need to have sufficient critical mass in each of these things. And we knew as we progressed that we would be -- it's very difficult to make a single move that's going to move you forward in each of these segments.  Right?  So you are looking at making moves that move one segment forward at a time.

***The Par transaction was a -- by far the best transaction for Qualitest in terms of getting to a critical mass and getting to leadership in the generics business. Right? It is a perfect complement in terms of capabilities, portfolio, et cetera. But clearly, temporarily, it puts us in a situation where we are weighted in terms of our revenues towards generics.  But that's not the intention.***

***Our intention is to continue to, as we kind of come out of 2016, as we do other transactions, to really build the other two segments, and really look for more branded and/or long-lived assets as we build out the rest of the portfolio.***

140.    When De Silva was directly asked about the integration of Par and how it would impact the Company's legacy business, Qualitest, Defendant De Silva described the integration as a "perfectly complementary transaction," stating, in pertinent part, as follows:

**Rajiv De Silva** – *Endo International plc - President, CEO, and Director*

So I think, as we've signaled in the past, the Qualitest business, even if we had not done Par, would have moved into a situation where it's mostly driven by volume, not price. Right? So I would kind of think about Qualitest as a high single-digit grower.

***But I think it is going to do very well under Par. Right?  Because you now have a much broader offering to customers.  Our controlled substance business is still one of the best in the industry.  We have a very strong liquids business,  which are all***

*complementary to what Par has. Right? So there is no reason to believe that it will slow down.*

*Now clearly, as you put the two businesses together, there will be portfolio optimization and we may choose to de-prioritize certain products as we negotiate with customers. But net-net, it is a perfectly complementary transaction.*

141.    Defendant De Silva also pointed out the contributions that Endo's generics business was expected to make toward the Company's organic growth and represented that the generics business was strong, stating, in pertinent part, as follows:

**Jami Rubin** – *Goldman Sachs* – *Analyst*

So I'm just curious to know where you stand on [Endo's generics] business, and do you see it as an important driver of sustainable growth going forward?

**Rajiv De Silva** – *Endo International plc* – *President, CEO, and Director*

From our perspective, it is a *very important contributor in double-digit organic growth*, right, because, it just – the commentary that we made. . . .

**Jami Rubin** – *Goldman Sachs* – *Analyst*

Double digit – or you expect that to be a double-digit organic grower?

**Rajiv De Silva** – *Endo International plc* – *President, CEO, and Director*

Exactly, right? *And it's large enough that it actually supports the rest of the company getting there as well. And that's primarily on the back of the Par pipeline.* Especially as the volume of approval to the FDA speeds up, it actually helps people with better pipelines, right? So, Par has a pipeline in excess of 300 projects. A good chunk of it are first-to-file potential products.

And as we look at the pipeline progress to 2016 through 2019, there's a multitude of opportunities, many of which can't be possibly disclosed at this point, which we think will contribute and drive growth, plus some of the more longer-term 505(b)(2) type opportunities that we have in the JHP injectables portfolio.

142.    Finally, Defendant De Silva underscored Qualitest's ability to contribute "high-single-digit" growth to Endo's generics segment and represented that it was "doing very well under Par" stating, in pertinent part, as follows:

- 45 -

**Jami Rubin** – *Goldman Sachs – Analyst*

Can you talk about your expectations for the Qualitest business? Would you expect that business now to slow down while Par picks up? Or how much of the growth from that business will be price versus volume?

**Rajiv De Silva** – *Endo International plc – President, CEO, and Director*

So, I think as we've signaled in the past, Qualitest is – the Qualitest business, even if we have not done Par, would have moved into a situation where it's mostly driven by volume, not price. Right? ***So, I would kind of think about Qualitest as a high-single-digit grower. But I think it is going to do very well under Par, right, because you now have a much broader offering to customers***. Our controlled substance business is still one of the best in the industry. We are very strong liquids business, which are all complementary to what Par have, right? So, there's no reason to believe that it will slow down. Now clearly, as you put two businesses together, there will be portfolio optimization that we may choose to depart certain products as we negotiate with customers. But net-net, it's a perfectly complementary transaction.

143.    The statements referenced above in ¶¶136-142 were materially false and misleading for the reasons set forth in ¶134.

### January 12, 2016 Presentation

144.    On January 12, 2016, Defendant De Silva made a presentation at the J.P. Morgan Health Care Conference on behalf of Endo. During the presentation, Defendant De Silva positively described the integration of Par, stating, in pertinent part, as follows:

In our US generics business, we completed the Par transaction which in one step allowed us to reposition Qualitest, our legacy generics business, as industry leader. ***We are -- we will be the number four generics player once the Teva, Actavis combination is completed***. And more importantly, with Par, we have now access to one of the industry's broadest and best pipelines with a substantial proportion of Paragraph IV filings first-to-file opportunities and well differentiated filings.

\*        \*        \*

***Thirdly, the integration of Par. It is a very large part of our business and I'm very pleased that Paul Campanelli and his team has already made great progress in the integration of the business, both in terms the capture synergies, solidifying the pipeline to ensure that all the launches that we anticipate in 2016 and beyond are still very much on track***.

\*        \*        \*

> *In our generics business, very strong underlying volume growth. We completed the Par transaction. As I mentioned, we are making very good progress on achieving our cost synergies*. We talked about $175 million of financial synergies, $100 million operations and $75 million tax. *We are well on the way to achieving those*.

145.    During the presentation, Defendant De Silva represented that Endo's generics business was experiencing "very strong underlying volume growth," stating, in pertinent part, as follows:

> *In our Generics business, very strong underlying volume growth*. We completed the Par transaction. As I mentioned, we are making very good progress on achieving our cost synergies. We talked about $175 million of financial synergies, $100 million operations and $75 million tax. We are well underway to achieving those.
>
> *And 2016 is a year that we expect to grow our combined Generics business double digit, and that is on the basis of pure volume and mix*. And most of that coming through – they had certain launches that Par expects to deliver towards the back end of the year. So the majority of growth, this double-digit growth will come from volume and mix.

146.    The statements referenced above in ¶¶144-145 were materially false and misleading for the reasons set forth in ¶134.

**The 2015 10-K and the February 29, 2016 Earnings Conference Call**

147.    On February 29, 2016, Endo issued a press release announcing its results for the Company's fourth quarter 2015 financial results and full year 2015 financial results. For the quarter, Endo reported a net loss of $118.46 million, or $0.53 per diluted share, on revenue of $1.07 billion, compared to a net loss of $53.48 million, or $0.34 per diluted share, on revenue of $662.88 million for the same period in the prior year. For 2015, Endo reported a net loss of $1.50 billion, or $7.59 per diluted share, on revenue of $3.27 billion, compared to a net loss of $721.32 million, or $4.60 per diluted share, on revenue of $2.38 billion for 2014. For U.S. Branded Pharmaceuticals, Endo reported net revenues of $379.41 million for the quarter, compared to net revenues of $245.79 million for the same period in the prior year, and net revenues of $1.28 billion for 2015, compared to net revenues of $969.44 million for 2014.

- 47 -

148.    In the press release, Endo provided revenue guidance, estimating total revenues between $4.32 billion and $4.52 billion for the year ended December 31, 2016.  Commenting on these results, De Silva was quoted in the press release as stating "Endo delivered solid financial results this quarter and was further strengthened by our first full quarter of revenues from the acquisition of Par Pharmaceutical Holdings, Inc.  As we enter 2016, we believe our business is diversified and positioned for double-digit underlying growth over the mid- to long-term."

149.    Following the issuance of the February 29, 2016 press release, the Company held a conference call with analysts and investors to discuss its financial and operating results for the quarter and year ended December 31, 2015.  De Silva, Upadhyay and Campanelli participated in the call, which other members of the executive management team joined.  In his opening remarks, Defendant De Silva discussed the challenges that the Company faced but continued to represent that Endo was poised for strong future growth.  Specifically, he stated:

> We generated strong underlying cash flow from operations in line with expectations. In short, we have established a platform that, even if we pursue no additional M&A, positions us for future double-digit underlying growth and expanding margins. 2015 was indeed an important and transformative year in Endo's evolution.
>
> *            *            *
>
> ***I would like to emphasize that 2015 was another year of transformation for Endo and one that positions us for future growth and profitability***.  Specifically, it was a year where we further diversified and expanded our revenue base.  We delivered solid underlying growth in a challenging market. We expanded margins, improved our underlying after-tax cash flow conversion. ***We've built a strong branded and generics product pipeline***.  We improved our operating model and execution and made continued progress on narrowing the tail of the company's mesh-related product liability.

150.    In addition, Upadhyay described the Company's results in a positive light stating:

> we believe the 2016 financial profile will be a continuation of 2015, which was marked by solid underlying revenue growth, margin expansion, an attractive tax rate and strong underlying cash flow conversion.
>
> *            *            *

- 48 -

So on slide 30, you will see the highlights of our full-year 2016 financial guidance are as follows. We expect total net revenues to be in the range of $4.32 billion to $4.52 billion. We project adjusted gross margins of 63% to 65% this year, which is in line with 2015 despite a higher mix of Generics revenue in 2016. This is primarily driven by the continued growth of XIAFLEX, the launch of BELBUCA and our continued shift towards high-value products in our Generics business. ***Each of our segments is expected to maintain or improve their gross margin profile in 2016 versus 2015***.

151.    De Silva reiterated that the Company was expecting strong growth in 2016 and that

it would de-lever its balance sheet within the year. De Silva stated as follows:

Third, Endo is achieving sustainable growth. As Suky mentioned, ***we expect to de-lever back down to the 3 to 4 times net debt to adjusted EBITDA range this year***, and, in our continuing efforts to diversify our revenue base, we expect to drive underlying growth in our Emerging Markets with our re-based Somar and Litha businesses.

*       *       *

Our focus is on value creation, which we plan to drive through our priorities, including a strong commercial launch of BELBUCA, continued growth for XIAFLEX and continued growth for the Par portfolio. We utilize a differentiated operating model that is based on a diversified product portfolio and a strong derisked R&D pipeline across our businesses. ***And, finally, we are achieving sustainable growth with a projected double-digit underlying growth rate, increasing operating margins, strong cash flow conversion and the ability to delever rapidly***. 2015 was a year of transformation and continued evolution for Endo. We see 2016 as a year of execution, of delivering on the promise and potential of our business and of creating significant value for our shareholders. We look forward to achieving these goals and to your continued support.

152.    De Silva also positively portrayed the performance of the generics segment:

. . . Moving to slide 22. Our focus on value creation also includes our US Generics business. This 2015 and 2016 break out of our pro forma generics revenue illustrates key segments of our Par business as well as how those segments are growing. Most importantly, the segments that are growing substantially are also those that represent our highest value products.

*       *       *

Moving to slide 23. You will see that the effect of our collective efforts and our acquisition of Par in 2015 are not only increasing the size of our portfolio and Generics pipeline but also growing revenue and improving our gross margins. We expect to meaningfully continue this expansion into 2016 and beyond.

- 49 -

153.    When asked about the underlying growth for the Company's generics segment, the following exchange took place:

**Annabel Samimy** – *Stifel Nicolaus – Analyst*

Is there some underlying growth that we can assume for the Generics business at this point?

**Rajiv De Silva** – *Endo International PLC – President & CEO*

So yes, we've talked about mid to high teens for the Generics business for 2016.

154.    While continuing to stress the growth of the generics segment, De Silva acknowledged "volume loss and pricing pressure" which he attributed to "increased competition in multi-player categories." De Silva explained as follows:

Next, let's talk about our U.S. Generics business on slide eight. Overall, we were able to drive an underlying growth rate in the double digits for the full year despite increasing pricing pressures across the sector. *We are very pleased with the strong contribution provided by the legacy Par business in the fourth quarter, which exceeded our internal expectations.*

*The legacy Qualitest business, while diversified and historically insulated from the challenging pricing environment, did experience some volume loss and pricing pressure in the fourth quarter due to increased competition in multi-player categories. While we have seen volume declines in some areas of this business, it is important to note that 80% of Qualitest's extended unit loss in the full year 2015 versus prior year was driven by only a handful of products that correspond to approximately 20% of Qualitest reported net sales in 2014.*

155.    During the question-answer period that followed De Silva's prepared remarks, Upadhyay discussed the pricing pressure trends in the market. Upadhyay stated as follows:

Having said that all of that is baked into our forward-looking estimates for 2016, and as Rajiv noted earlier in scripted remarks, *we still see very strong generics growth in the mid teens to high teens*, primarily driven by our injectables business, continued growth across the base, as well as our launches on base certain products. I don't know if Paul you want to add anything on the price erosion, please?

156.   With respect to the Par business, Upadhyay explained the Company's results and informed the markets of "higher than expected" costs surrounding the Par integration.  Upadhyay stated as follows:

**Suky Upadhyay** – *Endo International PLC – CFO*

Yes.   The one thing I'd say is that $359 million was a little better than our expectation, primarily driven by the injectables business.  We're also seeing good solid performance in the base business as Paul talked about a little bit earlier.  That should carryover into 2016, as well.  I will also say as we move forward into 2016, Paul was looking at this portfolio as one portfolio. So we will not break out Par versus legacy Qualitest sales.  We treat this as one business and that's how we'll report on it.

The change in the fourth quarter were about $30 million that we consider to be one-time and non-recurring. It's really three factors that make this up. Well there's a number of factors, three of which are examples are around trade disputes in the fourth quarter. We have some changes and estimates around gross to nets.

***And third, we had some charges higher than expected around the harmonization of our  methodologies around gross to nets as we integrated Par and Qualitest.*** Again, we do not expect those to re-occur on a quarterly basis going forward.

157.   Notwithstanding the negative news pertaining to the pricing pressures, the difficulties integrating Par and the volume loss in the Qualitest business, Upadhyay again told the market that the Company was set to de-lever following the Company's numerous acquisitions in the preceding years, stating that "[w]ith these post-tax cash call projections and our robust underlying cash generation, we have the confidence that we can continue to delever into the three to four times range in the second half of 2016 and expect further delevering into 2017."

158.   An analyst with RBC Capital Markets, inquired about the Company's growth and pricing strategy.  The following exchange took place:

**Randall S. Stanicky –** *RBC Capital Markets – Analyst*

Great.  Thanks, guys. Rajiv, or maybe this is better for Paul, can you just expand on some of the pricing headwinds that you're seeing and factoring in?  Most of your larger peers are talking about a similar erosion level this year to last year despite what is an expectation of greater approvals.  And so can you help us understand the

Qualitest impact from 4Q, if that's likely to continue? And then what type of erosion are you expecting in the business for this year?

*     *     *

**Suky Upadhyay –** *Endo International PLC – CFO*

Good morning, Randall. So the first thing I would say is into the fourth quarter when we gave preliminary results around 2015, that did imply some softness in 2015 fourth quarter around generics. *We did start to see the early signs of some volume erosion in our more commoditized parts of our business*. And then as we closed out our final processes for the year, we did recognize a higher level of charge-backs and rebates coming through, specifically around our more commoditized portfolio as well as our pain franchise.

That in tandem with some one-time charges that occurred in the fourth quarter led to a lower than expected fourth quarter. *I should say that those one-time charges we do not expect to continue in forward-looking quarterly results, but there is some underlying pressure around pricing that will extend into 2016.*

*Having said that, all of that is baked into our forward-looking estimates for 2016. And as Rajiv noted earlier in the scripted remarks, we still see very strong generics growth in the mid-teens to high-teens, primarily driven by our injectables business, continuing growth across the base, as well as our launches on date-certain products.*

**Paul Campanelli –** *Endo International PLC – President, Par Pharmaceuticals*

Thanks, [Upadhyay]. I think that's right. I think [Upadhyay] really hit the nail on the head. When you look at the consortiums, et cetera, really the full impact of the consortiums really resulted back in Q2 of last year when you saw Red Oak and OneStop in full operation. *I think on a go-forward basis, to [Upadhyay's] point, we are prepared for it. It's part of our 2016 forecast.*

     159.    In response to a question by an analyst of Guggenheim about gross margin expansion and operating leverage in 2016, Upadhyay provided the following response:

*Yes, so actually a little bit better than expected from the closing of Par. Our initial expectations going into 2016 was with the higher mix of generics products versus branded*. We might see some dilution into our gross margin. As we actually work through our plan and our portfolio prioritization we're actually moving to a higher mix of higher value products which is ultimately expanding our margins.

So as Paul talked about, or as Rajiv talked about in scripted remarks, the growth of the injectable franchise is one that is characterized with a gross margin profile well above the overall Company average. *As we think about the launches of some of our dates, certain products, those are also products that have gross margin profiles well*

*ahead of the overall gross margin average. But then when you add in continued growth of XIAFLEX, as well as BELBUCA, both of which have gross margin profiles above the Company average, you start to form a picture of where we're going to see this gross margin expansion into 2016 and one that we're very pleased and confident in*.   And then from about operating margin perspective, as I said we are going to spend more against advertising and promoting, promotion against XIAFLEX and BELBUCA.

160.     Defendants were evasive when analysts asked about the outlook for Qualitest.

During the questions period, the following exchange took place:

**David Risinger** – *Morgan Stanley – Analyst*

Thanks very much.  So I have two questions.

First, with respect to the Qualitest outlook, just so that we understand how to model it, should we be thinking about a 20% decline in 2016 similar to, or in the ballpark of, what was of what the number was in the fourth quarter of 2015?

*             *             *

**Rajiv De Silva** – *Endo International PLC – President & CEO*

Sure, David, let me address your first question, which is, first of all, keep in mind that as Suky pointed out, there was some non-recurring impacts in the fourth quarter that impacted Qualitest, which should not see any roll forward impact. And secondly, I think back to the comment that Suky made, we are not providing guidance for Qualitest distinct from Par, simply because at this point Paul has a combined portfolio, he is negotiating customer contracts across a combined portfolio. He will make some portfolio optimization decision as he goes into the year in terms of what products he prioritizes with customers, and that means that Par products, it means [Qualitest] products. *So as a result we don't expect to provide any guidance for the legacy Qualitest portfolio going forward, other than what we already commented on, which is that for the combined business we expect to see mid to high teens underlying growth for 2016.*

161.     Later, in response to a question regarding Par's performance, Upadhyay stated as

follows:

Yes.  The one thing I'd say is that $359 million was a little better than our expectation, primarily driven by the injectables business. *We're also seeing good solid performance in the base business as Paul talked about a little bit earlier. That should carryover into 2016, as well. I will also say as we move forward into 2016, Paul was looking at this portfolio as one portfolio*.  So we will not break out Par

versus legacy Qualitest sales. We treat this as one business and that's how we'll report on it.

The change in the fourth quarter were about $30 million that we consider to be one-time and non-recurring. It's really three factors that make this up. Well there's a number of factors, three of which are examples are around trade disputes in the fourth quarter. We have some changes and estimates around gross to nets. *And third, we had some charges higher than expected around the harmonization of our methodologies around gross to nets as we integrated Par and Qualitest. Again, we do not expect those to re-occur on a quarterly basis going forward.*

162.    Similarly, De Silva posed the problems integrating the Par generics portfolio as minor and non-recurring:

. . . . first of all, keep in mind that as *Suky pointed out, there was some non-recurring impacts in the fourth quarter that impacted Qualitest, which should not see any roll forward impact.* And secondly, I think back to the comment that Suky made, we are not providing guidance for Qualitest distinct from Par, simply because at this point Paul has a combined portfolio, he is negotiating customer contracts across a combined portfolio.

163.    Analysts pressed further to understand the Company's weakness in the generic segment.   Defendants attributed the weaker than expected results to the pain market generally and disavowed problems growing the generics business after Par.  The following exchange took place:

**Marc Goodman** – *UBS – Analyst*

. . . . And then third, I'm just trying to understand on the Generics business, the pricing that you're talking about, there's one aspect of it which is the commodity pricing, but then there's the other aspect, which is the pain products, which have been really important for you. The question is, we've heard from other companies in this space and they were complaining about new players coming back last year and they were complaining about pricing in that market and they were having some troubles there, and yet Endo was not complaining at all at that time and now there seems to be a delayed impact. So I'm trying to understand why is that?

**Rajiv De Silva** – *Endo International PLC – President & CEO*

So although we've taken some substantial volume declines in our pain portfolio, they are somewhat anticipated based on the price increases we took and the approach we've taken. *So net-net from a value standpoint, we are actually pleased with how the pain portfolio has performed. But is there pricing pressure in pain, as well as the commodity portfolio?* The answer is, yes, because there are smaller players who tend to be aggressive even in the pain arena now, most of them have been in the past.

- 54 -

164.    De Silva concluded the call by quieting investor concern and highlighting the Company's expected growth, stating: "We believe that the fundamentals of the business are very strong, strong underlying growth that will sustain us through 2016 into the medium term that we've talked about in the past.  We are positioned for growth in 2016.  We have some strong growth drivers like XIAFLEX, BELBUCA, and our Generics portfolio that we continue to put a laser-like focus on."

165.    In response to weakness in the Company's generics, the price of Endo stock dropped on February 29, 2016, from its opening of $50.47 to close at $41.81 a decline of 17%. Defendants, however, continued to conceal the true extent of the problems at Qualitest, as detailed herein.

### March 17, 2016 Presentation

166.    On March 17, 2016, at the Barclays Global Healthcare Conference, Defendants announced weaker-than-expected revenue guidance for the first quarter of 2016.  However, for the full year 2016, the Company reiterated the revenue guidance range of $4.32 billion to $4.52 billion previously announced in the Company's 2015 Earnings Release.

167.    Regarding the weaker revenue guidance, De Silva nonetheless portrayed the Company's results in a positive light, stating "Q1 considerations; so just to bring this back from what I said, we are off to a good start, right?"  De Silva also characterized the revised guidance as "incremental," stating:

> I will start off by acknowledging that this is a very challenging time for our sector and also very challenging time for the company, right?  But I'm also a strong believer that those who persevere and succeed in these situations are those companies that focus on the operations and those companies that are transparent in their communications with the investors; and that is what we seek to do.
>
> So let me just begin with a review of what we are trying to accomplish in 2016. In many ways, this is a refresher of what we talked about on our full-year guidance call. And I will then move to talking about the first quarter, right?  ***Now we do have***

*incremental information on the first quarter and we're using this opportunity today to set the proper expectations for our first quarter. But I would say at the very outset that we have confidence in our full plan for 2016 and we are making extremely good progress on all of our core priorities.*

168.   De Silva also commented on the recent performance of the Qualitest legacy business, stating:

**Rajiv De Silva –** Endo International plc – President, CEO, Director

In our Generic business, again, very good progress on the core growth drivers that we pointed to, which is the sterile injectables business, as well as the new product planning, particularly around Zetia and Seroquel. As we have more and more information, we feel more and more comfortable about Zetia and Seroquel. In fact, believe that there is further upside, particularly in 2017, around those two brands. And we believe that we are on a very strong trajectory with Vesastrip, which is one of the primary drivers of our sterile injectables business.

*We do continue to see continued price pressure in Q1, particularly around the ex-Qualitest business. If you look across the portfolio of the base business between Qualitest and Par, we do see a little bit more softness in the Qualitest side of the business than we expected. That being said, from a broader full-year perspective, our plan is well intact.*

*We've also made very good progress in operational – our operational aspects and Paul can certainly talk to some of those things in the Q&A session.*

169.   Further, De Silva told the market that the Company's integration of Par was "well on track." De Silva stated as follows:

*Integration is well on track.* We have completed all of our consortium bids, which is in line with what everyone else in the industry have done as well. We do expect the results of those to come through in the next couple of weeks. We are making good progress with our dialogue on the FDA. But clearly the things that we monitor most carefully are the outcomes of those consortium dialogues as well as how soon for our discussions with the FDA. Those of the things that can make some meaningful differences in terms of how some of these segments perform.

\*     \*     \*

And really if you look at the core engine of Par and what we invested in in terms of buying Par, this is it. This is the pipeline, the capability to keep renewing this pipeline. *And I'm delighted to say that has come through the integration extremely well* because beyond what you see on paper, what Paul and the team are working on

is repopulating this both in terms of new ANDAs as well as 505(b)(2) opportunities to refresh the next set of launches for 2018 and beyond.

170.    Defendant De Silva also downplayed the significance of the partial guidance and stated that the he saw "nothing that concerns us more broadly about the year in totality," explaining as follows:

> We obviously prefer to guide in a full-year basis.  We took the step this year of providing some phasing simply because our year is back-end loaded and we didn't want to – for those who follow us who didn't understand our business – to take a linear approach to how does a quarterly sequencing work, which is why we took the approach of providing some phasing from quarter-to-quarter.  ***And as we've said, we do see a little bit of softness in the Qualitest generic business, but nothing that concerns us more broadly about the year in totality***.

171.    Finally, with respect to the Company's guidance, De Silva again emphasized that the Company's full year guidance remained unchanged, stating, in pertinent part, as follows:

> So we want to be cautious about how we think about our first quarter.  And we've given you a range here, which effectively ranges revenues from roughly about $928 million to $972 million on the top line and $1.02 to $1.08 on the bottom line. So this is not another major deviation at all.  And this is a reflection that we want to be clear on our expectations for the first quarter; ***and our full-year guidance number remains intact***.

172.    In response to Defendants' admission about worsening problems at Qualitest, on March 17, 2016, the price of Endo stock dropped from $32.40 per share to close at $27.45 per share a decline of 15%.  Defendants, however, continued to conceal the true extent of the problems at Qualitest, as detailed herein.

173.    On May 5, 2016, after the market closed, Endo issued a press release announcing the Company's financial and operating results for the quarter ended March 31, 2016.  According to the press release, Endo reported a loss of $0.40 per diluted share, down from earnings of $0.11 per share in the first quarter of 2015.   Additionally, Endo significantly cut its 2016 guidance, announcing targeted revenue in the range of $3.87 billion and $4.03 billion, down from the range

of $4.32 billion to $4.52 billion that the Company had reaffirmed in March, less than two months earlier.

174.     That same day, the Company announced changes to its board and management structure, including the resignation of Lortie as President of the Company's U.S. Branded Pharmaceuticals segment.

175.     During the Company's May 5, 2016 earnings conference call, Defendants disclosed to the market, for the first time, the steep price erosion in the markets and the difficulty integrating Par and the Company's legacy business, Qualitest.  Upadhyay stated: "the largest driver of the change is the greater-then-expected erosion in our generic's base business."

176.     Further, De Silva explained as follows:  "In our generic segment, the base business erosion continued into the first quarter and was significantly deeper than we expected at approximately 30%.  This was driven by continued pricing and competitive pressures on our commoditized and pain products."

177.     For the first time, De Silva admitted that the Par acquisition involved changing the "operating model" of the legacy business.  De Silva explained as follows:

> Moving to slide 16, I do want to take a few moments to discuss our ongoing integration of the Qualitest and Par businesses.  Last fall in Q1 of this year, we were conducting an integration of two complex generic businesses.  What became very clear to those of us who have been in the generic industry for some time is that the legacy Par operating model is better positioned to address the challenges of today's evolving market.  ***As a result, we set out to shift the legacy Qualitest portfolio strategy from a high volume approach to the high value operating model long practiced by legacy Par.***
>
> ***As part of the integration activities, we're also transitioning the legacy Qualitest systems and processes to the Par business platform.  The legacy Par systems offer more real-time and product-level data, allowing for faster analysis and reaction within a challenging and changing market. While many of these improvements were already planned at Qualitest, the integration of our business will accelerate the benefits.***

- 58 -

178.    When analyst David Risinger of Morgan Stanley asked for a break down with respect to the generic pricing and competitive pressures that impacted the Company's generic segment, Campanelli finally admitted the profound difficulties facing the Qualitest business. Campanelli responded as follows:

> **Paul Campanelli** – *Endo Health Solutions – President, Par Pharmaceutical*
>
> David, your question on the price and the pressure, when we look at the Qualitest portfolio, which had served us well for so many years, as I said before, it is a mature portfolio, which is subject to more than normal competition. We were very strong in pain; a big portion of our portfolio is directed towards pain. ***It's not quite the barrier that it once was, and as a result, the pricing pressure that we saw was about 80% tied to legacy Qualitest and about 20% tied to legacy Par.***

179.    Analysts negatively reacted to this guidance cut and questioned the Company's management. For example, in a May 5, 2016 research report, analyst PiperJaffray noted the market's surprise at the Company's lower 2016 guidance: "We had not believed that the rebasing of expectations would be nearly this significant. We were wrong." Given the new developments, PiperJaffray was understandably not convinced by management that the problems facing the Company could be remediated so quickly, as reflected by the following comments:

> Given these dynamics (which in a sense further magnify payments related to the vaginal mesh lawsuits), *we believe it will be difficult for ENDP to make much of a dent in its net debt load of $8.4B over the next 1-2 years*. Further, given management's commentary, it is not even clear to us that ENDP is position to return to earnings growth in 2017. As such, it is now difficult for us to make a case that the current EV/2016E EBITDA multiple of near 8x will recover anytime soon.

180.    Likewise, on May 6, 2016, SIG Susquehanna Financial Group, LLP noted the market's surprise at the magnitude of the reduction: the Company's "23% reduction to 2016 EPS was far beyond what we expected."

181.    On May 6, 2016, Leerink expressed similar concerns, as follows: "We are lowering our rating to MP from OP based on the revised business outlook, limited near-term catalysts and our lack of conviction that the mgmt. team can turnaround the business in a timely fashion."

Leerink explained further that: "Based on a combination of intensifying competitive pressure to ENDP's historically high margin US generic business and underwhelming acquired brand performance, we find it increasingly difficult to be constructive of any of the company's top line growth drivers."

182.    Street.com, a news source following Endo, articulated these concerns as follows: "Many were surprised by the extent of the guidance cut. There are a number of questions floating around, including how did management get the estimates so wrong in the first place, is something bigger on the horizon and are the revised estimates a half-measure or the true picture?"

183.    On this news, Endo's stock price fell $10.42 per share, or 39.19%, to close at $16.17 on May 6, 2016.

184.    On May 6, 2016, after the market closed, Endo filed a Form 10-Q for the quarter ended March 31, 2016, with the SEC. In the Form 10-Q, Endo revealed that it had received a CID from the U.S. Attorney's Office regarding its contract with PBMs regarding Frova. The Form 10-Q stated as follows:

*Pricing Matters*

In March 2016, [Endo Pharmaceuticals] received a CID from the U.S. Attorney's Office for the Southern District of New York. The CID requests documents and information regarding contracts with Pharmacy Benefit Managers regarding Frova®. We are currently cooperating with this investigation. We are unable to predict the outcome of these matters or the ultimate legal and financial liability, if any, and at this time cannot reasonably estimate the possible loss or range of loss, if any, for these matters but will explore all options as appropriate in our best interest.

185.    In response to this news, Endo's stock price fell an additional $0.90 per share, or more than 5.57%, to close at $15.27 on May 9, 2016, the next trading day.

186.    Thereafter, Endo continued to report disappointing news. In June 2016 Endo announced a delay in the approval process for an abuse deterrent version of Opana ER and subsequently withdrew the application in August 2016.

187.    Then, on September 23, 2016, Endo issued a press release announcing that Defendant De Silva was resigning his positions at the Company and Defendant Campanelli was elevated to President and CEO of the Company.  Thus, Defendant De Silva's "turnaround" of Endo officially came to an end.

## CLASS ALLEGATIONS

188.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Endo securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

189.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Endo securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Endo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

190.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

191.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

192.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Endo;

- whether the prices of Endo securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

193.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

194.    As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Endo securities and operated as a fraud or deceit on purchasers of such stock by failing to disclose and misrepresenting adverse facts. As such misrepresentations and fraudulent conduct were disclosed and became apparent to the market,

the price of Endo stock declined significantly as the prior artificial inflation came out of the Company's stock price.

195.    As a result of its purchases of Endo securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Endo securities to trade at artificially inflated levels throughout the Class Period.

196.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Endo's business and future financial prospects. When the truth about the Company was revealed to the market, the price of Endo securities fell significantly. Such decline removed the inflation from the price of Endo securities, causing real economic loss to investors who had purchased Endo securities during the Class Period.

197.    The declines in the price of Endo securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Endo securities negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

198.    The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Endo securities and the subsequent significant declines in the value of Endo securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**NO SAFE HARBOR**

199.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged. Many of the statements herein

- 63 -

were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Endo who knew that those statements were false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

200.    During the Class Period, the market for Endo securities was an efficient market for the following reasons, among others:

(a)     Endo securities met the requirements for listing and were listed and actively traded on the NASDAQ;

(b)     as a regulated issuer, Endo filed periodic public reports with the SEC;

(c)     Endo regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Endo was followed by several stock analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

201.   As a result of the foregoing, the market for Endo securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Endo securities.  Under these circumstances, all purchasers of Endo securities during the Class Period suffered similar injury through their purchase of Endo securities at artificially inflated prices, and a presumption of reliance applies.

202.   Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder

203.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

204.   This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

205.   During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and

other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Endo securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Endo securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

206.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Endo securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Endo's finances and business prospects.

207.    By virtue of their positions at Endo, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

208.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers

and/or directors of Endo, the Individual Defendants had knowledge of the details of Endo's internal affairs.

209.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Endo. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Endo's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Endo securities was artificially inflated throughout the Class Period.   In ignorance of  the adverse facts concerning Endo's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Endo securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

210.     During the Class Period, Endo securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Endo securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class,

the true value of Endo securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Endo securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

211.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

212.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

213.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

214.    During the Class Period, the Individual Defendants participated in the operation and management of Endo, and conducted and participated, directly and indirectly, in the conduct of Endo's business affairs.  Because of their senior positions, they knew the adverse non-public information about Endo's misstatement of income and expenses and false financial statements.

215.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Endo's financial condition and results of operations, and to correct promptly any public statements issued by Endo which had become materially false or misleading.

- 68 -

216.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Endo disseminated in the marketplace during the Class Period concerning Endo's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Endo to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Endo within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Endo securities.

217.    Each of the Individual Defendants, therefore, acted as a controlling person of Endo. By reason of their senior management positions and/or being directors of Endo, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Endo to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Endo and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

218.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Endo.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

DATED:  September 26, 2016          ROBBINS GELLER RUDMAN
                                      & DOWD LLP
                                    SAMUEL H. RUDMAN
                                    DAVID A. ROSENFELD
                                    SAMUEL J. ADAMS
                                    AVITAL O. MALINA


                                              */s/ Samuel H. Rudman*
                                    SAMUEL H. RUDMAN

                                    58 South Service Road, Suite 200
                                    Melville, NY  11747
                                    Telephone:  631/367-7100
                                    631/367-1173 (fax)
                                    srudman@rgrdlaw.com
                                    drosenfeld@rgrdlaw.com
                                    sadams@rgrdlaw.com
                                    amalina@rgrdlaw.com

                                    *Lead Counsel for Plaintiff*