UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

CRAIG FRIEDMAN, Individually and on
Behalf of All Others Similarly Situated,

                         Plaintiff,

    vs.

ENDO INTERNATIONAL PLC, RAJIV
KANISHKA LIYANAARCHCHIE
DE SILVA, SUKETU P. UPADHYAY and
PAUL CAMPANELLI,

                    Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:16-cv-03912-JMF

<u>CLASS ACTION</u>

THIRD AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

Lead Plaintiffs Steamfitters' Industry Pension Fund and Steamfitters' Industry Security Benefit Fund (together, "Plaintiffs" or "Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following based upon the investigation of their counsel which included, among other things, a review of United States Securities Exchange Commission ("SEC") filings made by Endo International PLC ("Endo" or the "Company"), as well as securities analysts' reports, advisories, press releases, media reports and other public statements issued by or about the Company and interviews of former Endo employees and customers of Endo.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth after reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of Endo stock between May 11, 2015 and May 6, 2016, inclusive (the "Class Period"), seeking to pursue remedies under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      Defendant Endo describes itself as a global specialty pharmaceutical company that develops, manufactures and distributes pharmaceutical products and devices worldwide.  During the Class Period, the Company had four major business segments: Branded Pharmaceuticals, Generic Pharmaceuticals, International Pharmaceuticals and Medical Devices.   Endo markets its pharmaceuticals to physicians, retail pharmacies, healthcare professionals and wholesalers.

3.      During the second half of 2012, Endo's core branded pharmaceutical business came under competitive attack as drug manufacturers introduced generic versions of the Company's main pain products, Lidoderm and Opana ER, and started taking market share from Endo.  Exacerbating the issues facing the Company in its core pharmaceutical business, Endo's medical device division, American Medical Systems ("AMS"), was mired in tens of thousands of product liability suits

associated with various surgical mesh products – most notably vaginal mesh products – which caused serious injury to thousands of patients (the "Vaginal Mesh Litigation"). The Vaginal Mesh Litigation exposed the Company to enormous financial liability and new suits were being filed every day.

4.      In early 2013, Endo made efforts to address its sagging business prospects. On February 25, 2013, Rajiv De Silva ("De Silva" or "Defendant De Silva"), former Chief of Operations of Valeant Pharmaceuticals International, Inc. ("Valeant"), was appointed as Endo's Chief Executive Officer ("CEO"). De Silva publicly announced his plans for an aggressive turnaround of Endo and emphasized that he would reshape the Company through "organic and sustainable growth." In reality, Defendant De Silva's plan was to fashion Endo in the image of Valeant. Toward that end, Defendant De Silva re-domiciled Endo in Ireland to lower the Company's tax rate, cut research and development ("R&D") expenditures and acquired numerous other pharmaceutical businesses.

5.      Between 2013 and 2015, Endo acquired the following pharmaceutical companies, among others: (i) Boca Pharmacal LLC ("Boca"); (ii) Paladin Labs Inc. ("Paladin"); (iii) Litha Healthcare Group Limited ("Litha"); (iv) Grupo Farmaceutico Somar, Sociedad Anonima Promotora de Inversion de Capital Variable ("Somar"); (v) DAVA Pharmaceuticals, Inc. ("DAVA"); (vi) Innoteq, Inc. ("Innoteq"); and (vii) Auxilium Pharmaceuticals, Inc. ("Auxilium"). During the same period, Endo's long-term debt increased sharply from $3.324 billion in 2013 to $8.252 billion in 2015.

6.      By 2015, De Silva was focused on further growing Endo's generic drug business. Rather than engage in organic growth, on May 18, 2015, Endo announced that it had agreed to purchase privately-held Par Pharmaceutical Holdings Inc. ("Par") from TPG Capital Management

LP ("TPG") in a transaction valued at $8.05 billion including the assumption of Par debt. According to the announcement, the purchase price would consist of 18 million shares of Endo stock and $6.5 billion in cash consideration. Upon completion, the Par acquisition would increase Endo's generics-related revenues by a reported 46%. On September 28, 2015, Endo closed the Par acquisition.

7.     Throughout the Class Period, Defendants repeatedly assured investors that they were turning Endo around by successfully marketing Endo's branded and generic products and by growing revenue through strategic acquisitions. Defendants further represented that this approach was leading to "sustainable growth" that would enable the Company to de-leverage its balance sheet by mid-2016 and that the integration of Par was a success and would lead to growth in Endo's legacy generic drug business. In truth and in fact, however, Endo's acquisition strategy was a failure, the Company was saddled with over-valued businesses and marginal products, the Par integration had severely damaged Endo's legacy generic drug business and the Company was continuing to engage in improper and illegal sales practices.

8.     Unbeknownst to investors, Endo's acquisition spree had left it with an amalgam of unrelated and disjointed pharmaceutical businesses, which were failing to generate meaningful sales growth and were of diminishing value. For example, DAVA, which Endo had purchased for $590 million in August 2014, was failing to generate anticipated revenue growth because the price of DAVA's main product, Methotrexate, was rapidly declining due to market saturation. At the time of the DAVA acquisition, Endo internally valued DAVA based upon, among other things, a Methotrexate dose price of $130. Post-acquisition, however, Endo was only able to sell Methotrexate doses for $80. Similarly, as detailed further herein, the Auxilium acquisition was a

failure as its key product, STENDRA, and many other Auxilium legacy pharmaceuticals were not generating anticipated revenues and would ultimately have to be written down.

9.      Furthermore, Endo's generic drug business was not as well positioned as Defendants were leading the market to believe.  Unbeknownst to investors, the acquisition of Par would come at the expense of Endo's legacy generic drug business Qualitest Pharmaceuticals ("Qualitest") as upon consummation of the acquisition, Defendants secretly planned to, among other actions, lay off key Qualitest sales executives, abandon Qualitest's retail and wholesale accounts business, lay off the related sales force and restructure the way Qualitest bid and priced contracts for its customers.  As confirmed by former employees of Qualitest, when Par was acquired, Endo did just that and this led to a significant decline in Qualitest's business.  During the Class Period, however, Defendants, publicly portrayed the integration of Par as a success and represented that Qualitest's business was growing under the leadership of Defendant Campanelli.

10.     Lastly, in order to artificially stimulate sales growth of certain branded products, Endo continued to engage in improper and illegal sales practices in marketing the migraine pharmaceuticals Sumavel DosePro and Frova.  As confirmed by a former Endo employee, Company sales representatives were instructed to distribute pre-filled reimbursement forms thereby pushing physicians to prescribe Sumavel DosePro, the Company's needle-free migraine treatment, as opposed to more affordable generic options.  Similarly, during this time, Endo offered improper discounts and rebates to Pharmaceutical Benefit Managers ("PBMs") to induce them to list Frova on their formulary.  These activities violated the Federal Healthcare Fraud Act and the Federal Anti-Kickback Statute as well as Endo's obligations under prior regulatory settlements, which exposed the Company to the heightened risk that it would find itself having to answer to government regulators for its actions, as it had many times in the past.

11.     The problems with Endo's business were revealed to the market in a series of announcements.  On February 29, 2016, Endo issued a press release announcing its financial results for the fourth quarter of 2015.  For the quarter, Endo reported a net loss of $118.46 million, or $0.53 per diluted share, on revenue of $1.07 billion, compared to a net loss of $53.48 million, or $0.34 per diluted share, on revenue of $662.88 million for the same period in the prior year.  In discussing these results, Defendants acknowledged that Endo's generics business was negatively impacted by "volume loss and pricing pressure in the fourth quarter due to increased competition in multi-player categories."[1]

12.     In response to this news, on February 29, 2016, the price of Endo stock declined from $52.94 per share to $41.81 per share – a decline of 21%, on extremely heavy trading volume. Although Defendants acknowledged pricing pressure in Endo's generics business, they continued to conceal the extent of the weakness in this segment by reaffirming Endo's year-end earnings guidance and assuring investors that the Company was experiencing "strong generics growth in the mid teens to high teens[.]"  Defendants also concealed the negative impact that the Par integration was then having and would have on Qualitest's business.

13.     On March 17, 2016, Endo further admitted that it had seen more than expected softness in its generics business but remained confident in its full year earnings guidance, which projected revenues between *$4.32 billion to $4.52 billion*.  Defendants, however, again concealed the true extent of the problems caused by the Par integration and the negative impact on Qualitest's business.  In response to this news, the price of Endo stock declined from $33.91 per share to $30.03 per share – a decline of 11.4% on extremely heavy trading volume.

---

[1]     Unless otherwise noted, internal citations are omitted and emphasis is added throughout.

14.     On May 5, 2016, Endo issued a press release announcing its financial results for the first quarter of 2016, the period ended March 31, 2016.  In the press release, Endo reported a loss of $0.40 per diluted share, down from earnings of $0.11 per share in the first quarter of 2015. Additionally, ***Endo significantly cut its 2016 earnings and revenue guidance, announcing targeted revenue in the range of $3.87 billion to $4.03 billion, down from the range of $4.32 billion to $4.52 billion that the Company had reaffirmed in March, less than two months earlier***.  Following the Company's downward guidance revision, during a conference call to discuss the Company's results, Defendant De Silva finally admitted that there had been a "deeper than expected erosion in the legacy Qualitest business[.]"  Defendant De Silva explained that the Company had transitioned Qualitest to Par's business model stating, in pertinent part, as follows:

> [T]he legacy Par operating model is better positioned to address the challenges of today's evolving market.  As a result, we set out to shift the legacy Qualitest portfolio strategy from a high volume approach to the high value operating model long practiced by legacy Par.

15.     In response to this news, the price of Endo stock dropped from $26.59 per share to $16.17 per share – a decline of 39%, on heavy trading volume.

16.     That same day, Endo issued a press release announcing changes to its board and management structure, including the resignation of Brian Lortie ("Lortie") the Company's then-president of the branded pharmaceutical segment.

17.     Finally, on May 6, 2016, after the market closed, Endo filed a Quarterly Report on Form 10-Q for the quarter ended March 31, 2016, with the SEC.  The Form 10-Q disclosed that Endo was again subject to a governmental investigation related to improper sales practices. Specifically, the Form 10-Q stated that the U.S. Attorney's Office was investigating the Company's contracts with PBMs relating to Frova, one of Endo's main branded pharmaceutical products.  The Form 10-Q stated, in pertinent part, as follows:

*Pricing Matters*

In March 2016, [Endo Pharmaceuticals] received a CID from the U.S. Attorney's Office for the Southern District of New York. The CID requests documents and information regarding contracts with Pharmacy Benefit Managers regarding Frova®. We are currently cooperating with this investigation. We are unable to predict the outcome of these matters or the ultimate legal and financial liability, if any, and at this time cannot reasonably estimate the possible loss or range of loss, if any, for these matters but will explore all options as appropriate in our best interest.

18.     On this news, on May 9, 2016, the next trading day, the price of Endo stock fell an additional $0.90 per share, or more than 5.57% to close at $15.27.

19.     On September 23, 2016, Endo issued a press release announcing that Defendant De Silva was resigning his positions at the Company and Defendant Campanelli was elevated to President and CEO of the Company. Thus, Defendant De Silva's "turnaround" of Endo officially came to an end.

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

22.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).

23.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

24.     Lead Plaintiffs, as set forth in the certifications previously filed in this litigation and incorporated by reference herein, purchased Endo stock during the Class Period and have been damaged thereby.

25.     Defendant Endo develops, manufactures, and distributes pharmaceutical products and devices worldwide.  The Company's stock is listed and trades on the NASDAQ Global Exchange under the ticker symbol "ENDP."

26.     Defendant Rajiv Kanishka Liyanaarchchie De Silva ("De Silva") served as Chief Executive Officer, President and a Director of Endo from February 25, 2013 to September 23, 2016, when he was replaced by Defendant Campanelli.

27.     Defendant Suketu P. Upadhyay ("Upadhyay") served at all relevant times as Chief Financial Officer and Executive Vice President of Endo.

28.     Defendant Paul Campanelli ("Campanelli") served as President of the Par Pharmaceuticals segment of Endo from September 25, 2015 through the end of the Class Period.  On September 23, 2016, Campanelli was appointed as CEO of the Company.

29.     The defendants referenced above in ¶¶26-28 are sometimes collectively referred to herein as the "Individual Defendants," collectively with Endo, "Defendants."

30.     During the Class Period, Defendants were privy to confidential and proprietary information concerning Endo, its operations, finances, financial condition and present and future business prospects.  Because of their positions with Endo, Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects *via* internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.  Because of their

possession of such information, Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

31.     Defendants are liable as direct participants in the wrongs complained of herein.  In addition, Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, Defendants were able to and did, directly or indirectly, control the conduct of Endo's business.

32.     Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, Defendants had the opportunity to commit the fraudulent acts alleged herein.

33.     As controlling persons of a publicly-traded company whose stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ and governed by the federal securities laws, Defendants had a duty to promptly disseminate accurate and truthful information with respect to Endo's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Endo stock would be based upon truthful and accurate information.  Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

34.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Endo stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Endo's business, operations, and the intrinsic value of Endo stock; (ii) enabled Endo to sell more than $2 billion in Endo ordinary shares to the public and sell more than $1.6 billion in debt for the Par acquisition; and (iii) caused Plaintiffs and other members of the Class to purchase Endo stock at artificially inflated prices.

## BASIS OF ALLEGATIONS

35.     The factual allegations herein, as well as the inferences arising from these allegations are corroborated by information obtained by former Endo employees and customers with knowledge of its business and operations.  The following chart sets forth the positions and tenure of these individuals:

| FE | Job Description | Tenure |
|----|----------------|--------|
| 1 | Specialty Sales Consultant, Endo | 1999- September 2015 |
| 2 | Specialty Medical Sales Representative, Endo | January 2005 -August 2015 |
| 3 | Wholesale Accounts Representative, Qualitest | July 2012- February 2016 |
| 4 | Demand Planning Analyst, Qualitest | May 2012-October 2015 |
| 5 | Director of Sales, Qualitest | 1995-October  2015 |
| 6 | Regional Sales Manager, Qualitest | February 2012- October 2015 |
| 7 | Senior Regional Sales Manager, Qualitest | 1995-September 30, 2015 |
| 8 | Account Receivable, Wholesale Collection Specialist, Qualitest | October 2000 to February 2016 |
|  | Doug Cochran | Owner of Cochran Wholesale Pharmaceutical, Inc. for over 40 years |

(a) **Former Employee 1 ("FE1")**

36. FE1 worked for Endo as a specialty sales consultant from 1999 to September 2015 and was one of the original 100 employees at Endo. FE1 has over thirty years of experience in the pharmaceutical sales business. FE1 participated in the Frova launch in 2005 and was reassigned to Allentown, Pennsylvania in 2014 when the Company sought to increase Frova sales.

(b) **Former Employee 2 ("FE2")**

37. FE2 worked at Endo from January 2005 to August 2015 as a specialty medical sales representative.

(c) **Former Employee 3 ("FE3")**

38. FE3 held various positions in Qualitest's Huntsville, Alabama branch between July 2012 and February 2016. FE3's final position at Qualitest was serving from August 2015 to February 2016 as a Wholesale Accounts Representatives focusing mainly on accounts receivable matters.

(d) **Former Employee 4 ("FE4")**

39. FE4 served as a demand planning analyst at Qualitest from May 2012 to October 2015. FE4 worked closely with sales, marketing and manufacturing. FE4 was also involved in forecasting DAVA revenue after it was acquired.

(e) **Former Employee 5 ("FE5")**

40. FE5 worked at Qualitest from 1995 to October 2015. FE5's last position at the Company was director of sales.

(f) **Former Employee 6 ("FE6")**

41. FE6 worked for Qualitest as a regional sales manager from February 2012 to October 2015. FE6 explained that the regional sales force dealt with independent pharmacies, independent

long-term care, closed door pharmacies, college and university pharmacies, and some government contracts.

(g)     **Former Employee 7 ("FE7")**

42.     FE7 worked at Qualitest as a senior regional sales manager from 1995 until September 30, 2015.  As a senior regional sales manager, FE7 did business with wholesalers, supply companies, universities with oral contraceptive programs, retail pharmacies, government accounts and closed door pharmacies.  FE7 stated that the national sales team did business with the large pharmacy chains such as CVS Pharmacy ("CVS").

(h)     **Former Employee 8 ("FE8")**

43.     FE8 is a former employee of Par/Qualitest and worked as an accounts receivable, wholesale collection specialist from October 2000 to February 2016.

(i)     **Doug Cochran**

44.     Mr. Cochran has been the owner of Cochran Wholesale Pharmaceutical, Inc., for over forty years and helped Qualitest get started at a time when it had very few products.

## SUBSTANTIVE ALLEGATIONS

### Endo and Its Business

45.     Defendant Endo describes itself as a global specialty pharmaceutical company which is focused on both branded and generic pharmaceuticals.  The Company has offices in Huntsville, Alabama, Chestnut Ridge, New York, Dublin, Ireland and Malvern, Pennsylvania.  Endo is presently comprised of three business segments: U.S. Branded Pharmaceuticals, Generic Pharmaceuticals and International Pharmaceuticals.

46.     During the Class Period, the Company also produced and marketed medical devices through AMS.  In August 2015, Endo sold AMS's men's division to Boston Scientific Corporation. As detailed further below, the women's division of AMS was mired in suits related to the Vaginal

Mesh Litigation.  As a result, in February 2016, the Company announced that it would be discontinuing AMS's women's division and running off that business.

47.     Endo markets and distributes its products to physicians, retail pharmacies, healthcare professionals and wholesalers (*e.g.*, Cardinal Health, McKesson Corp. and AmerisourceBergen Corporation).  Endo also derives revenue from its relationships with specialty pharmacies, product licensing and royalties from the Company's third party collaboration partners.

48.     Endo's U.S. branded pharmaceutical segment includes a variety of branded prescription products related to the treatment and management of pain as well as urology, men's health, endocrinology and orthopedic products.  Endo's branded portfolio includes, *inter alia*: Lidoderm, OPANA ER, Voltaren Gel, Percocet, BELBUCA, Aveed, Supprelin LA, Sumavel DosePro, STENDRA, XIAFLEX and Frova, among others.

49.     Endo's non-branded generic pharmaceutical segment includes pharmaceuticals for pain management, urology, central nervous system disorders, immunosuppression, oncology, women's health and cardiovascular disease.  In November 2010, Endo gained critical mass in the generics market when it acquired Qualitest, a privately held manufacturer and distributor of generic drugs and over-the-counter pharmaceuticals, for $769.4 million plus a debt repayment of $406.8 million.

50.     Endo's International Pharmaceutical segment includes a variety of specialty pharmaceutical products from the Canadian, Mexican, South African and world markets.  Endo has grown this division through numerous acquisitions as follows: (i) in February 2014, Endo acquired Paladin, a Canadian pharmaceutical company that has a portfolio which serves growing therapeutic areas, including attention deficit hyperactivity disorder ("ADHD"), pain, women's health and oncology; (ii) in July 2014, Endo acquired Somar, which is based in Mexico City and develops,

- 13 -

manufactures and markets generic, branded generic and over-the-counter products, including dermatology and anti-infectives; (iii) in February 2015, Endo acquired Litha, a South African company, which is a diversified healthcare group providing services, products and solutions to public and private hospitals, pharmacies, general and specialist practitioners, as well as government healthcare programs; and (iv) in May 2015, Endo acquired Aspen Pharmacare Holdings Limited, a South African pharmaceutical company with a portfolio focused on pain, anti-infectives and cardiovascular treatments.

51.    A pharmaceutical company will generally generate revenue by developing new pharmaceutical products in their pipeline to cure and treat diseases and will typically expend approximately 15%-20% of revenues on R&D.  A pharmaceutical company's R&D spending bears fruit when its branded pharmaceutical product receives patent protection and the company is granted a limited period to exclusively market its branded product.

52.    A pharmaceutical company can bring a patented branded drug to the generic market *via* a fairly simple regulatory process.  Pursuant to the Hatch-Waxman Act, enacted by Congress in 1984, a manufacturer seeking to bring a generic drug to market is not required to file a complex New Drug Application ("NDA") to obtain U.S. Food and Drug Administration ("FDA") approval and does not need to conduct duplicative clinical trials.  Rather, the manufacturer is only required to file an Abbreviated New Drug Application ("ANDA"), which allows other generic drug manufacturers and the market to rely on the safety and efficacy data provided by the original NDA holder.

53.    Generic drugs are exact substitutes for branded pharmaceutical products.  Generic drugs contain the same active ingredient(s), in the same dosage form, in the same strength, and are bioequivalent to the original FDA approved brand name version of the drug.  Under the FDA rules, pharmaceutical products that are classified as equivalent can be substituted with the full expectation

that the substituted product will have the same clinical effect and safety profile as the branded product.

54.     To provide an incentive for generic companies to supply consumers with affordable generic options, the first generic manufacturer to file a substantially complete ANDA becomes the "authorized generic" and is allowed to exclusively market its generic product for a set period.  When the period of patent protection and ANDA protection expires, third parties then have an opportunity to introduce generic counterparts to the branded product.  When multiple generic products enter the market, the price of the drug (both retail and generic) falls precipitously.

### Endo's History of Improper and Illegal Sales Practices

55.     Endo has a long history of involvement in improper and illegal sales practices. Beginning in 2001, Endo was engaging in improper and illegal activities in order to market and sell its core pain product, Lidoderm, a patch to treat pain associated with post-herpetic neuralgia.  At the time, Endo launched a marketing campaign urging people to "put the patch where the pain is" and encouraged sales representatives to have discussions with physicians wherein they tried to broaden the sales base of Lidoderm to patients with conditions other than post-herpetic neuralgia.  After a study published in 2003 suggested that Lidoderm could be an effective treatment for lower back pain, the Company began aggressively marketing Lidoderm for off-label use.  A later December 2003 follow-up study which employed a more scientifically rigorous method (a multicenter, multiple dose, double-blind, randomized, placebo controlled, parallel group pilot study that enrolled 100 patients), however, failed to confirm the efficacy of Lidoderm for alternative therapeutic indications. Notwithstanding the results of the follow-up study, Endo sales representatives continued to promote the use of Lidoderm for lower back pain, carpal tunnel pain, osteoarthritis pain, diabetic neuropathy, and other neuropathic pain, and provided physicians with unsolicited restricted materials to further their promotional efforts.  In June of 2006, a multicenter, multiple dose, double-blind, randomized,

- 15 -

placebo controlled, parallel study again failed to show Lidoderm's efficacy for treating conditions other than post-herpetic neuralgia. Endo sales representatives continued to improperly market Lidoderm for off-label usage and ordered thousands of reprints of the original study supporting Lidoderm's alternative therapeutic indications to distribute to healthcare professionals.

56.     On February 21, 2014, Endo announced that it had reached a resolution of criminal and civil claims with the federal and participating state authorities and the District of Columbia regarding its investigation of Endo's sales, marketing and promotional practices related to Lidoderm. The Company announced that it would be paying a total of up to $194 million to settle these actions. As part of the settlement, Endo entered into a deferred prosecution agreement with the United States Department of Justice ("DOJ") for a period of up to 2 1/2 years and a corporate integrity agreement with the United States Department of Health and Human Services, Office of Inspector General, for a period of five years (together, the "Lidoderm Settlement").

57.     The deferred prosecution agreement included the Company's Enhanced Compliance Program which provided, *inter alia*, that:

> Endo has in place and will maintain policies and procedures that prohibit Endo and its employees and representatives *from engaging in any conduct that violates the federal anti-kickback statute,* unless that conduct is excluded from coverage of the statue by any exception or regulatory safe harbor, including, but not limited to, the offering or paying of any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to prescribe any Endo branded pharmaceutical product for which payment may be made in whole or in part under Federal health care program.

> *            *            *

> *Endo will establish and maintain policies and procedures that shall (1) require that financial incentives do not inappropriately motivate field facing sales representatives or their direct managers to engage in improper promotion, sales, and marketing of Endo's branded pharmaceutical products.*

58.     Commenting on the announcement of the settlement, Defendant De Silva stated: "[w]e are pleased to resolve this matter and are confident that we have robust programs in place to

- 16 -

assist us in satisfying our legal and regulatory agreements. We are committed to a company culture that supports the conduct of our business in a compliant and ethical manner." During the Company's March 2, 2015 earnings results conference, Defendant De Silva noted that the Company would need to reconcile its incentive practices with those of Auxilium, which the Company had recently acquired, and noted that the Company was subject to elevated obligations due to the Lidoderm Settlement in effect. Defendant De Silva stated, in pertinent part, as follows:

> With respect to Auxilium and the sales representatives and the sales force incentives, so so whenever we buy companies, we always have a process of reconciling our sales force incentives. ***Our general approach to incentives is on part with others in the industry. We do have ECIA under which we operate, so we have some specific requirements as well***.

59.     Similarly, in February of 2014, the Company drew more regulatory scrutiny when it received a CID from the U.S. Attorney's Office requesting information regarding Endo's settlement agreement with Actavis Generics and Impax Laboratories relating to the OPANA ER patent as well as Endo's marketing and sale of OPANA ER and Lidoderm. And, recently, on March 31, 2016, the Federal Trade Commission ("FTC") filed a lawsuit in the U.S. District Court for the Eastern District of Pennsylvania against Endo based on the Company's settlement agreements with Actavis Generics and Impax Laboratories alleging that these agreements constituted unfair methods of competition. The FTC action alleged that Endo and several other drug companies violated antitrust laws by using pay-for-delay settlements to block consumers' access to lower-cost generic versions of OPANA ER and Lidoderm.

60.     The issuance of a CID is evidence that a significant investigation by the Department of Justice is underway. Pursuant to 31 U.S.C. §3733(a)(1), CIDs may be issued only when the Attorney General or a designee "has reason to believe that any person may be in possession, custody, or control of any documentary material or information relevant to a false claims law

investigation . . . ."  Accordingly, the issuance of the CID indicates that there has been, at a minimum, some investigation by the government into the underlying merits of a possible violation.

61.     Further, Endo has been investigated for participating in price fixing.  On October 2, 2014, Senator Bernie Sanders initiated an investigation into the price increases of certain generic drugs and requested information from Endo regarding the escalating prices of Divalproex Sodium ER, Doxycycline Hyclate, and Glycopyrrolate, which are used to prevent migraines and treat certain types of seizures, to treat a variety of infections, and to prevent irregular heartbeats during surgery, respectively.

### Endo Continues to Engage in Improper Sales Practices

62.     Prior to and during the Class Period, Endo struggled to market its major branded migraine pharmaceuticals, Sumavel DosePro and Frova.  The Company acquired Sumavel DosePro in May 2014 for consideration of $89.7 million and contingent cash consideration.  The Company marketed Frova pursuant to its licensing agreement with Vernalis starting in mid-August 2004.  As detailed herein, Endo resorted to improper and illegal sales practices in order to inflate sales of Sumavel DosePro and Frova.

63.     **Sumavel DosePro**: There was extreme pressure on the Company's sales force to push both Frova and Sumavel DosePro.  According to FE1, who worked at Endo between 1999 and September 2014 as specialty sales consultant, Sumavel DosePro was a "dog."  FE1 commented: "we bought a drug that was virtually a dog and were told that we have to show Wall Street that we were able to sell these drugs otherwise they would not invest in our organization."  FE1 received emails to this effect from Defendant De Silva.

64.     Sumavel DosePro was difficult to market due to its exorbitant cost.  As FE1 explained, Endo sold Sumavel DosePro to customers for $2,700.00 for six units.  By comparison, the generic form of this therapy, which was administered *via* needle, was sold for only $7 for five units.

65.     FE2, who was a specialty medical sales representative at Endo between January 2005 and August 2015, also reported that Sumavel DosePro was a "dog."  According to FE2, it was difficult to convince physicians to prescribe Sumavel DosePro because, among other reasons, it cost between $800 to $1,000.  Moreover, FE2 stated that  physicians were further reluctant to prescribe Sumavel DosePro because patients complained about the pain of administration.  Moreover, it was difficult to obtain coverage for Sumavel DosePro because, to prescribe it, a physician needed to show that at least two other triptans that the patient tried were ineffective.  According to FE2, the Company is no longer promoting Sumavel DosePro.  Like FE1, FE2 related that the Company's management had hoped that Sumavel DosePro would be a blockbuster drug but, despite the Company's investment in marketing, Sumavel DosePro "ended up being a dog."

66.     In order to boost revenues associated with Sumavel DosePro, the Company improperly marketed the drug by using illegal tactics that caused physicians to prescribe it even when a cheaper generic existed and was indicated.  FE1 explained that Sumavel DosePro is administered *via* a needle-free delivery system, which delivers the medication through a burst of air under the skin.  According to FE1, Lortie instructed Endo sales representatives to utilize reimbursement forms that were pre-filled by Endo and had "all the appropriate" boxes, including one indicating "needle phobia" already checked off so that the physician would then only need to input the patient name.  FE1 stated that 100% of the patients prescribed Sumavel DosePro during this time had "needle phobias" according to the paperwork.  The indication of "needle phobia" presumably would make Sumavel DosePro indicated and therefore reimbursable.  Endo even provided the required ICD-9 reimbursement codes.  FE1 commented: "It was the only way to get reimbursement and it was illegal."  The Company's improper and illegal marketing of Sumavel DosePro violated its obligations under the Federal Health Care Fraud Act, 18 U.S.C. §1347 and the False Claims Act, 29

- 19 -

U.S.C. §3729 and its elevated obligations under Lidoderm Settlement, which was in effect.  FE1 reported that in February of 2015, FE1 attended a meeting in King of Prussia, Pennsylvania where the Company's sales representatives were instructed to stop using and shred all of the Sumavel DosePro pre-filled forms.  FE1 was not aware of what prompted this change.

67.     The Federal Health Care Fraud Act, 18 U.S.C. §1347, is a criminal statute that makes it a crime to "knowingly and willfully execute[], or attempts to execute, a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services."  The scope of the Health Care Fraud Act is much broader than many other federal health care statutes such as the False Claims Act and Anti-Kickback Statute, as the term "health care benefit program" has been defined broadly by the courts, and is not limited health care programs funded with federal dollars.

68.     Indeed, sales representatives filling out drug prior approval forms for doctors is illegal and at least one other pharmaceutical company has recently been held to account for similar conduct. On October 29, 2015, the U.S. Attorney's Office for the District of Massachusetts announced that pharmaceutical company Warner Chilcott ("Warner") agreed to plead guilty to health care fraud and pay $125 million dollars to settle claims related, in relevant part, to the manipulation of prior authorization forms for the drugs Actonel and Atelvia.  The Criminal Information—*United States v. Warner Chilcott Sales (U.S.) L.L.C.*, No. 1:15-cr-10327 (D. Mass. Dkt. No. 1)—which was filed on the same day as the proposed settlement and plea bargain, noted that Actonel and Atelvia required pre-authorization forms for many insurance companies, and that Warner deliberately filled in

portions of the prior authorization forms for doctors in order to increase the likelihood that insurance companies would authorize payment.

69.     The Criminal Information notes, for example, that Warner's New York District manager "directed certain sales representatives he supervised to fill out PAs [prior authorizations] for Actonel and ensure that the PAs were submitted to insurance plans.  The district manager shared with his sales representatives clinical justifications that he believed would result in an insurance plan approving the PA."  *Id*. at ¶39.  This behavior closely resembles the wrongful tactics employed by Endo to market Sumavel DosePro.  As in the Warner case, Endo sales representatives were sending physicians pre-completed prior authorization forms that listed "needle phobia," as a patient condition.  Endo representatives knew that this was a diagnosis likely to result in the insurance company authorization of Sumavel DosePro which had a needle free application as opposed to the $7 generic version of the drug which did not.  This resulted in the wrongful authorization of the drug.  Moreover, to the extent that any Medicare Part D Drug Plans approved payment for Sumavel DosePro based on the false statement that patients had "needle phobia," as described above, Endo would be subject to civil liability for violation of the False Claims Act.

70.     **Frova**: FE1 was part of the original launch of Frova in 2005 and in 2014, was again assigned to promote Frova when the Company sought to increase Frova sales from $25 million to $48 million per year.  Toward this end, the Company assigned 50 sales representatives to work on the Frova campaign.

71.     The Company offered steep discounts on generic drugs in exchange for PBM's agreements to list Endo's branded pharmaceuticals of the PBMs' formularies.  Endo's revenue stream relies in part on the Company's ability to negotiate favorable arrangements with PBMs, which are companies that manage prescription drug benefits for members of health plans.  Because

PBMs have the power to determine which drugs are covered by a health plan, pharmaceutical companies often offer certain incentives to have their drugs listed on a PBM's formulary. Recently, there has been increased regulatory scrutiny of such agreements as potentially violative of the Federal Anti-Kickback statute, a criminal statute which prohibits a person from knowingly and willfully soliciting, receiving, offering or providing remuneration, directly or indirectly, to induce either the referral of an individual, or the furnishing, recommending, or arranging for a good or service, for which payment may be made under a federal healthcare program such as the Medicare or Medicaid program. *See* 42 U.S.C. §1320(a)-7b.

72.     FE1 related that the Company's strategy was to offer the generic products at extremely discounted prices with the understanding that the PBMs would bring on Endo's tier 2 or tier 3 branded products. For example, according to FE1, the Company was able to bundle drugs such as Lidoderm with other generics when marketing to PBMs. FE1 stated that this strategy was set forth in emails from Endo's senior management. FE1 further explained that emails will demonstrate that the February 2014 Paladin acquisition was conducted so that Endo could further control the generics pricing. The result was "PBMs had no choice but to deal with Endo because we controlled the generics."

73.     On May 6, 2016, Endo disclosed that the Company was subject to a governmental investigation of its agreement with PBMs relating to Frova, one of Endo's main branded pharmaceutical products.

74.     FE1 also related that Endo engaged in improper manufacturing and distribution practices. In particular, FE1 was told by senior management that the Company was deliberately disrupting its distribution process to increase the demand for its products. As FE1 detailed, when the Company's Huntsville, Alabama facility was shut down by the FDA in the summer of 2014, Endo

deliberately did not ship certain branded pharmaceuticals from other locations to artificially increase the market demand for these products.  For example, Endo could have shipped Voltaren gel and Opana ER from another facility but chose not to and, as a result of this intentional delay, the price of Voltaren gel and Opana ER increased by 20% in 2014.

### Endo's Acquisition Spree Fails to Generate Meaningful Growth

75.     In February 2013, Defendant De Silva assumed his role as CEO of the Company.  At that time, Endo was struggling with shrinking revenues and declining business prospects.  At the end of the third quarter of 2012, Endo reported a 1% decrease in total revenues to $750 million, compared with $759 million in the same quarter of 2011.   Branded pharmaceutical sales of $417 million for the quarter represented a decrease of 2% as compared to the prior year.  At this time, Endo was also struggling to overcome the introduction of generic competition for its major pain products, Lidoderm and Opana ER, which represented $947.3 million and $299.3 million of the Company's revenue, respectively, for the year ended December 31, 2012.

76.     During the Company's June 5, 2013 earnings conference call, Defendant De Silva discussed his view of rehabilitating Endo's business and underscored the importance of shareholder value creation, organic growth and R&D "efficiency."  Defendant De Silva stated, in pertinent part, as follows:

> First we intend to reinvigorate *organic growth through a more focused and disciplined execution.*  Second, we will explore options for assets that do not fit within our new model, including exploring strategic alternatives for our HealthTronics business and early-stage pharmaceutical discovery platform*.*  Third, we are implementing a new lean operating model designed to generate significant cost savings, drive greater accountability, and allow us to focus more effectively on key priorities. Fourth, *we will improve R&D efficiency by concentrating our spend on lower-risk, near-term, revenue-generating projects*.  Fifth, we will *pursue select accretive and strategic external growth opportunity where we can identify a clear path to cost and revenue synergies*.  Sixth, we will continue to optimize our capital structure.   And, seventh, we intend to continue strengthening our talent and organizational capabilities.

- 23 -

77.     During the Company's Stifel Nicolaus Weisel Healthcare Conference, on September 12, 2013, De Silva further told investors that he "expect[ed] to return the business to organic growth starting in 2014."

78.     In truth, however, Defendant De Silva's plan for transforming the Company had little to do with "organic growth" or "discipline and focused execution."  Instead, under De Silva's management, Defendants grew Endo by sharply reducing R&D, initiating an aggressive buying spree (which increased the Company's debt to unprecedented levels) and encouraging improper and illegal sales practices.

79.     The first step of Defendant De Silva's turnaround plan was to increase the Company's tax "efficiency."  On October 31, 2013, Endo became incorporated in Ireland as a private limited company and re-registered effective February 18, 2014 as a public company.  The Company's tax inversion facilitated the later business combination between Endo's subsidiary, Endo Health Solutions Inc. ("EHSI") and the Canadian company, Paladin Labs.

80.     The second phase of Defendant De Silva's plan was to reduce R&D expenditures by ostensibly investing in acquisitions rather than the Company's research pipeline.  Under Defendant De Silva, Endo cut R&D spending dramatically, spending $116.8 million in 2013, $115.8 million in 2014, and $93 million in 2015, which represented 4.4%, 4.1% and 2.8% of the Company's revenue, respectively.  Rather than invest in Endo's growth through innovation and development of the Company's pipeline, the Company acquired various pharmaceutical companies in a series of transactions which increased the Company's long term debt from $3.324 billion in 2013 to $8.252 billion in 2015.  The following companies and assets were acquired, among others:

- On February 3, 2014, Endo acquired **Boca**, a specialty generics company that focuses on niche areas, commercializing and developing products in categories that include controlled substances, semisolids and solutions, for $236.6 million in cash;

- On February 28, 2014, Endo acquired **Paladin**, a Canadian pharmaceutical company, in a stock and cash transaction valued at approximately $2.7 billion;

- On May 19, 2014, Endo acquired the worldwide rights to **Sumavel DosePro**, a needle free delivery system for sumatripin from Zogenix Inc., for consideration of $89.7 million and contingent cash consideration with an acquisition-date fair value of $4.1 million;

- On July 24, 2014, Endo acquired **Somar**, a leading privately owned specialty pharmaceuticals company based in Mexico City, for $270.1 million in cash consideration;

- On August 6, 2014, Endo acquired **DAVA**, a privately held company specializing in marketed pre-launch and pipeline generic pharmaceuticals based in Fort Lee, New Jersey, for consideration of $590.1 million;

- On December 9, 2014, the Company acquired the rights to **Natesto** (nasal gel), a testosterone nasal gel for replacement therapy for adult males diagnosed with hypogonadism. The Company bought Natesto from Trimel BioPharma SRL, a wholly-owned subsidiary of Trimel Pharmaceuticals, for consideration of $56.7 million, consisting of an upfront payment of $25.0 million, prepaid inventory of $5.0 million and contingent cash consideration with an acquisition-date fair value of $26.7 million; and

- On January 29, 2015, Endo acquired **Auxilium**, a fully integrated biopharmaceutical company focusing in orthopedics, dermatology and other therapeutic areas, in a transaction valued at $2.6 billion. Through the Auxilium transaction, the Company also acquired other branded products.

81.     By the start of the Class Period, Defendants knew or recklessly disregarded that the Company's acquisition spree had left it with an amalgam of unrelated and disjointed pharmaceutical businesses, which were failing to generate meaningful sales growth and were of diminishing value.

82.     **Boca**: Endo's acquisition of privately held Boca, a specialty generics company, for $23.6 million in cash was meant to enhance Endo's footprint in the U.S. generics sector. Boca Pharmacal, founded in 1998, focused on niche areas, commercializing and developing products in categories that include: controlled substances, semisolids, and solutions.

83.     Boca was meant to augment Endo's pharmaceutical portfolio with the addition of a low-dose version of generic Vicodin. Endo initially increased the sales of Vicodin from $27 million

in adjusted sales to $45 million in adjusted sales in 2014, a 64% increase. However, in 2015, Vicodin sales have declined to $25 million adjusted sales, a 44% decrease, and the total number of prescriptions declined 35% in the same timeframe.

84.     Noting these developments, in its report on Endo stock dated April 21, 2016, JMP Securities LLC ("JMP") criticized the Boca acquisition, stating, in pertinent part: "[w]e do not view this as a high-quality, long-term, value-generating acquisition, as much of the growth occurred in the first year, followed by declining sales."

85.     **DAVA**: The Company's DAVA acquisition was unsuccessful. According to FE4, who worked as a demand planning analyst at Qualitest from May 2012 to October 2015, 70% of DAVA's business was associated with Methotrexate, a pharmaceutical which treats certain types of cancer. Methotrexate was already suffering price erosion prior to the Company's acquisition and after the acquisition continued its steep decline. FE4 was responsible for forecasting the DAVA acquisition revenue and explained that the Company's December 2014 Demand Review shows that, in the fourth of quarter of 2014, Methotrexate was already suffering from price erosion and competition. FE4 stated that when Endo originally contemplated acquiring DAVA, the price of methotrexate was approximately $130 per dose but after the acquisition, the price of Methotrexate fell precipitously to $80-$90 per dose. FE4 further recounted that the price erosion issues associated with Methotrexate were partially masked by unusually high demand for Valganciclovir, an anti-rejection drug used by organ transplant patients, which was in short supply in the market at the time due to manufacturing issues experienced by the Company's only competitor. However, the revenue compensation provided by Valganciclovir ended when the generic competitor for Valganciclovir was able to ramp up its manufacturing efforts.

86.     McKinsey and Company ("McKinsey") was responsible for providing the pre-acquisition valuation of the DAVA acquisition.  After the acquisition, FE4 conducted a separate valuation which found that DAVA was valued at approximately $120 million less than the valuation given by McKinsey.  FE4 was instructed numerous times to change FE4's forecasts to the point where FE4 felt FE4 was committing fraud.  FE4 stated that, ultimately, FE4's forecasts proved correct and the Company overpaid for the DAVA acquisition.

87.     **Paladin**: Paladin is a specialty pharmaceutical company headquartered in Montreal, Canada.  Paladin is focused on acquiring and licensing innovative pharmaceutical products for the Canadian and world markets.  Paladin's key products serve growing therapeutic areas including ADHD, pain, and urology.  The Company's 2014 acquisition of Paladin represented an ill-fated attempt by Endo to break into the Canadian market.  As part of the transaction, a portion of Paladin's assets that were not acquired by Endo were transferred to a new company called Knight Therapeutics Inc. ("Knight") which was awarded to Paladin's former shareholders.

88.     Expanding into the Canadian specialty pharmaceutical market proved to be too difficult for Endo, and the Company has been reportedly looking to cut its losses and offload Paladin at a steep discount less than three years after its initial acquisition.  Indeed, according to a media report by Reuters on November 4, 2016, Knight has been rumored to be in talks with Endo to buy back Paladin on the cheap.  Citing unnamed sources with knowledge of the potential sale, Reuters reported that any deal would value Paladin at significantly less than what Endo paid for it in 2014, underscoring the failure of the Paladin acquisition to generate meaningful returns for Endo shareholders.

89.     **Auxilium**: Auxilium is an integrated biopharmaceutical company which markets 12 pharmaceutical products, primarily in the area of urology.  These treatments include therapies for

testosterone replacement (Testim, Testopel), erectile dysfunction (Edex, STENDRA), and Peyronie's disease (Xiaflex).  Xiaflex is also approved to treat Dupuytren's contracture and is currently being studied for indications for frozen shoulder and cellulite.  Auxilium's branded portfolio contained many pharmaceuticals which were either mature or declining.  As a result, the Auxilium transaction did not meaningfully augment Endo's drug pipeline or boost the Company's revenues and, ultimately, Endo was forced to write down goodwill associated with numerous pharmaceuticals acquired in this transaction.  Specifically, based on an Endo FAQ filed with the SEC dated November 9, 2015, the Company reported that "[w]hen combined with the STENDRA and Testim impairments of $103 million (excluding Natesto of $49 million), the total impairment charge related to Auxilium is estimated to be $531 million."

90.    Along these lines, on April 21, 2015, JMP commented that: "We would not characterize the Auxilium acquisition as a successful strategic transaction given that sales may not reach pre-acquisition levels until beyond 2018."   The report, explained, stating in pertinent part, as follows:

> Multiple factors, including generic competition for Testim and competition from Viagra and Cialis for Stendra have severely compromised the franchise.  In January 2016, Endo returned the licensing rights for Stendra to Vivus as a result.  We believe the competitive landscape should have been taken into consideration during the due diligence for the transaction.  Inappropriate use and cardiac toxicity for testosterone-containing products have damaged a once successful franchise, in our opinion.  A 2014 study reported that testosterone therapy may increase the risk of a heart attack in men age 65 and older, as well as in younger men who have a history of heart disease.

### Endo Acquires Par and Unbeknownst to Investors, Radically Changes Qualitest's Business

91.    By the start of the Class Period, Defendants knew or recklessly disregarded that the Company's generics business was not as well positioned as they were leading the market to believe. And, unbeknownst to investors, the acquisition of Par would come at the expense of the existing

generics business, Qualitest.  As detailed herein, upon consummation of the Par acquisition, Defendants laid off key Qualitest sales executives, abandoned Qualitest's retail and wholesale accounts business and laid off the related sales force and restructured the way Qualitest bid and priced customer contracts.

92.     On May 18, 2015, Endo issued a press release announcing that it would acquire privately-held Par from TPG in an acquisition valued at $8.05 billion.  Defendant De Silva commented on the announcement stating, in pertinent part, as follows: "[w]e believe the acquisition of Par underscores the continued execution of Endo's value-driven M&A strategy and helps deliver on our goal of achieving double-digit revenue growth for the overall business over the long-term." According to the press release, the acquisition "w[ould] generate $175 million in operational and tax synergies that are expected to be realized within the first 12 months following the completion of the transaction, while strategically preserving investment in the R&D pipeline to help drive long-term organic growth."

93.     Par is a pharmaceutical company that specializes in developing, licensing, manufacturing, marketing and distributing generic drugs in the United States.  According to Par, it focuses on high-barrier to entry products that are difficult to formulate, difficult to manufacture or face complex legal or regulatory challenges.

94.     For the last decade, Par, like Endo, has been riddled with litigation related to its improper and illegal sales, marketing and pricing practices.  Specifically, before the Class Period, Par was involved in the price fixing conspiracy related to doxycycline (an antibiotic) and digoxin (a heart medication).  This scheme began to draw the attention of governmental authorities in 2014 when: (i) on August 6, 2014, Par received a subpoena from the Office of Attorney General of the State of Connecticut requesting documents relating to Par's agreement with Covis Pharma S.a.r.l. to

distribute an authorized version of Covis Lanoxin (digoxin) oral tablets; (ii) on October 4, 2014, Par, along with several of its competitors, received a letter from congressional investigators regarding price increases in generic drugs and requesting documents; (iii) on November 3, 2014, the DOJ opened a criminal grand jury investigation into the pricing of various generic drugs, including generic digoxin and generic doxycycline; and (iv) on December 5, 2014, Par received a subpoena from the Antitrust Division of the DOJ requesting documents related to Par's communications with competitors regarding its authorized generic version of Covis Lanoxin (digoxin) oral tablets and generic doxycycline products.  This probe was part of a wide-ranging criminal investigation of this broad conspiracy and resulted in grand jury subpoenas.

95.     The Company's acquisition of Par's product portfolio was intended to augment the Company's generic segment, which was acquired from Qualitest.   Upon completion of the acquisition, Endo's generics business was expected to grow by 46%.

96.     In September 2012, Par was taken private by TPG.   At that time, Defendant Campanelli was Par's Chief Operating Officer and received approximately $5.4 million for his Par stock and unvested options.  Following the going private transaction, Defendant Campanelli entered into an employment agreement with TPG that provided him with a healthy raise, elevated him to CEO of Par and provided him with a new equity-based management incentive plan.

97.     As a result of this incentive plan, Defendant Campanelli held 1.2% of Par's outstanding shares (9,341,403 shares in total) shortly before Endo acquired Par and would receive at least $68.77 million in connection with Endo's purchase of Par.

98.     To finance the Par transaction, in June 2015, Endo conducted a follow-on public offering of ordinary shares selling 27,627,628 ordinary shares at $83.25 per share, generating proceeds of $2.3 billion.   One month later, in July 2015, Endo issued and sold $1.64 billion in

aggregate principal amount of 6.00% senior notes due July 2023 (the "2023 Notes"). The 2023 Notes were issued in a private offering for resale for qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended.

99.    On September 25, 2015, Endo completed its acquisition of Par for total consideration of $8.14 billion, including the assumption of Par debt. The consideration included 18,069,899 ordinary shares valued at $1.33 billion and cash consideration of $6.5 billion.

100.    Throughout the Class Period, Defendants positively portrayed the Par acquisition and subsequent integration of Par. Unbeknownst to investors, however, as a result of the Par acquisition, the Company's generics business was not as well-positioned as they were representing and  the acquisition of Par would come at the expense of its existing generic business, Qualitest. In fact, upon the consummation of the Par acquisition, Defendants planned to lay off key Qualitest sales executives with critical customer relationships, abandon Qualitest's retail and wholesale accounts business and lay off the related sales force and restructure the way Qualitest bid and priced contracts for its customers which would cause Endo to lose business. Defendants did just that when Par was acquired and Qualitest's revenue declined dramatically. Defendants, however, publicly represented that the "integration [was] going extremely well" and the Qualitest business was "on track." Ultimately, as detailed herein, Endo was forced to announce significant revenue and earnings shortfalls in its generics division due to sales issues at Qualitest, as detailed herein.

101.    FE3, who worked at Qualitest from July 2012 to February 2016, and served in various positions, including a wholesale account representative from August 2015 to February 2016, explained that, upon consummation of the Par acquisition, Trey Propst ("Propst") (son of Qualitest founder) and Mike Reiney ("Reiney") (the son-in-law of Qualitest founder), both of whom had

strong and long-standing relationships with Qualitest customers, were "walked out" of the Company. Thereafter, many Qualitest customers no longer wanted to do business with Endo.

102.    In addition to the departure of two key Qualitest sales/relationship managers, FE3 reported that, in the fourth quarter of 2015, the Company stopped selling to many small wholesalers and retail customers.  FE3 added: "[t]hey totally cut them off and stopped selling to them."  FE3 stated that Par dropped some Qualitest customers because they did not order enough product.  For example, FE3 also mentioned that the Company terminated its contract with Cochran Wholesale Pharmaceutical Inc.

103.    Mr. Cochran has been the owner of Cochran Wholesale Pharmaceuticals for over forty years.  Mr. Cochran confirmed that when Par was acquired, the Company moved management from Alabama to the Northeast and maintained a manufacturing division in Alabama.  Mr. Cochran stated that, although he had helped Qualitest get started when it had very few products, Qualitest stopped doing business with his company when the Par transaction was consummated.  According to Cochran, Par terminated his contract while he still had outstanding orders and without notice.  Mr. Cochran stated that the volume of his business was not enough to be retained as a customer after the buyout occurred.

104.    FE8 worked in the accounts receivable at Qualitest/Par as a wholesale collections specialist from October 2000 through February 2016.  FE8 corroborated the accounts of the other former employees and reported that the Company ceased doing business with many wholesalers and retailers when Par was acquired.

105.    FE3 had also heard that some customers had previously had bad experiences with Par or were put off by Par's selling technique of trying to force a customer to buy one of its slower moving products when it requested a popular drug.  Further, according to FE3, some other

Company's customers left because Par stopped manufacturing certain products.  FE3 stated that all these factors led to a decrease in Qualitest sales.

106.    FE4, who worked as a demand planning analyst at Qualitest from May 2012 to October 2015, stated that Propst and Reiney had important customer relationships, including with Qualitest wholesale retailers such as Wal-Mart Stores, Inc. ("Walmart") and CVS.  According to FE4, Qualitest's business model put a high premium on customer service.  According to FE4, the Qualitest sales team would always figure out a way to sell a product to a customer at the price that they were willing to pay.  FE4 was told that shortly after the Par acquisition, customers expressed dissatisfaction that Propst and Reiney were no longer employed.

107.    FE4 stated that while Propst and Reiney were at the Company, the generics division met its financial goals.  However, when the Company overhauled the manner in which it ran its generics business when it acquired Par by eliminating retail and some wholesale contracts, revenues declined.  According to FE4, Qualitest had approximately 1500 customers, only four of which were major buyers (McKesson, CVS, Walmart and Walgreens).  FE4 explained that Qualitest's retail customers were an important aspect of Qualitest's business because retailers would often take short dated and overstocked items in addition to contract items.  Moreover, FE4 noted that the profit margin on the retail contracts were greater as compared to wholesale contracts.

108.    FE4 also stated that, prior to the Par acquisition, Qualitest priced bids according to the "basket pricing" method, which incorporated loss leaders into customer bids.  According to the "basket pricing" method, the goal in pricing was to make a profit on the bid as a whole.  After Endo acquired Par, the Company changed the customer bidding process to eliminate loss leaders and began to price contracts according to actual manufacturing costs per item.  In addition, the

department eliminated any products that Qualitest had been selling at a loss which resulted in the downsizing of two manufacturing plants.

109.    FE4 learned that when Par was acquired, Qualitest's practice of "trade loading," wherein Propst and Reiney would offer customers discounts to take leftover product at the end of the year, stopped.  According to FE4, FE4 was told that Par did not understand the return aspects of the Qualitest contracts nor did they fully understand the "chargebacks" that were a part of the Qualitest contracts.  FE4 reported that data produced by the chargeback numbers was too big to fit on normal excel spreadsheets and Qualitest used a separate database named "SQL" to handle the data.  FE4 explained that this database was 70 columns wide and had millions of lines of information.  The "chargebacks," also known as rebates, were individually negotiated between Qualitest and its distributors usually based on volumes of product sold.  FE4 was told that Par did not have its own system to handle chargebacks because Par was a high margin low volume company as opposed to Qualitest which was a low margin company.

110.    FE4 stated that the price erosion that the Company described in May 2016 was foreseeable.  FE4 stated that Qualitest would have been aware immediately if there was a decline in prescription volume in particular drugs.  In particular, FE4 stated that it was forecasted that pain products would decline and that Qualitest's demand forecast reflected this.  According to FE4, the customer "firing" and customer "walk aways" were a significant factor in this earnings miss.

111.    FE4 stated that after the Par acquisition, FE4 heard that the following customers had problems with the combined generics company: Auburn Pharmaceuticals, Drogeuria Betances Inc. (Puerto Rico), Burlington Drug Co., DIK Drug Company LLC, Bloodworth Wholesale Drugs, Quest Pharmaceuticals Inc., TOP RX LLC, Richie Pharmacal Co., Inc., Genetco Inc. and Peytons.

- 34 -

112.    FE5, who worked at Qualitest from 1995 to October 2015, and ultimately served as the director of sales, explained the difference between the Par and Qualitest business model. According to FE5, Par was a specialty generic line and Qualitest was more of a commodity, high volume production generic line.  According to FE5, when Endo acquired Par, the Company laid off the entire Qualitest retail team along with FE5.  FE5 reported that the radical downsizing of the Company's sales force meant that it was impossible for the Company to maintain the same number of accounts as it had prior to the Par acquisition.

113.    FE6, who worked as a regional sales manager from February 2012 to October 2015, explained that Qualitest's regional sales group did business with independent pharmacies, independent long-term care, closed-door pharmacies, college and university pharmacies, and some government contracts.  FE6 corroborated FE5's account and stated that FE6 and the entire regional sales force, with the exception of two people, were let go immediately following the acquisition of Par: "[t]hey signed the contract on Monday and we were laid off on Tuesday."  FE6 stated that after the regional sales force was let go, the Company made the decision to focus on its four biggest customers and stop selling to retail customers.

114.    FE7, who worked as a senior regional sales manager at Qualitest from 1995, September 30, 2015, was responsible for sales with wholesalers, supply companies, universities with oral contraceptive programs, retail pharmacies, government accounts and closed door pharmacies confirmed that after FE7 and the rest of the regional team was laid off, Endo ceased selling to retail pharmacies but continued to sell to universities, wholesalers, and the big accounts.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

### Q1 2015 10-Q and Earnings Conference Call

115.     On May 11, 2015, Endo issued a press release announcing its financial results for the first quarter of 2015, the period ended March 31, 2015.  For the quarter, Endo reported a net loss of $75.72 million, or $0.43 per diluted share, on revenue of $714.13 million, compared to a net loss of $436.91 million, or $3.41 per diluted share, on revenue of $470.84 million for the same period in the prior year.  For U.S. Branded Pharmaceuticals, Endo reported net revenues of $284.51 million, compared to net revenues of $234.17 million for the same period in the prior year.  Defendant De Silva commented on the announcement stating, in pertinent part, as follows:

> We continued to make progress during the first quarter toward achieving a number of our strategic priorities for the year. . . .  Our diversified business helped us deliver strong financial results for the quarter and helps us to provide the flexibility to re-invest and re-deploy capital to drive growth. . . .  We also believe that we have attractive development opportunities to support further organic growth across each of our business units.

Further, the press release stated that the "U.S. Generic Pharmaceuticals continues strong growth in the first quarter with 68 percent revenue increase over first quarter 2014."

116.     Following the issuance of the earnings release, Endo held a conference call with analysts and investors to discuss the earnings release and its business operations.  Defendants De Silva and Upadhyay participated in the call, which other members of the executive management team joined.  In his opening remarks, Defendant De Silva represented that Endo was experiencing positive business trends stating, in pertinent part, as follows:

> [W]e continue to make good progress in addressing our near-term strategic priorities, that we believe will support our objective of becoming a leading global specialty-pharmaceutical Company.  First, we are enhancing our operational focus in order to help drive *organic growth.*

*         *         *

- 36 -

*[W]e remain focused on delivering strong and sustainable financial performance.* We had a solid first quarter, and are raising our guidance for full-year 2015 adjusted diluted EPS from continuing operations. First-quarter revenues were collectively in line with expectations, and we are maintaining our full-year 2015 financial guidance for revenue. *The relative strength of revenues from our US Generics Pharmaceuticals business in the first quarter was a highlight of the value of our increasingly diversified business.*

117. During the conference call, Defendant Upadhyay positively described the Company's operations and the integration of its recent acquisitions stating: "[w]e believe the strength of our increasingly diversified portfolio, the efficiency of our integration of Auxilium Pharmaceuticals, and our favorable corporate structure have us well positioned to support our key organic growth drivers, and to access the capital we need to pursue value-creating M&A opportunities." Along those lines, Defendant Upadhyay described the Company's results:

We are holding our revenue guidance and raising EPS, despite FX headwinds, and a slower than expected start to the year for STENDRA. The continued diversification of our portfolio should enable continued growth for the Company in 2015 and beyond. We expect full-year 2015 revenues of between $2.9 billion and $3 billion.

118. Defendant De Silva again underscored the Company's focus on "organic growth" and "financial discipline." Defendant De Silva stated, in pertinent part, as follows:

Second, we are investing to support current and *future organic growth*, as we have detailed in today's presentation. Third, we are focused on deploying capital to accretive value-creating transactions, and we believe our objective to complete two to three value-creating deals in 2015 is achievable. We continue to evaluate a robust set of small- to medium-size transactions across all of our Businesses, and we continue to be willing to opportunistically pursue larger transformative deals. What is important to emphasize is that *financial discipline* remains the key in all of our transactions.

119. The statements referenced above in ¶¶115–118 regarding the Company's positive results, organic growth, sustainable strategy and financial discipline were materially false and misleading when made as they failed to disclose that Endo's acquisitions had left the Company with an amalgam of unrelated and disjointed pharmaceutical businesses, which were failing to generate meaningful sales growth and were of diminishing value.

120.    Defendant Upadhyay discussed the reasons for the purportedly successful quarter and pointed to the Company's "increased promotional investments in U.S. Branded Pharmaceuticals." Defendant Upadhyay stated, in pertinent part, as follows:

> The combination of ***improved price and volume performance in generics***, and ***increased promotional investments in US Branded Pharmaceuticals***, along with the additional months of Auxilium sales in the second half of 2015, gives us confidence in achieving our full-year guidance for revenues.

121.    The statement referenced above in ¶120 was materially false and misleading as it failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them, as follows:

(a)    that Endo's acquisition spree had left the Company with an amalgam of unrelated and disjointed pharmaceuticals businesses, which were failing to generate meaningful growth and were of diminishing value; and

(b)    that Endo was continuing to engage in improper and illegal sales practices which heightened the risk that the Company would run afoul of the Lidoderm Settlement and draw increased regulatory scrutiny, as detailed herein.

122.    Later in the conference call, Defendant De Silva was asked by an analyst from Deutsche Bank about Endo's generics strategy and did not disclose that Endo was then already in negotiations to purchase Par.  The following exchange took place:

**Gregg Gilbert –** *Deutche Bank- Analyst*

And my last question is for you, Rajiv, on generic strategy, and I know you're not trying to be broad based generic company, but you do already get a large portion of your revenues from the US generics market, so my question is are you comfortable increasing your exposure to US generics as a portion of your total revenues, or do you think you're about right when you consider how diverse you would like to be? Thanks.

\*        \*        \*

**Rajiv De Silva –**

In terms of your question on generics, as I reflect on the last two years at Endo that I've been here and certainly before that, Qualitest has been a continued sustained high performer, with mid-teens organic growth. So in that regard, we would not be opposed to adding to our exposure to US generics. *I think as we said, we are unlikely to want to become a broad-based provider of generics, but we do like special niches and more protected areas like controlled substances*. So if we have an opportunity to add assets to Qualitest, that add other niches, other high barrier to entry types of areas, we would certainly be open to it.

### May 18, 2015 Press Release and Conference Call
### Regarding the Par Acquisition

123.   On May 18, 2015, Endo issued a press release announcing that it had entered into a definitive agreement under which Endo would acquire privately held Par from TPG in a transaction valued at $8.05 billion, including the assumption of Par debt.   The purchase price consisted of approximately 18 million shares ($1.55 billion of value based on the 10-day volume weighted average share price of Endo ending on May 15, 2015) of Endo equity and $6.50 billion cash consideration to Par shareholders.   Endo stated that it secured fully committed financing from Deutsche Bank and Barclays to fund the cash consideration.   The press release stated: "[t]he combination will create a leading specialty pharmaceutical company with a generics business that is one of the industry's fastest growing and among the top five as measured by U.S. sales.   It is also expected to help drive long-term double-digit revenue growth for Endo."   Defendant De Silva further explained the purported benefits of this transaction, as follows: "[w]e believe the acquisition of Par underscores the continued execution of Endo's value-driven M&A strategy and helps deliver on our goal of achieving double-digit revenue growth for the overall business over the long-term."

124.   Following the issuance of the press release, Endo held a conference call with analysts and investors to discuss the Par acquisition.   Defendants De Silva, Upadhyay and Campanelli participated in the call, which other members of the executive management team joined.   In his opening remarks, Defendant De Silva reiterated the positive performance of the Company's generics segment stating, in pertinent part, as follows:

- 39 -

More recently in the first quarter of this year our *Generics business delivered impressive results with sales of $357 million delivering 68% growth versus the prior year*. These first-quarter results benefited from our strategic acquisitions of DAVA Pharmaceuticals and Boca Pharmacal, but more importantly were driven by robust underlying organic growth of 39%. *Underlying growth was a product of both volume and price and we are confident in the double-digit growth rate we expect for this business for the full year.*

125.     Defendant De Silva also made additional positive statements about the outlook of Qualitest and the benefits of the Par acquisition, stating that "Qualitest is well positioned for continued growth but we see the addition of Par's specialized high margin product portfolio and extremely attractive and productive R&D pipeline as a transformational opportunity, not only for our Generics business but for Endo overall."

126.     Likewise, Defendant Campanelli portrayed Par's generics business as overwhelmingly successful. Defendant Campanelli described the Par business stating, in pertinent part, as follows:

Importantly, like Qualitest, *Par has been achieving impressive growth that out paces the overall generic space*. We achieved $1.3 billion in revenue in 2014. That is a compound annual growth rate of approximately 12% for revenues and more than 20% for adjusted EBITDA over the last three years.

127.     Defendant Upadhyay stated that Endo and Par were both growing at a rate above their peers explaining, in pertinent part, as follows:

On slide 23, you'll see the combined net revenues of Par and Endo for the last four full years. Recall that the overall Generic space is growing at a compounded annual growth rate in the mid single digits. *However, Endo and Par have grown at a combined compounded annual growth rate of 18% from 2011 to 2014. And in 2014, at pro forma combined revenues of nearly $2.5 billion.*

Growth across both Companies resulted from a combination of volume, new products, prudent pricing strategies and accretive acquisitions. *In addition to impressive revenue growth, both Companies have realized meaningful margin gains since 2011 as a result of greater manufacturing efficiencies, favorable mix and through the optimization of pricing across a more specialized product portfolios.*

- 40 -

128.    Defendant Upadhay addressed the prospective synergies associated with the business combination, stating, in pertinent part, as follows: "[o]ur anticipated operational and tax synergies are projected to be approximately $175 million and we are committed to strategically maintaining R&D investments to support future growth."

129.    During the question and answer period of the conference call, Defendant De Silva was asked about the combination of Qualitest and Par.  The following exchange took place:

**Annabel Samimy** – *Stifel Nicolaus – Analyst*

Hi.  Thanks for taking my question, congratulations. Rajiv, one of the criteria you use for acquisitions is that you could possibly run a business better than the former owners.  So it looks like Paul has done a pretty good job in terms of bringing this Company back into strong growth and profitability, but what more can you bring to the table in terms of driving this business forward.  You mentioned the injectables?

**Rajiv De Silva** – *Endo International PLC - President and CEO*

Perfect.  So this is a transformational opportunity for us and this is less about us adding value specifically to Par and more about how Paul and his team can help transform the combined Generics business, right?  So I think this is a deal where there's substantial industrial logic for it.  ***And I think the combination of Par and Qualitest can do a lot more than either Company could do by itself***.  So that is the fundamental basis of the value creation that we see.

130.    Later in the call, Defendant De Silva further highlighted the combined Company's focus on organic growth:

Importantly, this transaction firmly positions Endo for long-term double-digit organic growth and ultimately we believe this acquisition establishes a transformative M&A platform for Endo moving forward.

131.    The statements referenced above in ¶¶123-130 regarding the Company's organic growth, the strength of both the Par and Qualitest portfolios and the synergies to be derived from the Company's acquisition of Par were materially false and misleading when made as they failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them:

(a)     that Endo's acquisition spree had left the Company with an amalgam of unrelated and disjointed pharmaceutical businesses, which were failing to generate meaningful sales growth and were of diminishing value;

(b)     that upon the consummation of the Par acquisition, Endo planned to, among other actions, lay off key Qualitest sales executives with critical customer relationships, abandon Qualitest's retail and wholesale accounts and lay off the related sales force, and restructure the way Qualitest bid and priced contracts for its customers and which would cause the revenue from Endo's generic segment to decline; and

(c)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Par acquisition and the synergies to be derived therefrom.

### May 20, 2015 Conference Call

132.     On May 20, 2015, Defendants De Silva, Upadhyay and Campanelli gave a presentation on behalf of Endo at the UBS Global Healthcare Conference.  Defendant De Silva positively portrayed the synergies to be derived from Company's acquisition of Par and highlighted Endo's delevering plan stating, in pertinent part, as follows:

> *We expect the transaction to be substantially accretive*.  *We expect it to be accretive in the mid-teens in 2016.*  I know there is some uncertainty around exactly where the 2016 accretion number will fall simply because the actual close of the transaction is unknown and synergy capture will be an important part of what that ultimate accretion in 2016 would look like.  *However, we are very confident that we would have fully captured our synergies by 2017 and for 2017 we see the accretion being higher around 20% and that is on a fully synergized basis for the full year of 2017.*
>
> *            *            *
>
> We talked about delevering.  This is how we expect the delevering profile of the transaction to work.  Roughly around five times leverage at the close of the transaction.  *Delever into 4.5 times based on the use of proceeds from our sale of AMS, which we expect to close in the third quarter.And then within 12 months post close, [we expect] around four times or less.*  And certainly if you can over-deliver on operational synergies and/or the performance of the business, we will get there even faster.

133.    During the presentation, Defendant De Silva also reiterated the Company's prior

guidance regarding the synergies stemming from the Par acquisition, stating, in pertinent part, as

follows:

> We expect **operational and tax synergies of $175 million**, but just to be clear, obviously from a EBITDA standpoint, we are only including cost synergies, operational synergies, and our calculation of EBITDA and that number is likely to be in the range of around $100 million of the $175 million. **And ultimately, we are very confident given the growth of Par's assets that when fully synergized in 2016, the acquisition multiple will be in the range of 10 to 11 times EBITDA in 2016.**

134.    Later, in response to a question by a UBS analyst, Defendant Upadhyay related a

positive view of the synergies of the Par acquisition.  The following exchange took place:

**Marc Goodman** - *UBS – Analyst*

Maybe the first question is just on synergies.  Can you help us understand just tax versus operational, what you're including and what you're not including as far as what potentially could be upsize?  I know you mentioned something about manufacturing, you're not including that.  Why are you not including that?  When do you expect manufacturing, you know, that kind of thing.  So just more broadly is the question.

*        *        *

**Suky Upadhyay** – *Endo International plc – EVP & CFO*

Sure, so as Rajiv said, we're currently estimating **$175 million of total synergies with about $100 million in OpEx and $75 million in tax.  In the OpEx synergies, that's simply cut across SG&A as well as R&D.**  We do see there being significant opportunity across the G&A portions of the business obviously as you don't need to duplicate a lot of the back office sort of support within the selling aspect of the business.

There's going to be some opportunity there and then also within R&D, there's the opportunity to leverage a lot of what Par has already started to do from a vertical integration standpoint around API clinical development etcetera.  So we think the $100 million is a fair proportion.  **There could be some potential upside to that, but we're going to do a lot more planning over the coming months as we do the integration planning for the transaction.**

- 43 -

135.     Moreover, when questioned by analysts,  Defendant Campanelli further assured the

market of the combined Company's ability to compete in the generics space.   The following

exchange took place:

> **Marc Goodman** – *UBS – Analyst*
>
> So, also on the generics, obviously the customers have consolidated partners
> whatever you want to call it supply everything's gotten much more bigger on the
> other side, so negotiating with them is more difficult, obviously, you know, we hear
> from other generics companies that they're pushing back on price quite a bit.  I was
> curious just from Par's angle, number one, how much of that was happening with
> price and how much you could offset with volume and now in a much bigger
> company, you know, how that will change?
>
> **Paul Campanelli** – *Par Pharmaceuticals Companies, Inc. – CEO*
>
> Yes.  So it's a great question.  So I think anybody that played in the generic world all
> took a little bit of a hair cut last year with the consortiums and you had to build your
> portfolios up to kind of get pass that.  *I would tell you from the Par point of view,
> we're pass that, right?*
>
> *So the consortiums have kind of settled out.  When I look at on a go-forward basis
> taking on the Qualitest division and adding mass, the two things that are important
> to me are mass and quality and I think that's two things that we're going to now
> have and better position us to – to position ourselves up against some of the
> consortiums.*  Clearly they have buying and selling powers amongst themselves, but
> having strength with more product portfolios is certainly going to place us in a better
> position to differentiate ourselves going forward.  *So volume, quality, and a
> diversified portfolio.  I think that's very important.  That's going to help and drive
> Par's ability to have long-term growth.*

136.     The statements referenced in ¶¶132-135 above regarding the Company's organic

growth and the synergies to be derived from the Par acquisition were materially false and misleading

for the reasons set forth in ¶131.

## June 2, 2015 Offering

137.     On June 2, 2015, Endo filed a Form S-3 registration statement and prospectus using a

"shelf" registration, or continuous offering process (No. 333-204657) with the SEC.

- 44 -

138.    On June 3, 2015, the Company filed a Prospectus Supplement with the SEC and announced that it was offering $1.75 billion ordinary shares of Endo and would use a portion of the net proceeds, together with the net proceeds of the debt financing, to finance the acquisition of Par, refinance certain outstanding debt and to pay related fees and expenses.

139.    On June 8, 2015, Endo priced the offering at $83.25 per share and filed its final prospectus, which formed part of the registration statement, pursuant to which Endo would sell 24,024,025 ordinary shares to the public (not including the underwriters' overallotment of 3,603,603 shares).

140.    The offering was successful for the Company and the underwriters.  27,627,628 shares of Endo common stock were sold to the public at $83.25 per share, raising more than $2.3 billion in gross proceeds for Endo.

141.    The Registration Statement, including the materials incorporated therein by reference, and the final Prospectus are collectively referred to as the "Registration Statement."

142.    The Registration Statement stated that the Company is "committed to driving organic growth at attractive margins by improving execution, optimizing cash flow and leveraging our strong market position, while maintaining a streamlined cost structure throughout each of our businesses." The Registration Statement described the Company's business segments as follows:

- U.S. Branded Pharmaceuticals: Enhancing performance of organic growth drivers, increasing profitability from our mature brands and investing in key late-stage pipeline opportunities.

- U.S. Generic Pharmaceuticals: Capitalizing on encouraging demand trends for a differentiated portfolio of controlled substances and liquids and more effective research and development ("R&D") investment by targeting low-risk, high-return opportunities in generics.  We believe the acquisition of Par will enhance our existing generics platform, adding scale and diversity in products, capabilities and R&D infrastructure.

- 45 -

- International Pharmaceuticals: Investing in high growth business segments with durable revenue streams and where physicians play a significant role in choosing the course of therapy.

143.    The statements referenced above representing the purported benefits of the Par transaction were materially false and misleading for the reasons set forth in ¶131.  Additionally, the representations in the Registration Statement regarding the Company's branded pharmaceutical segment failed to disclose that in order to artificially stimulate sales growth of certain branded products, Endo was continuing to engage in illegal and improper sales practices which heightened the risk that the Company would violate its compliance with applicable laws and its obligations under the Lidoderm Settlement and draw increased regulatory scrutiny, as detailed herein.

144.    The Registration Statement also described the Company's "***Targeted sales and marketing infrastructure***."  The Registration Statement stated, as follows:

> Targeted sales and marketing infrastructure.  We market our branded products directly to physicians primarily in the United States through a sales force of over 600 individuals in the pharmaceutical product and device markets.  We market our products to primary care physicians and specialty physicians, including those specializing in pain management, orthopedics, neurology, rheumatology, surgery, anesthesiology, urology and pediatric endocrinology.  Our sales force also targets retail pharmacies and other healthcare professionals throughout the U.S.  We distribute our products principally through independent wholesale distributors, but we also sell directly to retailers, clinics, government agencies, doctors and retail and specialty pharmacies.  ***Our marketing policy is designed to assure that products and relevant, appropriate medical information are immediately available to physicians, pharmacies, hospitals, public and private payers, and appropriate healthcare professionals throughout the U.S.  We work to gain access to healthcare authority, pharmacy benefit managers and managed care organizations' formularies (lists of recommended or approved medicines and other products), including Medicare Part D plans and reimbursement lists by demonstrating the qualities and treatment benefits of our products within their approved indications.***

145.    Defendants' statement above regarding its sales and marketing structure was materially false and misleading when made as it failed to disclose that Defendants were engaging in improper and illegal sales practices by instructing its sales force to encourage doctors to prescribe

one of its branded products, Sumavel DosePro, over the lower cost generic alternative and offering improper incentives to PBMs in exchange for listing Frova as a formulary.

146.     Under the rules and regulations governing the preparation of the Registration Statement, the Registration Statement was required to disclose the adverse facts detailed herein.  No such disclosure was made.

### Q2 2015 10-Q and Earnings Conference Call

147.     On August 10, 2015, Endo issued a press release announcing its financial results for the period ended June 30, 2015.  For the quarter, Endo reported a net loss of $250.42 million, or $1.35 per diluted share, on revenue of $735.17 million, compared to net income of $21.16 million, or $0.13 per diluted share, on revenue of $592.85 million for the same period in the prior year.  For U.S. Branded Pharmaceuticals, Endo reported net revenues of $315.91 million, compared to net revenues of $248.55 million for the same period in the prior year.

148.     Commenting on these results, Defendant De Silva described the Company's "strong financial results" stating, in pertinent part, as follows:

> Our diversified business delivered strong financial results for the quarter and demonstrated the value that we expect to create through the continued execution of our strategy.
>
> **We are close to completing the integration planning for our acquisition of Par and we remain excited by the strategic expansion of our product portfolio**, R&D pipeline and long-term growth profile that the Par assets and Par talent joining Endo are expected to help provide. Looking ahead to the second half of 2015 and beyond, **we are focused on accelerating growth in our current U.S. Branded Pharmaceuticals portfolio and continue to expect that our strategic M&A and pipeline development efforts will yield future growth drivers.**

149.     Defendants' statements in ¶¶147-148 were materially false and misleading for the reasons set forth in ¶136.

150.     Following the issuance of the earnings press release, Endo held a conference call with analysts and investors to discuss its earnings release and its business operations.  Defendants  De

Silva and Upadhyay participated in the call.  In his opening remarks, Defendant De Silva reiterated the Company's purported focus on "organic growth" and the strength of the generics business stating as follows: "[f]irst, we are further enhancing our operational focus in order to help drive organic growth.  Our US Generics business delivered strong underlying growth in the first half of 2015."

151.    Along those lines, later in the call, Defendant De Silva remarked: "we are investing to support current and future organic growth.  As we have detailed in today's presentation, we have attractive underlying growth within Endo and we have a disciplined approach to supporting the current commercial portfolio and pipeline opportunities for each businesses."  Defendant  De Silva added that "Qualitest continues to be an extremely attractive and effective growth driver for Endo. The addition of Par will enable us to achieve critical mass in our generics business unit expanding our scale and capacity and building upon steady double-digit organic growth at Qualitest by adding a strong portfolio of specialty high barrier to entry products with attractive gross margins."

152.    During the conference call, Defendant De Silva also made positive comments regarding the growth that the Company would achieve as a result of the Par acquisition, stating, in pertinent part, as follows:

> For Endo, the addition of Par will help us achieve our goal of delivering double-digit revenue growth for the overall business over the longer term.  We expect to deliver significant accretion to adjusted diluted earnings per share with a midteens percentage in 2016 and around 20% in 2017.  Anticipated financial synergies from the Par transaction of $175 million will help deliver that accretion and returns well in excess of our cost of capital.

153.    Further, Defendant De Silva discussed the generic pricing market, which he characterized as "consistent," stating, in pertinent part, as follows:

> Our view on the ***pricing environment within generics remains consistent***.  We believe that commodity products face pressure while specialty products present sound strategic pricing opportunities depending on market conditions.  Given the focus of our (inaudible) business in specialty products including controlled substances we believe it can continue to outperform the broader market and the

acquisition of Par will further increase the focus of our generics portfolio on specialty products.

154.     In response to a question by an analyst from RBC Capital Markets, Defendant De Silva commented positively regarding the Par integration.  The following exchange took place:

**Randall Stanicky** - *RBC Capital Markets – Analyst*

After the Par deal was announced, you had talked about accretion in 2016 and 2017 of 15% and 20% and that seemed to imply around a $6 EPS number in 2016 and just over a $7 EPS number in 2017.  Can you just update us as to whether those still hold?  Has anything changed in terms of how you are looking about the combined Endo and Par asset?

*            *            *

**Rajiv De Silva -** *Endo International PLC - President and CEO*

***But what I would say is that we remain very confident in the aspirational guidance that we put out for 2016 and 2017.***  As we have done more integration planning with Par, we continue to be very impressed with the business.  ***We are confident about our synergy numbers that we put out there which is roughly $175 million of financial synergies of which is about $100 million are operational.  Plus we have now become more confident that there is further upside to that number through supply chain and cost of goods reductions which were not included in that number as well.***  So net net all of that points us in the direction of being very confident about the midteens accretion for 2016 and roughly 20% accretion in 2017 and the rest of our business is progressing as expected.

155.     The statements referenced above in ¶¶150-154 were materially false and misleading for the same reasons as set forth in ¶136.

### September 28, 2015 Conference Call
### Regarding the Par Acquisition

156.     On September 28, 2015, the Company held a conference call with analysts and investors to discuss its acquisition of Par.  Defendants De Silva, Upadhyay and Campanelli participated in the call.

157.     During the conference call, Defendant De Silva outlined how the Par business was complimentary to Endo stating, in pertinent part, as follows:

- 49 -

Moving to slide 3; first, we have emphasized the addition of Par **strategically expands our product portfolio, R&D pipeline capabilities and long-term growth drivers.** We see great value in Par's extensive range of dosage forms and delivery systems and their focus on specialized, market leading products.

Second, **we expect Par to immediately accelerate Endo's growth**. Their addition today will help us achieve double-digit revenue growth in the mid-term and be accretive to adjusted diluted earnings per share. We expect to deliver $175 million of financial synergies and to increase adjusted gross margins in our U.S. generics business based on Par's high-value portfolio. Looking forward, we also expect Par's strong R&D pipeline to fuel long-term organic growth.

Third, **our new combined company has a strategically expanded corporate profile, scope and size that provide a powerful platform for future M&A. Strong cash flow is expected to lead to rapid de-levering with an objective of achieving a net debt-to-EBITDA ratio of three times to four times in mid-2016.**

And fourth, we believe the addition of Par is aligned with Endo's strategy of pursuing **accretive value-creating growth opportunities** and together, that we can create shareholder value and drive benefits for patients and customers.

Moving to slide 4, the combination of Endo and Par is transformational for our Company and enhances scale in a number of measures. Enterprise pro forma revenues for 2014 were in excess of $4 billion and pro forma EBITDA for 2014 was more than $1.6 billion. We now have approximately 6,300 employees globally and our long-term value creation is expected to be fueled by operational synergies, double-digit revenue growth, and a transformative M&A platform.

Moving to slide 5, the combination of Qualitest and Par is transformational for our generics business as well. **Together, they become a leader in specialty generics with greater scale. Pro forma revenues for generics in 2014 were approximately $2.4 billion and US generics now has approximately 3,500 employees, primarily focused on R&D, as well as on global manufacturing and supply chain operations.**

Combined, our new generics R&D pipeline includes approximately 300 programs, approximately two-thirds of which are in alternative dosage forms and more than 100 are expected to be Paragraph IV filings, including some with first-to-file or first-to-market opportunities. Reloading the pipeline is a focus as well and we expect our US generics business to file 20 to 30 new ANDAs per year.

158.    Furthermore, during the conference call, Defendant De Silva reiterated the purported strategic strength of the business combination and provided positive financial guidance, stating, in pertinent part, as follows:

- 50 -

[A]s we have stated before, ***we believe the addition of Par will provide attractive accretion in 2016 and in 2017 relative to undisturbed consensus expectations prior to announcement of the acquisition in May.*** We stand by those prior statements, and today, we formalized them by providing initial financial guidance for 2016. In our view, we expect adjusted diluted earnings per share to be in the range of $5.85 to $6.15 for the full year of 2016. This growth is possible due to several key factors.

First, ***we expect double-digit underlying revenue growth for the total enterprise. Second, we are projecting strong and rapid synergy capture from the Par acquisition. And third, we continue to progress and execute on our tax strategy.***

***Endo is positioned for growth***. We have the resources to continue investing to support commercial opportunities that are key to our current and future growth and to advance our promising late-stage pipeline opportunities. This includes BELBUCA, where we are making good progress in our dialog with the FDA. The PDUFA date for this product is October 23, leading to an anticipated launch in early 2016, assuming approval. We also expect our robust cash flow generation to facilitate rapid delevering and to enable continued execution of strategic M&A in 2016 and beyond.

159.    With respect to the Par transaction and the Company's financial guidance, Defendant

Upadhyay stated, in pertinent part, as follows:

***Regarding Par, as I noted, financial results for Par were in line to slightly ahead of our expectations and we expect that trend to continue for the remainder of the year.*** We'll provide more color on our overall third quarter revenue performance on our earnings call in early November.

Turning to our combined full year 2015 guidance, we now expect revenues to be between $3.22 billion and $3.27 billion. On an adjusted basis, we expect our full year 2015 gross margin, as a percentage of revenues, to be approximately 64%. This is slightly better than our original expectation and it's driven by improved margins in the combined generics business, as a result of a prioritization and optimization exercise with the objective of improving mix and margins.

160.    Defendant Campanelli also told investors that there was positive generic growth in

the business, explaining, in pertinent part, as follows:

I think, Greg, a little bit more in terms of elaborate it and I think the way we're looking at, ***when we see both the Qualitest and Par pipeline, we feel good and we feel that everything is right on track and as we're predicting, the approvals are anticipated and we have a good relationship with the FDA.*** So overall, we're executing on the strategy and I feel as though that we will be launching products as we're predicting.

161.    In closing the conference call, Defendant De Silva summarized the purportedly

positive attributes of the Par acquisition, stating, in pertinent part, as follows:

> But as we've said, even more importantly for us, the Par transactions puts us at a
> point of scaled cash generation and organic growth that really allows us to expand
> our horizons and our aspirations. ***Going forward, we will have a business that is
> growing double-digit organically, expanding margins and with an attractive tax
> rate and underlying tax strategies have an expanding cash conversion rate which
> makes our platform even more attractive and viable in terms of future M&A and
> we are looking forward to this next phase of the Company's growth at a much
> larger scale and cash generation capabilities so that we can continue to play out
> our M&A strategies alongside the many organic growth opportunities that we
> have, including the BELBUCA launch as well as XIAFLEX pipeline***.

162.    The statements referenced ¶¶157-161 regarding the Company's organic growth, the

strength of both the Par and Qualitest portfolios and the synergies to be derived from the acquisition

of Par were materially false and misleading for the reasons set forth in ¶131.

**Q3 2015 10-Q and November 5, 2015**
**Earnings Conference Call**

163.    On November 5, 2015, the Company issued a press release announcing its financial

results for the third quarter ended  September 30, 2015.  For the quarter, Endo reported a net loss of

$1.05 billion, or $5.02 per diluted share, on revenue of $745.73 million, compared to a net loss of

$252.08 million, or $1.59 per diluted share, on revenue of $654.12 million for the same period in the

prior year.  For U.S. Branded Pharmaceuticals, Endo reported net revenues of $304.78 million,

compared to net revenues of $240.93 million for the same period in the prior year.  In commenting

on these results, Defendant De Silva stated, in pertinent part, as follows:

> ***Our diversified business delivered solid financial results this quarter and was
> further strengthened by our completed acquisition of Par Pharmaceutical
> Holdings, Inc.  As we continue to execute on our strategy of organic growth, de-
> risked pipeline development and creating shareholder value through accretive,
> strategic M&A, we believe Endo is positioned for overall double-digit revenue
> expansion over the mid- to long-term*** . . . .  Fundamentally, our business is more
> diversified and well positioned financially and strategically.  Following the recent
> FDA approval of BELBUCA™, we are conducting a strategic portfolio optimization
> process to expand our pain sales force and reallocate resources across key growth

- 52 -

products in our U.S. Branded Pharmaceuticals business. ***Moving forward, we remain focused on execution and value creation activities: the integration of Par, driving growth for our priority branded products, growing our international presence and strategic M&A.***

164.    Following the issuance of the earnings release, Endo held a conference call with analysts and investors to discuss its earnings and business operations.  Defendants De Silva, Upadhyay and Campanelli participated.

165.    During the conference call, Defendant De Silva highlighted the Company's purportedly "sustainable growth" saying, in pertinent part, as follows:

> ***First, we have optimized and refocused the Endo business for sustainable growth***. Our efforts have enabled us to successfully right-size our cost base and upgrade our management talent.  We have divested the non-core assets of HealthTronics and AMS Men's Health to sharpen the strategic focus on pharmaceuticals and our base business.
>
> We completed bolt-on acquisitions like Boca, DAVA, and SUMAVEL DosePro that added near-term critical mass at key points in our corporate evolution.  Finally, we expanded the R&D pipeline with the addition of AVEED, creating a new branded growth opportunity.

166.    Defendant De Silva also noted what he characterized as the "extremely attractive" generics business saying that "it is important to note that our ***U.S. generics business continues to be an extremely attractive and effective growth driver for Endo***."  Further, De Silva stated that "with the acquisition of Par completed in the third quarter[,] [w]e believe that we have created significant value and have achieved critical mass in our U.S. Generics business unit."

167.    In his scripted remarks, Defendant Upadhyay stated that the Company was  well positioned to capture its anticipated synergies, stating that "[w]e have been very efficient in capturing synergies from the Auxilium transaction, and are well positioned to captured synergies from the Par acquisition."  Additionally, during the conference call, Defendant Upadhyay positively portrayed the growth performance of Qualitest, saying: "[j]ust to reiterate on the generics piece, sequentially even excluding Par, the Qualitest business did grow from Q2 into Q3, and that's even

with the backdrop of a steeper price decline in Lido AG than we originally anticipated, so the business fundamentally is still performing quite well."

168.     Defendant De Silva closed his remarks by positively characterizing the Company's growth and the success of the Par acquisition, as follows:

> **[W]e are strongly positioned for growth in 2016**, and today, we reiterate the 2016 financial guidance of an estimated adjusted diluted earnings per share from continuing operations in the range of $5.85 to $6.15. **We remain confident in our ability to deliver double-digit revenue growth, strong and rapid synergy capture, continued progression and execution of our tax strategy, and robust cash flows and rapid de-levering that enables continued execution of our M&A strategy**.

169.     The statements in ¶¶163, 165-168 referenced above regarding the Company's organic growth and the successful acquisition of Par were materially false and misleading when made as they failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them:

(a)     that Endo's acquisition spree had left the Company with an amalgam of unrelated and disjointed pharmaceutical businesses, which were failing to generate meaningful sales growth and were of diminishing value;

(b)     that upon consummation of the Par acquisition, Endo had laid off key Qualitest sales executives with crucial customer relationships, abandoned Qualitest's retail and wholesale accounts business and laid off the related sales force and restructured the way Qualitest bid and priced contracts for its customers.  As a result of the foregoing, Qualitest was experiencing declining revenues and earnings and was not performing according to internal expectations; and

(c)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Par acquisition and the synergies to be derived therefrom.

**December 2, 2015 Presentation**

170.     On December 2, 2015, Defendants De Silva and Upadhyay made a presentation at the

Piper Jaffray Healthcare Conference on behalf of Endo.  During this call, De Silva represented that

the integration with Par was "going extremely well," stating, in pertinent part, as follows:

> And I would say this is one of those transactions, probably one of the few transactions where you actually feel much better after the close, and you actually got a closer look.  ***Because, oftentimes, you go through due diligence; you do a transaction; and then things come up once you actually have it on your budget. And in this case, I think we're even more positive, post- the transaction***.
>
> I think one of the key aspects of why it is going so well is that we were able to retain Paul Campanelli to run the business.  ***And as importantly, Paul, in turn, was able to convince pretty much his entire team to stay with him. So, we have kept intact the core parts of Par success:*** put it through the R&D group, the Paragraph IV capability, as well as obviously its commercial [prep now fronted].
>
> ***So, the integration is going extremely well***.  For us, I think what really intrigued us about Par was its pipeline.  And I think that's what differentiates Par, and now Endo, in terms of our generics business versus other generics businesses, which is that we have a product pipeline of roughly about 300 programs of which the vast majority are in differentiated categories.
>
> We have a substantial number of Paragraph IV opportunities for us to file, for us to market.  ***So in many ways, as we look forward into the next several years, we think we're really well positioned from the standpoint of a generics business.***

171.     During the presentation, Defendant Upadhyay similarly represented that Endo was

realizing its expected synergies from the merger, stating, in pertinent part, as follows:

> ***So, first of all, the integration is going quite well; if anything, probably a little bit ahead of schedule.  And when we announced the deal, we first talked about $175 million in financial synergies, broadly broken up about $100 million in OpEx synergies and $75 million in tax synergies.***
>
> ***On the OpEx synergies, we are right on track to deliver that full synergy run rate within the 12 months as we talked about at the deal, maybe even slightly faster than that.  The tax synergies are playing through quite nicely. In fact, if anything, we are seeing positive momentum coming into the back end of 2015.***  And it is lining us up really well to maintain a mid-teen tax rate, despite Par being a full US taxpayer, and that EBITDA base coming into us.  So, we also think that there is opportunity [to] improve that tax rate over time.

*And then the last piece that we haven't explicitly guided on, which is the OpEx and supply -- excuse me, manufacturing and supply chain synergies -- we do think that there is a sizable opportunity there after a couple months of integration, and working with Paul's team and the Qualitest team.  And, the way we would think about that is somewhere about 100 to 300 basis points over the 2017 to 2018 and 2019 time frame.*

172.    The statements referenced above in ¶¶170-171 regarding the Company's organic growth, the synergies to be derived from the acquisition with Par were materially false and misleading as they failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them:

(a)    that Endo's acquisition spree had left the Company with an amalgam of unrelated and disjointed pharmaceutical businesses, which were failing to generate meaningful sales growth and were of diminishing value;

(b)    that upon consummation of the Par acquisition, Endo had, among other actions, laid off key Qualitest sales executives with critical customer relationships, abandoned Qualitest's retail and wholesale accounts business and laid off the related sales force and restructured the way Qualitest bid and priced contracts for its customers.  As a result of the foregoing, Qualitest was experiencing declining revenues and earnings and was not performing according to internal expectations; and

(c)    as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Par acquisition and the synergies to be derived therefrom.

173.    Further, Defendant Upadhyay's statement in ¶170 that the Company was "even more positive, post- the transaction" and that the success of the integration was due to the Company's ability to retain Defendant Paul Campanelli and his team was materially misleading because it falsely characterized the integration as a success when it had severely damaged Qualitest's business.

- 56 -

**January 5, 2016 Conference Call**

174.    On January 5, 2016, Defendant De Silva made a presentation at the Goldman Sachs

Healthcare Conference on behalf of Endo.  During this presentation, Defendant De Silva highlighted

the Company's purported transformation under his leadership, stating, in pertinent part, as follows:

> So, as I look at 2015 and look at where our starting point was in 2012, we are very
> proud of what we achieved over the course of those- - I don't know, two, two and a
> half years, and *really feel that we are entering 2016 with a fundamentally different*
> *and fundamentally stronger Company than it ever has been.*

175.    Further, during the presentation, in response to an analyst question, Defendant De

Silva represented that the Company's product pipeline was promising and that its integration of Par

was "going very well."  The following exchange took place:

> **Jami Rubin** - *Goldman Sachs - Analyst*
>
> You've said that you expect double-digit earnings growth or double-digit organic
> growth in the near to medium-term.  And you talked about the areas of the business
> that you need to execute on.  Can you touch on what you really need to do to meet
> this target?  And how comfortable you are getting there?  And what could go wrong?
> I mean, what keeps you up at night?  What are the key challenges that you see in
> achieving this 10% organic growth rate?
>
> **Rajiv De Silva** – *Endo International plc - President, CEO, and Director*
>
> Sure.  So, the -- frankly, it comes back to the priorities that I mentioned, which is Par,
> XIAFLEX and BELBUCA.  Right?  The -- I mean, those are going to be the major
> contributors to that double-digit organic growth.  *And what I would say is on Par,*
> *the integration is going very well. I'm very impressed with the team that Paul has*
> *kept around him.  And early signs are very positive.  Right?*

176.    During the presentation, Defendant De Silva represented that Qualitest would

experience an increase in sales volume in 2016, stating, in pertinent part, as follows:

> **Jami Rubin** – *Goldman Sachs – Analyst*
>
> Given the focus on pricing, can you take us through what has historically been the
> contribution of price to Endo's growth and how you think about that going forward?
>
> **Rajiv De Silva** – *Endo International plc- President, CEO, and Director*

- 57 -

In our Generics business, Qualitest has historically - - we have had about 15% organic growth of which about a third came from price.  But that, we always signal, was going to shift as it went into the future.  ***So if you look at 2015, all the growth in Qualitest is going to come from volume and by and large it's because the positive price that we had is offset by some of the price penalties that we had to pay on some of the new price increases we took.  So net-net, if you look at 2015 year-to-date, the substantial majority of our growth is volumes, not price***.

177.    During the presentation, Defendant De Silva further underscored the strategic nature of the Par acquisition and represented that Par was the "perfect complement to the Company" stating, in pertinent part, as follows:

**Jami Rubin** – *Goldman Sachs – Analyst*

The Par deal has transformed the Company into a major generics play.  Is that your intention?  Or is it your goal to be -- do you want to be a more diversified -- would you rather have a more diversified portfolio of businesses?

**Rajiv De Silva** – *Endo International plc – President, CEO, and Director*

That's a good question.  And I go back to where I began this commentary on what our aspiration was and is, which is to build a global specialty pharmaceutical leader with a footprint in all these three areas, right? -- which is generics, branded, as well as international.  But clearly as a part of leadership, you need to have sufficient critical mass in each of these things.  And we knew as we progressed that we would be -- it's very difficult to make a single move that's going to move you forward in each of these segments.  Right?  So you are looking at making moves that move one segment forward at a time.

***The Par transaction was a -- by far the best transaction for Qualitest in terms of getting to a critical mass and getting to leadership in the generics business. Right? It is a perfect complement in terms of capabilities, portfolio, et cetera. But clearly, temporarily, it puts us in a situation where we are weighted in terms of our revenues towards generics.  But that's not the intention.***

***Our intention is to continue to, as we kind of come out of 2016, as we do other transactions, to really build the other two segments, and really look for more branded and/or long-lived assets as we build out the rest of the portfolio.***

178.    Further, Defendant De Silva described the integration as a "perfectly complementary transaction," stating, in pertinent part, as follows:

**Rajiv De Silva** – *Endo International plc - President, CEO, and Director*

- 58 -

So I think, as we've signaled in the past, the Qualitest business, even if we had not done Par, would have moved into a situation where it's mostly driven by volume, not price.  Right?  So I would kind of think about Qualitest as a high single-digit grower.

***But I think it is going to do very well under Par.  Right?  Because you now have a much broader offering to customers.  Our controlled substance business is still one of the best in the industry.  We have a very strong liquids business,  which are all complementary to what Par has.  Right?  So there is no reason to believe that it will slow down.***

***Now clearly, as you put the two businesses together, there will be portfolio optimization and we may choose to de-prioritize certain products as we negotiate with customers.  But net-net, it is a perfectly complementary transaction.***

179.    Defendant De Silva also pointed out the contributions that Endo's generics business were expected to make toward the Company's organic growth and represented that the Company's generics business was strong.  The following exchange took place:

**Jami Rubin** – *Goldman Sachs – Analyst*

So I'm just curious to know where you stand on [Endo's generics] business?  And do you see it as an important driver of sustainable growth going forward?

**Rajiv De Silva –** *Endo International plc – President, CEO, and Director*

From our perspective, it is a ***very important contributor in double-digit organic growth.***  Right?  Because, it just – the commentary that we made - -

**Jami Rubin –** *Goldman Sachs – Analyst*

Double digit?  Or you expect that to be a double-digit organic grower?

**Rajiv De Silva –** *Endo International plc – President, CEO, and Director*

Exactly, right?  ***And it's large enough that it actually supports the rest of the company getting there as well.   And that's primarily on the back of the Par pipeline.***  Especially as the volume of approval to the FDA speeds up, it actually helps people with better pipelines, right?

So, Par has a pipeline in excess of 300 projects.  A good chunk of it are first-to-file potential products.

180.    Finally, Defendant De Silva underscored Qualitest's ability to contribute "high-single-digit" growth to Endo's generics segment and represented that it was "doing very well under Par."  The following exchange took place:

**Jami Rubin –** *Goldman Sachs – Analyst*

Can you talk about your expectations for the Qualitest business?  Would you expect that business now to slow down while Par picks up?  Or how much of the growth from that business will be price versus volume?

**Rajiv De Silva** *– Endo International plc – President, CEO, and Director*

So, I think as we've signaled in the past, Qualitest is – the Qualitest business, even if we have not done Par, would have moved into a situation where it's mostly driven by volume, not price.  Right?  *So, I would kind of think about Qualitest as a high-single-digit grower. But I think it is going to do very well under Par, right, because you now have a much broader offering to customers*.  Our controlled substance business is still one of the best in the industry.  We are very strong liquids business, which are all complementary to what Par have, right?  So, there's no reason to believe that it will slow down.  Now clearly, as you put two businesses together, there will be portfolio optimization that we may choose to depart certain products as we negotiate with customers.  But net-net, it's a perfectly complementary transaction.

181.    The statements referenced above in ¶¶174-180 for the reasons set forth in ¶172.

### January 12, 2016 Presentation

182.    On January 12, 2016, Defendant De Silva made a presentation at the J.P. Morgan Health Care Conference on behalf of Endo.  During the presentation, Defendant De Silva positively described the integration of Par, stating, in pertinent part, as follows:

In our US generics business, we completed the Par transaction which in one step allowed us to reposition Qualitest, our legacy generics business, as industry leader. *We are -- we will be the number four generics player once the Teva, Actavis combination is completed*.  And more importantly, with Par, we have now access to one of the industry's broadest and best pipelines with a substantial proportion of Paragraph IV filings first-to-file opportunities and well differentiated filings.

*        *        *

*Thirdly, the integration of Par.  It is a very large part of our business and I'm very pleased that Paul Campanelli and his team has already made great progress in the integration of the business, both in terms the capture synergies, solidifying the*

- 60 -

*pipeline to ensure that all the launches that we anticipate in 2016 and beyond are still very much on track.*

\*      \*      \*

*In our generics business, very strong underlying volume growth.  We completed the Par transaction.  As I mentioned, we are making very good progress on achieving our cost synergies.*  We talked about $175 million of financial synergies, $100 million operations and $75 million tax.  *We are well on the way to achieving those.*

183.    Further, Defendant De Silva represented that Endo's generics business was experiencing "very strong underlying volume growth," stating, in pertinent part, as follows:

*In our Generics business, very strong underlying volume growth*.  We completed the Par transaction.  As I mentioned, we are making very good progress on achieving our cost synergies.  We talked about $175 million of financial synergies, $100 million operations and $75 million tax.  We are well underway to achieving those.

*And 2016 is a year that we expect to grow our combined Generics business double digit, and that is on the basis of pure volume and mix.*  And most of that coming through – they had certain launches that Par expects to deliver towards the back end of the year.  So the majority of growth, this double-digit growth will come from volume and mix.

184.    The statements referenced above in ¶¶182-183 for the reasons set forth in ¶172.

### The February 29, 2016 Earnings Release and Conference Call

185.    On February 29, 2016, Endo issued a press release announcing its results for the Company's fourth quarter 2015 and full year 2015 financial results.  For the quarter, Endo reported a net loss of $118.46 million, or $0.53 per diluted share, on revenue of $1.07 billion, compared to a net loss of $53.48 million, or $0.34 per diluted share, on revenue of $662.88 million for the same period in the prior year.  For 2015, Endo reported a net loss of $1.50 billion, or $7.59 per diluted share, on revenue of $3.27 billion, compared to a net loss of $721.32 million, or $4.60 per diluted share, on revenue of $2.38 billion for 2014.  For U.S. Branded Pharmaceuticals, Endo reported net revenues of $379.41 million for the quarter, compared to net revenues of $245.79 million for the same period in the prior year, and net revenues of $1.28 billion for 2015, compared to net revenues of $969.44

million for 2014.  In the press release, Endo provided revenue guidance, estimating total revenues between $4.32 billion and $4.52 billion for the year ended December 31, 2016.  Commenting on these results, Defendant De Silva was quoted in the press release as stating: "Endo delivered solid financial results this quarter and was further strengthened by our first full quarter of revenues from the acquisition of Par Pharmaceutical Holdings, Inc.  As we enter 2016, we believe our business is diversified and positioned for double-digit underlying growth over the mid- to long-term."

186.    Following the issuance of the February 29, 2016 press release, the Company held a conference call with analysts and investors to discuss its financial and operating results for the quarter and year ended December 31, 2015.  Defendants De Silva, Upadhyay and Campanelli participated in the call, which other members of the executive management team joined.  In his opening remarks, Defendant Upadhyay discussed the challenges that the Company faced but continued to represent that Endo was poised for strong future growth.  Specifically, Defendant Upadhyay stated, in pertinent part, as follows:

> We generated strong underlying cash flow from operations in line with expectations. In short, we have established a platform that, even if we pursue no additional M&A, positions us for future double-digit underlying growth and expanding margins. 2015 was indeed an important and transformative year in Endo's evolution.
>
> *        *        *
>
> **I would like to emphasize that 2015 was another year of transformation for Endo and one that positions us for future growth and profitability.**  Specifically, it was a year where we further diversified and expanded our revenue base.  We delivered solid underlying growth in a challenging market.  We expanded margins, improved our underlying after-tax cash flow conversion.  **We've built a strong branded and generics product pipeline.**  We improved our operating model and execution and made continued progress on narrowing the tail of the company's mesh-related product liability.

187.    In addition, Defendant Upadhyay described the Company's results in a positive light stating, in pertinent part, as follows:

[W]e believe that 2016 financial profile will be a continuation of 2015, which was marked by solid underlying revenue growth, margin expansion, and attractive tax rate and strong underlying cash flow conversion.

*        *        *

So, on slide 30, you will see the highlights of our full-year 2016 financial guidance are as follows.  We expect total net revenues to be in the range of $4.32 billion to $4.52 billion.  We project adjusted gross margins of 63% to 65% this year, which is in line with 2015 despite a higher mix of Generics revenue in 2016.

This is primarily driven by the continued growth of XIAFLEX, the launch of BELBUCA and our continued shift towards high-value products in our Generics business.  ***Each of our segments is expected to maintain or improve their gross margin profile in 2016 versus 2015***.

188.    Defendant De Silva reiterated that the Company was expecting strong growth in 2016 and that it would de-lever its balance sheet within the year.  Defendant De Silva stated, in pertinent part, as follows:

Third, Endo is achieving sustainable growth.  As Suky mentioned, ***we expect to de-lever back down to the 3 to 4 times net debt to adjusted EBITDA range this year***, and, in our continuing efforts to diversify our revenue base, we expect to drive underlying growth in our Emerging Markets with our re-based Somar and Litha businesses.

*        *        *

Our focus is on value creation, which we plan to drive through our priorities, including a strong commercial launch of BELBUCA, continued growth for XIAFLEX and continued growth for the Par portfolio.  We utilize a differentiated operating model that is based on a diversified product portfolio and a strong derisked R&D pipeline across our businesses.

***And, finally, we are achieving sustainable growth with a projected double-digit underlying growth rate, increasing operating margins, strong cash flow conversion and the ability to de-lever rapidly***.  2015 was a year of transformation and continued evolution for Endo.  We see 2016 as a year of execution, of delivering on the promise and potential of our business and of creating significant value for our shareholders.  We look forward to achieving these goals and to your continued support.

189.    Defendant De Silva also positively portrayed the performance of the generics segment, stating, in pertinent part, as follows:

- 63 -

Moving to slide 22.  Our focus on value creation also includes our US Generics business.  This 2015 and 2016 break out of our pro forma generics revenue illustrates key segments of our Par business as well as how those segments are growing.  Most importantly, the segments that are growing substantially are also those that represent our highest value products.

*     *     *

Moving to slide 23.  ***You will see that the effect of our collective efforts and our acquisition of Par in 2015 are not only increasing the size of our portfolio and Generics pipeline but also growing revenue and improving our gross margins.***  We expect to meaningfully continue this expansion into 2016 and beyond.

190.    When Defendant De Silva was asked about the underlying growth for the Company's

generics segment, the following exchange took place:

**Annabel Samimy** – *Stifel Nicolaus – Analyst*

Is there some underlying growth that we can assume for the Generics business at this point?

**Rajiv De Silva** – *Endo International PLC – President & CEO*

So yes, we've talked about mid to high teens for the Generics business for 2016.

191.    While continuing to stress the growth of the generics segment, Defendant De Silva

acknowledged "volume loss and pricing pressure" which he attributed to "increased competition in

multi-player categories."  Defendant De Silva explained, in pertinent part, as follows:

Next, let's talk about our U.S. Generics business on slide eight.  Overall, we were able to drive an underlying growth rate in the double digits for the full year despite increasing pricing pressures across the sector.  ***We are very pleased with the strong contribution provided by the legacy Par business in the fourth quarter, which exceeded our internal expectations***.

***The legacy Qualitest business, while diversified and historically insulated from the challenging pricing environment, did experience some volume loss and pricing pressure in the fourth quarter due to increased competition in multi-player categories.  While we have seen volume decline in some areas of this business, it is important to note that 80% of Qualitest's extended unit loss in the full year 2015 versus prior year was driven by only a handful of products that correspond to approximately 20% of Qualitest reported net sales in 2014.***

- 64 -

192.     During the question and answer period that followed Defendant De Silva's prepared remarks, Defendant Upadhyay discussed the pricing pressure trends in the market.   Defendant Upadhyay explained, in pertinent part, as follows:

> Having said that all of that is baked into our forward-looking estimates for 2016, and as Rajiv noted earlier in scripted remarks, *we still see very strong generics growth in the mid teens to high teens*, primarily driven by our injectables business, continued growth across the base, as well as our launches on base certain products. . . .

193.     With respect to the Par business, Defendant Upadhyay explained the Company's results and informed the markets of "higher than expected" costs surrounding the Par integration. Defendant Upadhyay stated, in pertinent part, as follows:

> **Suky Upadhyay** – *Endo International PLC – CFO*
>
> Yes.   The one thing I'd say is that $359 million was a little better than our expectation, primarily driven by the injectables business.   We're also seeing good solid performance in the base business as Paul talked about a little bit earlier.   That should carry over into 2016, as well.   I will also say as we move forward into 2016, Paul was looking at this portfolio as one portfolio.   So we will not break out Par versus legacy Qualitest sales.   We treat this as one business and that's how we'll report on it.
>
> The change in the fourth quarter were about $30 million that we consider to be one-time and non-recurring.   It's really three factors that make this up.   Well there's a number of factors, three of which are examples are around trade disputes in the fourth quarter.   We have some changes and estimates around gross to nets.
>
> *And third, we had some charges higher than expected around the harmonization of our methodologies around gross to nets as we integrated Par and Qualitest.* Again, we do not expect those to re-occur on a quarterly basis going forward.

194.     Defendant Upadhyay again told the market that the Company was set to de-lever following the Company's numerous acquisitions in the preceding years, stating that "[w]ith these post-tax cash call projections and our robust underlying cash generation, we have the confidence that we can continue to de-lever into the three to four times range in the second half of 2016 and expect further de-lever into 2017."

- 65 -

195.     Defendant Upadhyay described the generics business as strong when an analyst with RBC Capital Markets, inquired about the Company's growth and pricing strategy.  The following exchange took place:

**Randall S. Stanicky –** *RBC Capital Markets – Analyst*

Great.  Thanks, guys. Rajiv, or maybe this is better for Paul, can you just expand on the pricing headwinds that you're seeing and factoring in?  Most of your larger peers are talking about a similar erosion level this year to last year despite what is an expectation of greater approvals.  And so can you help us understand the Qualitest impact from 4Q, if that's likely to continue?  And then what type of erosion are you expecting in the business for this year?

*             *             *

**Suky Upadhyay –** *Endo International PLC – CFO*

Good morning, Randall.  So the first thing I would say is into the fourth quarter when we gave preliminary results around 2015, that did imply some softness in 2015 fourth quarter around generics.  ***We did start to see the early signs of some volume erosion in our more commoditized parts of our business***.  And then as we closed out our final processes for the year, we did recognize a higher level of charge-backs and rebates coming through, specifically around our more commoditized portfolio as well as our pain franchise.

That in tandem with some one-time charges that occurred in the fourth quarter led to a lower than expected fourth quarter.  ***I should say that those one-time charges we do not expect to continue in forward-looking quarterly results, but there is some underlying pressure around pricing that will extend into 2016.***

***Having said that, all of that is baked into our forward-looking estimates for 2016. And as Rajiv noted earlier in the scripted remarks, we still see very strong generics growth in the mid-teens to high-teens, primarily driven by our injectables business, continuing growth across the base, as well as our launches on base-certain products.***

196.     In response to a question by an analyst of Guggenheim about gross margin expansion and operating leverage in 2016, Defendant Upadhyay reassured the market that these metrics were positive.  The following exchange took place:

**Louise Chen** - *Guggenheim – Analyst*

How should we think about that in light of your results in the fourth quarter?  And then second question is on the Generics business, how should we think about the

underlying growth outside of Seroquel and Zetia and the sales progression quarter-over-quarter?  Thanks.

**Suky Upadhyay** – *Endo International PLC - CFO*

***Yes, so actually a little bit better than expected from the closing of Par.  Our initial expectations going into 2016 was with the higher mix of generics products versus branded.***  We might see some dilution into our gross margin.  As we actually work through our plan and our portfolio prioritization we're actually moving to a higher mix of higher value products which is ultimately expanding our margins.

So as Paul talked about, or as Rajiv talked about in scripted remarks, the growth of the injectable franchise is one that is characterized with a gross margin profile well above the overall Company average.  ***As we think about the launches of some of our dates, certain products, those are also products that have gross margin profiles well ahead of the overall gross margin average. But then when you add in continued growth of XIAFLEX, as well as BELBUCA, both of which have gross margin profiles above the Company average, you start to form a picture of where we're going to see this gross margin expansion into 2016 and one that we're very pleased and confident in***.  And then from about operating margin perspective, as I said we are going to spend more against advertising and promoting, promotion against XIAFLEX and BELBUCA.

197.     Defendant De Silva was evasive when analysts asked about the outlook for Qualitest.

During the questions period, the following exchange took place:

**David Risinger** – *Morgan Stanley – Analyst*

Thanks very much.  So I have two questions.

First, with respect to the Qualitest outlook, just so that we understand how to model it, should we be thinking about a 20% decline in 2016 similar to, or in the ballpark of, what was[,] of what the number was in the fourth quarter of 2015?

*        *        *

**Rajiv De Silva** – *Endo International PLC – President & CEO*

Sure, David, let me address your first question, which is, first of all, keep in mind that as Suky pointed out, there was some non-recurring impacts in the fourth quarter that impacted Qualitest, which should not see any roll forward impact.   And secondly, I think back to the comment that Suky made, we are not providing guidance for Qualitest distinct from Par, simply because at this point Paul has a combined portfolio, he is negotiating customer contracts across a combined portfolio.

He will make some portfolio optimization decision as he goes into the year in terms of what products he prioritizes with customers, and that means that Par products, it

means [Qualitest] products. *So as a result we don't expect to provide any guidance for the legacy Qualitest portfolio going forward, other than what we already commented on, which is that for the combined business we expect to see mid to high teens underlying growth for 2016.*

198.    Later, in response to a question regarding Par's performance, Defendant Upadhyay

stated that the Company was seeing "good solid performance" in the base business, explaining, in

pertinent part, as follows:

Yes.   The one thing I'd say is that $359 million was a little better than our expectation, primarily driven by the injectables business. *We're also seeing good solid performance in the base business as Paul talked about a little bit earlier. That should carry over into 2016, as well. I will also say as we move forward into 2016, Paul was looking at this portfolio as one portfolio.*  So we will not break out Par versus legacy Qualitest sales.  We treat this as one business and that's how we'll report on it.

The change in the fourth quarter were [sic] about $30 million that we consider to be one-time and non-recurring.  It's really three factors that make this up.  Well there's a number of factors, three of which are examples are around trade disputes in the fourth quarter.  We have some changes and estimates around gross to nets.

*And third, we had some charges higher than expected around the harmonization of our methodologies around gross to nets as we integrated Par and Qualitest. Again, we do not expect those to re-occur on a quarterly basis going forward.*

199.    Similarly, Defendant De Silva posed the problems integrating the Par generics

portfolio as minor and non-recurring explaining, in pertinent part, as follows:

[F]irst of all, keep in mind that as *Suky pointed out, there was some non-recurring impacts in the fourth quarter that impacted Qualitest, which should not see any roll forward impact.*  And secondly, I think back to the comment that Suky made, we are not providing guidance for Qualitest distinct from Par, simply because at this point Paul has a combined portfolio, he is negotiating customer contracts across a combined portfolio.

200.    Analysts pressed further to understand the Company's weakness in the generic

segment.  Defendant De Silva attributed the weaker than expected results to the pain market

generally and disavowed problems growing the generics business after Par.  The following exchange

took place:

- 68 -

**Marc Goodman** – *UBS – Analyst*

I'm just trying to understand on the Generics business, the pricing that you're talking about, there's one aspect of it which is the commodity pricing, but then there's the other aspect, which is the pain products, which have been really important for you. The question is, we've heard from other companies in this space and they were complaining about new players coming back last year and they were complaining about pricing in that market and they were having some troubles there, and yet Endo was not complaining at all at that time and now there seems to be a delayed impact. So I'm trying to understand why is that?

<center>*     *     *</center>

**Rajiv De Silva** – *Endo International PLC – President & CEO*

So although we've taken some substantial volume declines in our pain portfolio, they are somewhat anticipated based on the price increases we took and the approach we've taken. ***So net-net from a value standpoint, we are actually pleased with how the pain portfolio has performed. But is there pricing pressure in pain, as well as the commodity portfolio?*** The answer is, yes, because there are smaller players who tend to be aggressive even in the pain arena now, most of them have been in the past.

201.    Defendant De Silva concluded the call by quieting investor concern and highlighting the Company's expected growth, stating: "[w]e believe [that] the fundamentals of the business are very strong, strong underlying growth that will sustain us through 2016 into the medium term that we've talked about in the past.  We are positioned for growth in 2016.  We have some strong growth drivers like XIAFLEX, BELBUCA, and our Generics portfolio that we continue to put a laser-like focus on."

202.    Although the statements in ¶¶191,193,195,198 and 199 acknowledged pricing pressures in the market and issues with the integration of Par and Qualitest, Defendants' statements in ¶¶185-201 positively portrayed the Company's financial performance and reaffirmed the strength of the Company's generics business.  These statements were materially false and misleading as they failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them:

(a)      that the Par integration had negatively impacted Qualitest's business and would continue to do so for some time, as Endo laid off key Qualitest sales executives with critical customer relationships, abandoned Qualitest's retail and wholesale accounts business and laid off the related sales force and restructured the way Qualitest bid and priced contracts for its customers;

(b)      that Qualitest had lost a significant amount of its key customers as a result of the Par acquisition as detailed herein; and

(c)      as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Par acquisition and the synergies to be derived therefrom.

203.    In response to this news, on February 29, 2016, the price of Endo stock declined from $52.94 per share to $41.81 per share – a decline of 21%, on extremely heavy trading volume.

### March 17, 2016 Presentation

204.    On March 17, 2016, at the Barclays Global Healthcare Conference, Defendants announced weaker-than-expected annual revenue guidance for the first quarter of 2016. However, for the full year 2016, the Company reiterated the year-end revenue guidance previously announced in the Company's 2015 Earnings Release.

205.    Despite the weaker revenue guidance, Defendant De Silva nonetheless portrayed the Company's results in a positive light, stating: "Q1 considerations; so just to bring this back from what I said, we are off to a good start . . . ." Defendant  De Silva also characterized the revised guidance as "incremental," stating, in pertinent part, as follows:

> I will start off by acknowledging that this is a very challenging time for our sector and also a very challenging time for the company. But I'm also a strong believer that those who persevere and succeed in these situations are those companies that focus on the operations and those companies that are transparent in their communications with the investors; and that is what we seek to do.
>
> So let me just begin with a review of what we are trying to accomplish in 2016. In many ways, this is a refresher of what we talked about on our full-year guidance call and I will then move to talking about the first quarter. ***Now we do have incremental***

*information on the first quarter and we're using this opportunity today to set the proper expectations for our first quarter. But I would say at the very outset that we have confidence [in] our full plan for 2016 and we are making extremely good progress on all of our core priorities*.

206.    Defendant De Silva also commented on the recent performance of the Qualitest legacy business, acknowledging continued pricing pressures in the Qualitest business. Defendant De Silva explained, in pertinent part, as follows:

**Rajiv De Silva** – *Endo International plc – President, CEO, Director*

In our Generic business, again, very good progress on the core growth drivers that we pointed to, which is the sterile injectables business, as well as the new product planning, particularly around Zetia and Seroquel.  As we have more and more information, we feel more and more comfortable about Zetia and Seroquel. In fact, believe that there is further upside, particularly in 2017, around those two brands. And we believe that we are on a very strong trajectory with Vesastrip, which is one of the primary drivers of our sterile injectables business.

*We do continue to see continued price pressure in Q1, particularly around the Qualitest business.  If you look across the portfolio of today's business between Qualitest and Par, we do see a little bit more softness in the Qualitest side of the business than we expected.  That being said, from a broader full-year perspective, our plan is well intact.*

*We've also made very good progress in operational – our operational aspects and Paul can certainly talk to some of those things in the Q&A session.*

207.    Further, Defendant De Silva told the market that the Company's integration of Par was "well on track."  Defendant De Silva stated, in pertinent part, as follows:

*Integration is well on track.*  We have completed all of our consortium bids, which is in line with what everyone else in the industry have done as well.  We do expect the results of those to come through in the next couple of weeks.  We are making good progress with our dialogue on the FDA.  But clearly the things that we monitor most carefully are the outcomes of those consortium dialogues as well as how soon for our discussions with the FDA.  Those [are] the things that can make some meaningful differences in terms of how some of these segments perform.

\*        \*        \*

And really if you look at the core engine of Par and what we invested in in terms of buying Par, this is it.  This is the pipeline, the capability to keep renewing this pipeline.  ***And I'm delighted to say that has come through the integration extremely***

*well* because beyond what you see on paper, what Paul and the team are working on is repopulating this both in terms of new ANDAs as well as 505(b)(2) opportunities to refresh the next set of launches for 2018 and beyond.

208.    Additionally, Defendant De Silva downplayed the significance of the partial guidance and stated that he saw "nothing that concerns us more broadly about the year in totality" explaining, in pertinent part, as follows:

We obviously prefer to guide on a full-year basis.  We took the step this year of providing some phasing simply because our year is back-end loaded and we didn't want to – for those who follow us who didn't understand our business – to take a linear approach to how does a quarterly sequencing work, which is why we took the approach of providing some phasing from quarter-to-quarter. ***And as we've said, we do see a little bit of softness in the Qualitest generic business, but nothing that concerns us more broadly about the year in totality***.

209.    Finally, with respect to the Company's guidance, Defendant De Silva again underscored that the Company's full year guidance remained unchanged, stating, in pertinent part, as follows:

So we want to be cautious about how we think about our first quarter.  And we've given you a range here, which effectively ranges revenues from roughly about $928 million to $972 million on the top line and $1.02 to $1.08 on the bottom line. So this is not another major deviation at all.  And this is a reflection that we want to be clear on our expectations for the first quarter; ***and our full-year guidance number remains intact***.

210.    The statements referenced in ¶¶204-209 were materially false and misleading for the reasons set forth in for the reasons set forth in ¶202.

211.    In response to this news, the price of Endo stock declined from $33.91 per share to $30.03 per share – a decline of 11.4% on extremely heavy trading volume.

212.    On May 5, 2016, after the market closed, Endo issued a press release announcing the Company's financial and operating results for the quarter ended March 31, 2016.  According to the press release, Endo reported a loss of $0.40 per diluted share, down from earnings of $0.11 per share in the first quarter of 2015.  Additionally, Endo significantly cut its 2016 guidance, announcing

targeted revenue in the range of $3.87 billion to $4.03 billion, down from the range of $4.32 billion to $4.52 billion that the Company had reaffirmed in March, less than two months earlier.

213.   That same day, the Company announced changes to its board and management structure, including the resignation of Lortie as President of the Company's U.S. Branded Pharmaceuticals segment.

214.   During the Company's May 5, 2016 earnings conference call, Defendants disclosed to the market, for the first time, the steep price erosion in the markets and the difficulty integrating Par and the Company's legacy business, Qualitest.  Defendant Upadhyay stated: "the largest driver of the change is the greater-the-expected erosion in our generic's base business."  Further, Defendant De Silva explained as follows: "[i]n our generics segment, the base business erosion continued into the first quarter and was significantly deeper than we expected at approximately 30%.  This was driven by continued pricing and competitive pressures on our commoditized and pain products."

215.   For the first time, Defendant Campanelli admitted that the Par acquisition involved changing the "operating model" of the legacy business.  Campanelli explained, in pertinent part, as follows:

> Moving to slide 16, I do want to take a few moments to discuss our ongoing integration of the Qualitest and Par businesses.  Last fall in Q1 of this year, we were conducting an integration of two complex generic businesses.  What became very clear to those of us who have been in the generic industry for some time is that the legacy Par operating model is better positioned to address the challenges of today's evolving market.  *As a result, we set out to shift the legacy Qualitest portfolio strategy from a high volume approach to the high value operating model long practiced by legacy Par.*
>
> *As part of the integration activities, we're also transitioning the legacy Qualitest systems and processes to the Par business platform.  The legacy Par systems offer more real-time and product-level data, allowing for faster analysis and reaction within a challenging and changing market.  While many of these improvements were already planned at Qualitest, the integration of our business will accelerate the benefits.*

216.    When analyst David Risinger of Morgan Stanley asked for a break down with respect to the generic pricing and competitive pressures that impacted the Company's generic segment, Campanelli finally admitted the profound difficulties facing the Qualitest business.  The following exchange took place:

**David Risinger** - *Morgan Stanley – Analyst*

A couple questions.  So with respect to the generic pricing and competitive pressures that hit your generics guidance, could you just help us understand how much of that is from the Qualitest business and how much is hitting the Par business?  So I'll make up a number.  Let's say that the hit was $10.  Of the $10 hit, was it two-thirds to Qualitest and one-third to Par, or was it half and half to each?  Just trying to understand that.

*                 *                 *

**Paul Campanelli** – *Endo Health Solutions – President, Par Pharmaceutical*

David, your question on the price and the pressure, when we look at the Qualitest portfolio, which had served us well for so many years, as I said before, it is a mature portfolio, which is subject to more than normal competition.  We were very strong in pain; a big portion of our portfolio is directed towards pain.  ***It's not quite the barrier that it once was, and as a result, the pricing pressure that we saw was about 80% tied to legacy Qualitest and about 20% tied to legacy Par.***

217.    Analysts reacted negatively to this guidance cut and questioned the Company's management.  For example, in a May 5, 2016 research report, analyst PiperJaffray noted the market's surprise at the Company's lower 2016 guidance: "[w]e had not believed that the rebasing of expectations would be nearly this significant.  We were wrong."  Given the new developments, PiperJaffray was understandably not convinced by management that the problems facing the Company could be remediated so quickly, as reflected by the following comments:

Given these dynamics (which in a sense further magnify payments related to the vaginal mesh lawsuits), ***we believe it will be difficult for ENDP to make much of a dent in its net debt load of $8.4B over the next 1-2 years***.  Further, given management's commentary, it is not even clear to us that ENDP is position to return to earnings growth in 2017.  As such, it is now difficult for us to make a case that the current EV/2016E EBITDA multiple of near 8x will recover anytime soon.

218.    Likewise, on May 6, 2016, SIG Susquenhanna Financial Group, LLP noted the market's surprise at the magnitude of the reduction: the Company's "23% reduction to 2016 EPS was far beyond what we expected[.]"

219.    On May 6, 2016, Leerink Partners LLC expressed similar concerns, as follows: "[w]e are lowering our rating to MP from OP based on the ENDP's revised business outlook, limited near-term catalysts and our lack of conviction that the mgmt. team can turnaround the business in a timely fashion."  Leerink explained further that: "[b]ased on a combination of intensifying competitive pressure to ENDP's historically high margin US generic business and underwhelming acquired brand performance, we find it increasingly difficult to be constructive on any of the company's top line growth drivers."

220.    Street.com, a news source following Endo, articulated these concerns as follows: "[m]any were surprised by the extent of the guidance cut.  There are a number of questions floating around, including how did management get the estimates so wrong in the first place, is something bigger on the horizon and are the revised estimates a half-measure or the true picture?"

221.    In response to this news, the price of Endo stock dropped from $26.59 per share to $16.17 per share – a decline of 39%, on heavy trading volume.

222.    On May 6, 2016, after the market closed, Endo filed a Form 10-Q for the quarter ended March 31, 2016, with the SEC.  In the Form 10-Q, Endo revealed that it had received a CID from the U.S. Attorney's Office regarding its contract with PBMs regarding Frova.  The Form 10-Q stated as follows:

*Pricing Matters*

In March 2016, [Endo Pharmaceuticals] received a CID from the U.S. Attorney's Office for the Southern District of New York.  The CID requests documents and information regarding contracts with Pharmacy Benefit Managers regarding Frova®. We are currently cooperating with this investigation.  We are unable to predict the outcome of these matters or the ultimate legal and financial liability, if any, and at

- 75 -

this time cannot reasonably estimate the possible loss or range of loss, if any, for these matters but will explore all options as appropriate in our best interest.

223.    On this news, on May 9, 2016, the next trading day, the price of Endo stock fell an additional $0.90 per share, or more than 5.57% to close at $15.27.

224.    Then, on September 23, 2016, Endo issued a press release announcing that Defendant De Silva was resigning his positions at the Company and Defendant Campanelli was elevated to President and CEO of the Company.  Thus, Defendant De Silva's "turnaround" of Endo officially came to an end.

## CLASS ALLEGATIONS

225.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Endo stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

226.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Endo stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Endo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

227.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

228.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

229.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Endo;

- whether the prices of Endo stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

230.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

231.    As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Endo stock and operated as a fraud or deceit

on purchasers of such stock by failing to disclose and misrepresenting adverse facts. As such, misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Endo stock declined significantly as the prior artificial inflation came out of the Company's stock price.

232.    As a result of its purchases of Endo stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Endo stock to trade at artificially inflated levels throughout the Class Period.

233.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Endo's business and future financial prospects. When the truth about the Company was revealed to the market, the price of Endo stock fell significantly. Such declines removed the inflation from the price of Endo stock, causing real economic loss to investors who had purchased Endo stock during the Class Period.

234.    The declines in the price of Endo stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Endo stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

235.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Endo stock and the subsequent significant declines in the value of Endo stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## NO SAFE HARBOR

236.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged.  Many of the statements herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants  are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of  Endo who knew that those statements were false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

237.    During the Class Period, the market for Endo stock was an efficient market for the following reasons, among others:

(a)    Endo stock met the requirements for listing and were listed and actively traded on the NASDAQ;

(b)    as a regulated issuer, Endo filed periodic public reports with the SEC;

(c)    Endo regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Endo was followed by several stock analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

238.     As a result of the foregoing, the market for Endo stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Endo stock.  Under these circumstances, all purchasers of Endo stock during the Class Period suffered similar injury through their purchase of Endo stock at artificially inflated prices, and a presumption of reliance applies.

239.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against All Defendants**

240.     Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

241.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

242.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not

misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock during the Class Period.

243.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Endo stock.  Plaintiffs and the Class would not have purchased Endo stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

244.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Endo stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

245.    Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

246.    The Individual Defendants acted as controlling persons of Endo within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions as officers and/or directors of Endo, and their ownership of Endo stock, the Individual Defendants had the power and authority to, and did, cause Endo to engage in the wrongful conduct alleged.

247.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Endo stock during the Class Period.

248.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

   A.  Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

   B.  Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

   C.  Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

   D.  Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

  Plaintiffs hereby demand a trial by jury.

DATED:  November 16, 2016    ROBBINS GELLER RUDMAN
                & DOWD LLP
              SAMUEL H. RUDMAN
              DAVID A. ROSENFELD
              SAMUEL J. ADAMS
              AVITAL O. MALINA

                  /s/ Samuel H. Rudman
                  SAMUEL H. RUDMAN

              58 South Service Road, Suite 200
              Melville, NY  11747
              Telephone:  631/367-7100
              631/367-1173 (fax)
              srudman@rgrdlaw.com
              drosenfeld@rgrdlaw.com
              sadams@rgrdlaw.com
              amalina@rgrdlaw.com

              *Lead Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 16, 2016, I caused a true and correct copy of the THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS to be electronically transmitted to the Clerk of Court using the ECF System for filing.  Based on the records on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the ECF registrants of record.

<div align="right">

*/s/ Samuel H. Rudman*
Samuel H. Rudman

</div>