USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 01/16/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

CRAIG FRIEDMAN,

                Plaintiff,

        -v-

ENDO INTERNATIONAL PLC, et al.,

                Defendants.

----------------------------------------------------------------X

16-CV-3912 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

    In this putative class action, Plaintiffs bring securities fraud claims against Endo International PLC ("Endo") and three of its executives, Rajiv De Silva, Suketu Upadhyay, and Paul Campanelli (collectively, the "Individual Defendants" and, together with Endo, "Defendants"). Plaintiffs allege two principal violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Securities Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240: first, that Defendants engaged in an unlawful scheme to defraud investors by inflating sales of two of its prescription drugs and, second, that Defendants made material misrepresentations in public statements and securities filings. Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiffs' claims. For the reasons stated below, Defendants' motion is GRANTED and the Third Amended Complaint (Docket No. 72 ("Compl.")) is dismissed.

## BACKGROUND

    The following facts, which are taken from the Third Amended Complaint, documents it incorporates, and matters of which the Court may take judicial notice, are construed in the light

most favorable to Plaintiffs. *See, e.g.*, *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013); *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009); *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

Endo "develops, manufactures, and distributes pharmaceutical products and devices worldwide." (Compl. ¶ 25). Its business involves both "branded" and "generic" pharmaceuticals (*id.* ¶ 45), which Endo markets and distributes to "physicians, retail pharmacies, healthcare professionals and wholesalers," (*id.* ¶ 47). Defendant De Silva was Endo's President and Chief Executive Officer, as well as a Director of the company, from February 2013 to September 2016. (*Id.* ¶ 26). Defendant Upadhyay served as the company's Chief Financial Officer. (*Id.* ¶ 27). And Defendant Campanelli served as President of Par Pharmaceuticals ("Par"), (*id.* ¶ 28), another company involved in the distribution of generic pharmaceutical products, until Endo acquired Par in 2015, (*id.* ¶¶ 6, 92-93). In September 2016, Campanelli became Endo's President and CEO. (*Id.* ¶¶ 28, 224).

Plaintiffs' claims relate predominantly to Endo's generic pharmaceuticals business. By way of background, Plaintiffs allege that, in November 2010, Endo acquired Qualitest Pharmaceuticals, thereby securing a "critical mass in the generics market." (*Id.* ¶ 49). According to the Third Amended Complaint, however, the company took a turn after De Silva took over as CEO in February 2013, when it began reducing research and development expenditures and buying up other pharmaceutical companies. (*Id.* ¶¶ 79-81). As a result, Plaintiffs claim that, by May 11, 2015 — the start of the Class Period — Endo owned "an amalgam of unrelated and disjointed pharmaceutical businesses, which were failing to generate meaningful sales growth." (*Id.* ¶ 81). Plaintiffs allege that Endo's acquisition of Par on May 18, 2015, was a continuation of that ill-advised business plan. (*Id.* ¶¶ 91, 95, 100).

Between May 11, 2015, and May 6, 2016 (the "Class Period"), Defendants publicly commented in press releases, conference calls, and at investor conferences that the company was "mak[ing] progress . . . toward achieving a number of [its] strategic priorities, (*id.* ¶ 115), and was "well positioned to support [its] key organic growth drivers," (*id.* ¶ 116). For example, after Endo completed the purchase of Par, Defendants stated at an investor conference on May 20, 2015, that they anticipated the acquisition would yield greater revenue growth. (*See id.* ¶¶ 132-36). Likewise, in a Registration Statement filed with the SEC in June 2015, Defendants stated that the company believed that its "acquisition of Par" would "enhance [its] existing generics platform." (*Id.* ¶ 142). In subsequent press releases, presentations, and earnings calls during the Class Period, Defendants continued to make optimistic comments regarding the strength of Endo's market position and the success of the integration of Par. (*See, e.g.*, *id.* ¶¶ 152, 157-61; 163-68; 170-71). It was not until May 5, 2016, that Defendants stated publicly that the integration of Par was not entirely seamless and announced that the company would "transition[] the legacy Qualitest systems and processes to the Par business platform." (*Id.* ¶ 214-15).

Defendants initially proclaimed that the Par acquisition and integration was "going extremely well," but later reported significant "revenue and earnings shortfalls in its generics division due to sales issues at Qualitest." (*Id.* ¶ 100). Endo's stock price dropped dramatically following the company's announcements of poor financial results. On February 29, 2016, for example, the company's stock price declined twenty-one percent after it announced losses totaling $118.46 million during the fourth quarter of 2015. (*See id.* ¶¶ 185, 203). Similarly, after Endo publicly softened expectations for earnings in 2016 at an investor conference on March 17, 2016, the stock price declined more than eleven percent. (*See id.* ¶¶ 204, 211). On the last day

3

of the Class Period — May 5, 2016 — Endo revised its 2016 revenue expectations downward; the stock price dropped thirty-nine percent. (*See id.* ¶¶ 212, 221).

Separately, Plaintiffs allege that Defendants engaged in illegal practices to inflate the sales of two migraine drugs: Sumavel DosePro and Frova. (*Id.* ¶ 10). Specifically, Plaintiffs claim that Endo sales representatives were instructed to provide "pre-filled" reimbursement forms to physicians in order to incentivize them to prescribe Sumavel DosePro. (*Id.* ¶ 66). Citing a former employee, Plaintiffs contend that, in February 2015, sales representatives were told to "stop using and shred all of the . . . pre-filled forms." (*Id.*). Plaintiffs also allege that Endo offered "improper discounts and rebates to" Pharmaceutical Benefit Managers ("PBMs") "to induce them to list Frova" as one of the drugs covered by the benefits policy. (*Id.* ¶ 10; *see also id.* ¶¶ 70-74). On May 6, 2016, Endo announced that, in March 2016, the company had received a civil investigative demand from the U.S. Attorney's Office for the Southern District of New York seeking information relating to Frova and PMBs. (*Id.* ¶ 17).

## LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319 (S.D.N.Y. 2012). The Court will not dismiss any claims unless Plaintiffs have failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, Plaintiffs must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and

4

conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if Plaintiffs "have not nudged their claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

Because Plaintiffs in this case allege securities fraud, they must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which requires that scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc. v Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted). To satisfy Rule 9(b), a plaintiff generally "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). To satisfy the PSLRA, a complaint must, "with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

Finally, Plaintiffs in this case allege liability not only under subsection (b) of Rule 10b-5, which prohibits material misrepresentations and omissions, but also under subsections (a) and (c), which prohibit schemes to defraud investors. *See* 17 C.F.R. § 240.10b-5(a)-(c). (*See* Compl. ¶ 242). Because scheme liability "does not require an allegation that the defendant[s] made a statement," claims brought under Rule 10b-5(a) and (c) "need not comport with Subsection

5

(b)(1) of the PSLRA, which requires that . . . plaintiff[s] set forth each statement alleged to have been misleading, and facts giving rise to this belief." *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 457 n. 2 (S.D.N.Y. 2017). But scheme liability claims are subject to the PSLRA pleading standards with respect to scienter. *Id.* at 470. Thus, to state a scheme liability claim, a plaintiff must plead facts demonstrating "a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc.,* 551 U.S. at 321. Pursuant to Federal Rule of Civil Procedure 9(b), plaintiffs must also state with particularity "what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005).

## DISCUSSION

Plaintiffs bring securities fraud claims under Section 10(b) and Rule 10b-5 against all Defendants and under Section 20(a) against the Individual Defendants as "control persons." More specifically, Plaintiffs allege first that, during the Class Period, Defendants engaged in a scheme to defraud investors by unlawfully boosting sales of two of migraine treatment drugs. (Compl. ¶ 10).[1] Second, Plaintiffs allege that Defendants made material misrepresentations and

---

[1] The Third Amended Complaint also alleges that, between February 2014 and January 2015, Endo went on an "acquisition spree" of seven "companies and assets" that left it with an "amalgam of unrelated and disjointed businesses" that "were failing to generate meaningful growth and were of diminishing value." (Compl. ¶¶ 8, 75, 80-81, 119, 121(a), 131(a), 136, 143, 155, 162, 169(a), 172(a), 181, 184). At most, however, those allegations are merely hindsight critiques of ordinary business decisions. Accordingly, to the extent that they are meant to support a scheme-to-defraud claim, they fail as a matter of law. *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 36 (2d Cir. 2012) ("Section 10(b) . . . does not reach mere 'instances of corporate mismanagement.'" (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977))).

omissions by failing to disclose the unlawful scheme and in connection with the acquisition and integration of Par. (Compl. ¶ 9). The Court addresses these claims in turn.

**A. Scheme To Defraud**

To state a claim under the Exchange Act's "scheme to defraud" provision, a plaintiff must allege "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d at 470 (internal citation omitted). Here, it is questionable whether Plaintiffs meet any of those requirements, but they plainly fail to adequately allege scienter. To establish the requisite "strong inference" of scienter, plaintiffs must allege "facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.*, 493 F.3d at 99. Notably, Plaintiffs do not even attempt to argue that they meet those standards with respect to their scheme-to-defraud claim, contending only that they do so with respect to their misrepresentation and omission claim. (*See* Docket No. 82 ("Pls' Opp'n"), at 17-24). That is for good reason. Their theory of liability against the Individual Defendants rests on little more than the fact that the Individual Defendants held powerful positions at the company, but that does not suffice. *See, e.g.*, *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). And in the absence of allegations giving rise to a strong inference of scienter on the part of the Individual Defendants, Plaintiffs cannot establish scienter on the part of Endo itself. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (holding that a plaintiff must plead facts that "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter" to state a claim against a corporate defendant).

7

Plaintiffs' scheme claim regarding Sumavel DosePro and Frova fails as a matter of law for additional reasons. First, Plaintiffs do not contend that any scheme with respect to Sumavel DosePro was attributable to corporate officers as opposed to individual sales representatives. *See, e.g.*, *Levy v. Maggiore*, 48 F. Supp. 3d 428, 451 (E.D.N.Y. 2014) (granting motion to dismiss in part because the plaintiff did not allege that the actions taken by an individual employee were "attributable to a corporate insider"). In fact, Plaintiffs themselves suggest that it was a former low-level employee, "Lortie," who "instructed Endo sales representatives to utilize reimbursement forms [for Sumavel DosePro] that were pre-filled by Endo." (Compl. ¶ 66). Second, Plaintiffs allege that certain Endo employees "were instructed to stop using and shred all of the Sumavel DosePro pre-filled forms" in February 2015 — well before the Class Period began. (*Id.*). And third, it is far from clear that what Plaintiffs describe, in conclusory fashion, as an "improper and illegal sales practice[] in order to inflate sales of . . . Frova" was actually an illegal sales practice. (Compl. ¶ 62). Plaintiffs allege only that Endo "offered steep discounts on generic drugs in exchange for [PBMs'] agreements to list Endo's branded pharmaceuticals on [their] formularies." (*Id.* ¶ 71). Rather obliquely, Plaintiffs state that, "[r]ecently, there has been increased regulatory scrutiny of such agreements as *potentially* violative of the Federal Anti-Kickback statute." (*Id.* (emphasis added)). Notably, however, Plaintiffs stop short of actually alleging that the tactics at issue were fraudulent.

**B. Material Misrepresentation**

To state a claim that Defendants "made material misrepresentations or omissions in violation of § 10(b) and Rule 10b-5," Plaintiffs must plausibly allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (internal quotation marks omitted); *see IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015). An alleged misstatement or omission "must be one of existing fact, and not merely an expression of opinion, expectation, or declaration of intention." *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006) (internal quotation marks omitted). Relatedly, "puffery," or general statements of corporate optimism, are not actionable under Section 10(b) and Rule 10-b(5) because they are "too general to cause a reasonable investor to rely on them." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).

1. **Statements Regarding "Improper and Illegal Sales Practices"**

Applying the foregoing standards here, Plaintiffs' first theory of liability — that Defendants made material misrepresentations or omissions in connection with their allegedly "improper and illegal sales practices," (Compl. ¶¶ 121, 143, 145) — plainly fails as a matter of law.[2] Plaintiffs cite three statements made by Defendants that, they claim, were misleading for failure to disclose the allegedly "improper and illegal sales practices" employed by the Defendants. First, Upadhyay stated that "improved price and volume performance in generics . . . gives us confidence in achieving our full-year guidance for revenues." (Id. ¶ 120). Second, in a Registration Statement, Defendants described Endo's branded pharmaceutical division as "[e]nhancing performance of organic growth drivers, increasing profitability from our mature brands." (*Id.* ¶ 142). And third, in a separate part of the Registration Statement,

---

[2] Notably, Plaintiffs all but abandon the "improper and illegal sales practices" theory in opposing Defendants' motion to dismiss. The Court will address the theory anyway.

9

Defendants stated that its "marketing policy is designed to assure that products and relevant, appropriate medical information are immediately available to physicians." (*Id.* ¶ 144). But Plaintiffs' theory of falsity depends on their ability to plausibly allege that Defendants engaged in "improper and illegal sales practices," which — as discussed above — they do not do. On top of that, the statements at issue are classic cases of forward-looking, general statements of corporate optimism and, thus, not actionable. *See, e.g.*, *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11-cv-4209 (KBF), 2013 WL 1223844, at *9 (S.D.N.Y. Mar. 27, 2013) ("In a number of cases, 'rosy affirmations' or statements that are loosely optimistic regarding a company's well-being have been found to be too vague and general to be actionable.").

Plaintiffs' "improper and illegal sales practices" material misrepresentation claims fail for two other reasons as well. First, Plaintiffs do not allege any rational connection between the omitted information and the statements made. In *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015), the Supreme Court made clear that a plaintiff alleging securities fraud must show that "the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare*, 135 S. Ct. at 1329). Plaintiffs do not meet that burden because no reasonable investor would view the alleged plan to inflate the prices of Sumavel DosePro and Frova to be relevant to the routine statements of corporate optimism at issue. Second, as noted above, Plaintiffs fail to allege that any of the named Defendants knew about the alleged scheme to defraud at the time the statements at issue were made. The *Omnicare* Court held that to state a claim based on an omission, an investor must identify "particular (and material) facts . . . about the inquiry the issuer did or did not conduct or the knowledge it did or did not have." 135 S. Ct. at 1332. In this case, Plaintiffs fail to meet that requirement because

they never allege that any of the Defendants knew of the purported plan to artificially inflate the prices of Endo's products. Accordingly, their material misrepresentation and omission claims must be and are dismissed to the extent that they are based on Defendants' allegedly "improper and illegal sales practices."

### 2. Statements Regarding Endo's Integration of Par

As their opposition to Defendants' motion makes plain, Plaintiffs ultimately place most of their eggs in the Par basket. That is, Plaintiffs' primary theory of liability is that Defendants made material misrepresentations and omissions regarding the acquisition and integration of Par in May 2015. Most, if not all, of the statements they identify, however, qualify as expressions of opinion or expectation. (*See, e.g.*, Compl. ¶ 118 ("[W]e believe our objective to complete two to three value-creating deals in 2015 is achievable."); Compl. ¶ 180 ("I think [Qualitest] is going to do very well under Par, right, because you now have a much broader offering to customers."); Compl. ¶ 183 ("We completed the Par transaction [and] . . . we are making very good progress on achieving our cost synergies.")). Such statements are not actionable, except in two narrow sets of circumstances. First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.'" *Sanofi*, 816 F.3d at 210 (quoting *Omnicare*, 135 S. Ct. at 1327). Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Id.* (citing *Omnicare*, 135 S. Ct. at 1332). To adequately allege that a statement of opinion was misleading by virtue of the omission of material information, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion — facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have — whose

11

omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 209 (quoting *Omnicare*, 135 S. Ct. at 1332). As the Supreme Court explained, "a reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at a time.'" *Id.* at 210 (quoting *Omnicare*, 135 S. Ct. at 1329). "The core inquiry," then, "is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329).

Plaintiffs rest primarily on the second exception, for omission of information that makes a statement misleading to a reasonable investor. In particular, they allege that Defendants failed to disclose three material pieces of information: *first*, "that Endo's acquisitions had left the Company with an amalgam of unrelated and disjointed pharmaceutical businesses, which were failing to generate meaningful sales growth and were of diminishing value," (Compl. ¶ 119); *second*, that "upon the consummation of the Par acquisition," Endo planned to "lay off key Qualitest sales executives with critical customer relationships, abandon Qualitest's retail and wholesale accounts and lay off the related sales force, and restructure the way Qualitest bid and priced contracts for its customers," (*id.* ¶ 132); and *third*, that "Qualitest had lost a significant amount of its key customers as a result of the Par acquisition." (*Id.* ¶ 202). And as proof of these misrepresentations and omissions, they now point — no fewer than eight times in their opposition memorandum of law (Pls' Opp'n 2, 3, 7, 10, 13, 15, 19, 20 n.14) — to a statement on the last day of the Class Period by Campanelli, in which he allegedly "admitted that the Par acquisition involved changing the 'operating model' of [Qualitest]." (Compl. ¶ 215).

12

These arguments fail, for at least two reasons. First, Campanelli's statement is not quite the "admission" of a "secret plan" that Plaintiffs now suggest it was.[3] As set forth in the Third Amended Complaint, Campanelli explained as follows:

> Last fall [and] in Q1 of this year, we were conducting an integration of two complex generic businesses. What became very clear to those of us who have been in the generic industry for some time is that the legacy Par operating model is better positioned to address the challenges of today's evolving market. As a result, we set out to shift the legacy Qualitest portfolio strategy from a high volume approach to the high value operating model long practiced by legacy Par.
>
> As part of the integration activities, we're also transitioning the legacy Qualitest systems and processes to the Par business platform. The legacy Par systems offer more real-time and product-level data, allowing for faster analysis and reaction within a challenging and changing market. While many of these improvements were already planned at Qualitest, the integration of our business will accelerate the benefits.

(Compl. ¶ 215 (emphasis omitted)). Considered as a whole, that statement comes nowhere near suggesting, let alone proving, that when it acquired Par, Endo had a secret plan to fundamentally and drastically change Qualitest. (Indeed, such a plan would have made little sense. Nowhere do Plaintiffs explain why Defendants would have purposefully set out to sabotage a thriving business unit that was responsible for up to 50% of its total revenue.) At most, it reflects Campanelli's recognition, in hindsight, that the integration of Par and Endo was not as seamless as Defendants had perhaps expected. The Second Circuit has "firmly rejected this 'fraud by hindsight' approach." *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 24 (S.D.N.Y. 2016) (quoting *Podany v. Robertson Stephens, Inc.*, 318 F.Supp. 2d 146, 156 (S.D.N.Y. 2004)).

---

[3] Perhaps revealingly, Plaintiffs themselves did not make as much of Campanelli's statement prior to their opposition to Defendants' motion. They cite it only once in the Third Amended Complaint, but neither as a false statement nor as proof of scienter, and certainly not as the proof a sinister "secret plan" that they now suggest it was. (Compl. ¶ 215).

Second, and in any event, it is well established that "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). It is equally well established that a company has no such duty to disclose changes to its business plans — unless the company "had 'hyped' a specific plan, thereby inducing investors to believe that alternative[] [plans] were excluded." *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 810 (2d Cir. 1996) (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993)). To qualify for that exception, a plaintiff must allege facts plausibly establishing that a company had "stated its intention to adhere exclusively to" a particular strategy and then changed its strategy without informing investors. *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 651 (S.D.N.Y. 2015); *see San Leandro*, 75 F.3d at 811 (holding that a plaintiff fails to state a claim where the challenged "statements simply reflected company policy at the time; they were not promises to maintain that policy in the future, and thus were not rendered misleading by the company's subsequent consideration of an alternative plan"). Plaintiffs fail to do so here. Nowhere do they allege that Defendants "hyped" a specific business plan regarding Qualitest to the exclusion of others. In fact, as Plaintiffs themselves acknowledge, Endo accurately characterized the acquisition of Par as "transformational," (Compl. ¶¶ 125, 157), and as a chance to "reposition Qualitest," (Compl. ¶ 182), thereby clearly signaling that changes to Qualitest were likely to occur (as most, if not all, reasonable investors would plainly have anticipated).

Plaintiffs' remaining allegations are similarly unavailing. For instance, Plaintiffs contend that De Silva made a materially false statement when, at a healthcare conference on December 2, 2015, he commented on the integration of Par into Endo's business as follows: "[I]n this case, I

14

think we're even more positive, post-the transaction. I think one of the key aspects of why it is going so well is that we were able to retain Paul Campanelli to run the business." (Compl. ¶ 170; *see id.* ¶ 173). But Plaintiffs fail to plausibly allege that, when he made that statement, De Silva did not genuinely believe it to be true or that he proffered an untrue supporting fact. *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016) (granting motion to dismiss in part because the plaintiffs "failed to allege any facts showing that [the defendant] did not believe what he said . . . [or] that the [speaker] misstated or omitted a material fact"). Additionally, Plaintiffs cite statements made during a February 29, 2016 conference call with analysts and investors — for example, that Endo was "positioned for growth in 2016," (Compl. ¶ 201); was "seeing good solid performance in the base business," (*id.* ¶ 198); "expect[ed] to see mid to high teens underlying growth for 2016," (*id.* ¶ 197); and "believe[d] [its] business is diversified and positioned for double-digit underlying growth over the mid- to long-term," (*id.* ¶ 185; *see also id.* ¶¶ 185-201). Plaintiffs contend that those statements were false and misleading insofar as Qualitest "lost a significant amount of its key customers as a result of the Par acquisition." (*Id.* ¶ 202). But Plaintiffs fail to plausibly allege that Defendants knew that Qualitest "had lost a significant amount of its key customers as a result of the Par acquisition" (if indeed it even had (*compare id.* ¶ 107 (noting that "Qualitest had approximately 1500 customers" prior to the acquisition of Par), *with id.* ¶ 111 (noting that, after the acquisition, only ten customers "had problems with the combined generics company"))), let alone that such a loss would render rosy statements about the future of the company overall false or misleading.

## CONCLUSION

In the final analysis, Plaintiffs may well be right that Endo engaged in an ill-advised "acquisition spree" by acquiring Par and other companies. The securities laws, however, do not

15

provide remedies for bad business decisions; they provide remedies only for fraud. *See, e.g.*, *Pehlivanian*, 153 F. Supp. 3d at 655 (holding that an "unorthodox" business decision did not give rise to a securities fraud claim); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 379 (S.D.N.Y. 2007) (holding that even "ill-advised" or "bad business decisions are not actionable under the securities laws"). Try as Plaintiffs might, they cannot muster facts plausibly suggesting that Defendants engaged in any such fraud here. Accordingly, and for the reasons stated above, Plaintiffs' claims under Section 10(b) and Rule 10b-5 must be and are dismissed. It follows that their claims for control person liability under Section 20(a), which depend upon the existence of a "primary violation" under Section 10(b), also fail. *See, e.g.*, *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 606 (S.D.N.Y. 2016) (dismissing a Section 20(a) claim based on the failure to adequately allege a primary violation).

That leaves only the question of whether Plaintiffs should be granted leave to amend their complaint for a fourth time, as they perfunctorily request in a footnote at the end of their memorandum of law in opposition to Defendants' motion. (*See* Pls' Opp'n 25 n.17). The Court declines to grant Plaintiffs' leave to amend, for a combination of three reasons. First, amendment here would likely be futile. Indeed, given the various grounds for the Court's decision, there is nothing to suggest that Plaintiffs would be able to state a valid claim should the Court grant them leave to amend. *See, e.g.*, *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend."). Second, and related, Plaintiffs have not "given any indication that [they are] in possession of facts that would cure the problems identified in this opinion." *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014); *see also TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d

Cir. 2014) ("A plaintiff need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint."). Finally, in granting leave to file the third amended complaint, the Court expressly warned that Plaintiffs would not be given another opportunity to address the issues raised in Defendants' motion to dismiss. (*See* Docket No. 71). *See, e.g.*, *Clark*, 2014 WL 4054284, at *15 (holding that the plaintiff's failure to remedy the complaint's deficiencies identified by an earlier motion to dismiss "is alone sufficient ground to deny leave to amend"); *see also, e.g.*, *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (affirming the district court's denial of leave to amend in part because of the previous opportunities that the plaintiff had received to amend the complaint).

The Clerk of Court is directed to terminate Docket Nos. 78 and 84, and to close this case.

SO ORDERED.

Date: January 16, 2018
New York, New York

_____
JESSE M. FURMAN
United States District Judge