# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

CRAIG FRIEDMAN, Individually and on
Behalf of All Others Similarly Situated,

                  Plaintiff,

    vs.

ENDO INTERNATIONAL PLC, RAJIV
KANISHKA LIYANAARCHCHIE DE
SILVA, SUKETU P. UPADHYAY and PAUL
CAMPANELLI,

                  Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:16-cv-03912-JMF

CLASS ACTION

[PROPOSED] FOURTH AMENDED
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Lead Plaintiffs Steamfitters' Industry Pension Fund and Steamfitters' Industry Security Benefit Fund (together, "Plaintiffs" or "Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following based upon the investigation of their counsel, which included, among other things, a review of United States Securities Exchange Commission ("SEC") filings made by Endo International PLC ("Endo" or the "Company"), as well as securities analysts' reports, advisories, press releases, media reports, other public statements issued by or about the Company, and interviews of former Endo employees and customers of Endo.   Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth after reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of Endo stock between May 18, 2015 and May 6, 2016, inclusive (the "Class Period"), seeking to pursue remedies under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      Endo is a specialty pharmaceutical company that develops, manufactures, and distributes pharmaceutical products and devices worldwide.  This lawsuit alleges that Endo and its most senior executives – former Chief Executive Officer ("CEO") and President Rajiv De Silva, former Chief Financial Officer ("CFO") Suketu Upadhyay, and current CEO Paul Campanelli – undertook radical changes to the already successful business model of the Company's legacy generic drug business, Qualitest Pharmaceuticals ("Qualitest"), but failed to disclose those changes – which turned out to be disastrous – to investors during the Class Period.  By failing to disclose those profound changes – even if made with the best of intentions – to what was arguably Endo's most

successful business unit (representing 50% of the Company's revenue in the first quarter 2015), and affirmatively misleading investors to believe they were continuing to pursue their historically successful business model, Defendants violated §§10(b) and 20(a) of the Exchange Act.

3.      Although the Company began to feel the negative effects of Defendants' undisclosed, transformative changes almost immediately – announcing a $91 million impairment of intangible Qualitest business assets only 38 days after beginning to implement those changes – Defendants continued to represent the purported strength of Qualitest's business and Endo's success in integrating Qualitest with recently acquired Par Pharmaceutical Holdings Inc., while continuing to conceal the nature and specifics of the fundamental changes they were making.

4.      By the end of the Class Period, as a result of these changes, *inter alia*, Defendants were compelled to disclose the full extent of Endo's problems.  On May 5, 2016, Endo issued a press release announcing its financial results for the first quarter of 2016, the period ended March 31, 2016.  In the press release, Endo reported a loss of $0.40 per diluted share, down from earnings of $0.11 per share in the first quarter of 2015.  In addition, Endo significantly cut its 2016 earnings and revenue guidance, announcing targeted revenue in the range of $3.87 billion to $4.03 billion, down from the range of $4.32 billion to $4.52 billion that the Company had reaffirmed in March, less than two months earlier.

5.      After the Company's downward guidance revision, during a conference call to discuss the Company's results, CEO De Silva admitted that there had been a "deeper than expected erosion in the legacy Qualitest business . . . ."  Or, as he more candidly put it less than a week later, on May 10, 2016, Endo was facing a "very severe challenge and a set of setbacks, particularly in our legacy Qualitest generics business."

6.     In response to the May 5 news, the price of Endo stock dropped more than $10 per share – from $26.59 per share to $16.17 – a decline of 39%, on heavy trading volume.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

9.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa(c)).

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.     Lead Plaintiffs, as set forth in the certifications previously filed in this action and incorporated by reference herein, purchased Endo stock during the Class Period and have been damaged thereby.

12.     Defendant Endo develops, manufactures, and distributes pharmaceutical products and devices worldwide.  The Company's stock is listed and trades on the NASDAQ Global Exchange under the ticker symbol "ENDP."

13.     Defendant Rajiv Kanishka Liyanaarchchie De Silva ("De Silva") served as Chief Executive Officer, President and a Director of Endo from February 25, 2013 to September 23, 2016, when he was replaced by defendant Campanelli.

14.     Defendant Suketu P. Upadhyay ("Upadhyay") served at all relevant times as Chief Financial Officer and Executive Vice President of Endo.

15.     Defendant Paul Campanelli ("Campanelli") served as President of the Par Pharmaceuticals Holdings Inc. ("Par") segment of Endo from September 25, 2015 through the end of the Class Period.  On September 23, 2016, Campanelli was appointed as CEO of the Company.

16.     The defendants referenced above in ¶¶13-15 are sometimes collectively referred to herein as the "Individual Defendants," and collectively with Endo, as "Defendants."

17.     During the Class Period, Defendants were privy to confidential and proprietary information concerning Endo, its operations, finances, financial condition and present and future business prospects.  Because of their positions with Endo, Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

18.     Defendants are liable as direct participants in the wrongs complained of herein.  In addition, Defendants were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, Defendants were able to and did, directly or indirectly, control the conduct of Endo's business.

19.     Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities

analysts and through them, to the investing public.  Defendants were provided with copies of the

Company's reports and press releases alleged herein to be misleading, prior to or shortly after their

issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

Thus, Defendants had the opportunity to commit the fraudulent acts alleged herein.

20.     As controlling persons of a publicly-traded company whose stock was registered with

the SEC pursuant to the Exchange Act, and was traded on the NASDAQ and governed by the federal

securities laws, Defendants had a duty to promptly disseminate accurate and truthful information

with respect to Endo's financial condition and performance, growth, operations, financial statements,

business, products, markets, management, earnings and present and future business prospects, and to

correct any previously issued statements that had become materially misleading or untrue, so that the

market prices of Endo stock would be based upon truthful and accurate information.  Defendants'

misrepresentations and omissions during the Class Period violated these specific requirements and

obligations.

21.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of

business that operated as a fraud or deceit on purchasers of Endo stock by disseminating materially

false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived

the investing public regarding Endo's business, operations, and the intrinsic value of Endo stock;

(ii) enabled Endo to sell more than $2 billion in Endo ordinary shares to the public and sell more

than $1.6 billion in debt for the Par acquisition; and (iii) caused Plaintiffs and other members of the

Class to purchase Endo stock at artificially inflated prices.

## BASIS OF ALLEGATIONS

22.     The factual allegations herein, as well as the inferences arising from these allegations

are corroborated by information obtained by former Endo employees and customers with knowledge

of the Company's business and operations.  The following chart sets forth the positions and tenure of

these individuals:

| FE | Job Description | Tenure |
|----|-----------------|--------|
| 1 | Wholesale Accounts Representative, Qualitest | July 2012- February 2016 |
| 2 | Demand Planning Analyst, Qualitest | May 2012-October 2015 |
| 3 | Director of Sales, Qualitest | 1995-October  2015 |
| 4 | Regional Sales Manager, Qualitest | February 2012- October 2015 |
| 5 | Senior Regional Sales Manager, Qualitest | 1995-September 30, 2015 |
| 6 | Accounts Receivable, Wholesale Collection Specialist, Qualitest | October 2000 to February 2016 |
| 7 | Accounting, Senior Manager, Qualitest | September 2008 to July 2016 |
| | Doug Cochran | Owner of Cochran Wholesale Pharmaceutical, Inc. for over 40 years |

(a)     Former Employee 1 ("FE1")

23.     FE1 held various positions in Qualitest's Huntsville, Alabama branch between July

2012 and February 2016.  FE1's final position at Qualitest was serving from August 2015 to

February 2016 as a Wholesale Accounts Representatives, focusing mainly on accounts receivable

matters.

(b)     Former Employee 2 ("FE2")

24.     FE2 served as a demand planning analyst at Qualitest from May 2012 to October

2015.  FE2 worked closely with sales, marketing and manufacturing.

(c)     Former Employee 3 ("FE3")

25.     FE3 worked at Qualitest from 1995 to October 2015.  FE3's last position at the

Company was Director of Sales.

(d)     Former Employee 4 ("FE4")

26.     FE4 worked for Qualitest as a regional sales manager from February 2012 to October

2015.  FE4 explained that the regional sales force dealt with independent pharmacies, independent

long-term care, closed-door pharmacies, college and university pharmacies, and some government contracts.  Closed-door pharmacies are niche operations that are not open to the public, but that provide services to group homes, long-term care facilities, or other customers with specialized needs.

(e)    **Former Employee 5 ("FE5")**

27.    FE5 worked at Qualitest as a senior regional sales manager from 1995 until September 30, 2015.  As a senior regional sales manager, FE5 did business with wholesalers, supply companies, universities with oral contraceptive programs, retail pharmacies, government accounts, and closed-door pharmacies.  FE5 stated that the national sales team did business with the large pharmacy chains such as CVS Pharmacy ("CVS").

(f)    **Former Employee 6 ("FE6")**

28.    FE6 is a former employee of Par/Qualitest and worked as an accounts-receivable and wholesale-collection specialist from October 2000 to February 2016.

(g)    **Former Employee 7 ("FE7")**

29.    FE7 worked at Qualitest as a Senior Manager in the Accounting Department from September 2008 to July 2016.  FE7's responsibilities included quarterly and yearly SEC financial reporting and managing the close of the financial statements.

(h)    **Doug Cochran**

30.    Doug Cochran ("Cochran") has been the owner of Cochran Wholesale Pharmaceutical, Inc., for over forty years and helped Qualitest get started at a time when it had very few products.

## SUBSTANTIVE ALLEGATIONS

### Endo and Its Business

31.    Endo is a global specialty pharmaceutical company that is focused on both branded and generic pharmaceuticals, which it markets to physicians, retail pharmacies, healthcare

professionals, and wholesalers (*e.g.*, Cardinal Health, McKesson Corp., and AmerisourceBergen Corporation). Endo also derives revenue from its relationships with specialty pharmacies, product licensing, and royalties from the Company's third-party collaboration partners. With offices in Alabama, New York, Pennsylvania, and Ireland, the Company has three business segments: U.S. Branded Pharmaceuticals, Generic Pharmaceuticals, and International Pharmaceuticals. During the Class Period, Endo also had a medical devices segment.

32.     In November 2010, Endo gained critical mass in the generics market when it acquired Qualitest, a privately-held manufacturer and distributor of generic drugs and over-the-counter pharmaceuticals, for $769.4 million plus a debt repayment of $406.8 million.

33.     During the second half of 2012, Endo's core branded pharmaceutical business came under competitive attack as drug manufacturers introduced generic versions of the Company's main pain products, Lidoderm and Opana ER, and started taking market share from Endo. Exacerbating the issues facing the Company in its core pharmaceutical business, Endo's medical device division, American Medical Systems ("AMS"), was mired in tens of thousands of product liability suits associated with various surgical mesh products – most notably vaginal mesh products – which caused serious injury to thousands of patients. The litigation exposed the Company to enormous financial liability, and new suits were being filed every day.

34.     In early 2013, Endo undertook efforts to address its sagging business prospects. On February 25, 2013, the Company appointed defendant Rajiv De Silva, the former Chief of Operations of Valeant Pharmaceuticals International, Inc. ("Valeant"), to be its CEO. De Silva publicly announced his plans for an aggressive turnaround of Endo. To that end, he began to fashion Endo in the image of his former employer, Valeant, by re-domiciling Endo in Ireland to lower the

Company's tax rate, cutting research and development ("R&D") expenditures, and acquiring other pharmaceutical businesses.

**Endo's Decision to Acquire Par Pharmaceuticals**

35.     By the spring of 2015, having already completed a number of acquisitions, De Silva focused on growing Endo's already successful generic drug business, Qualitest.  According to Endo's 2014 Form 10-K, Qualitest generated 28% of Endo's revenues in 2013, and 39.7% in 2014. In the first and second quarters of 2015 – before Endo completed the acquisition of Par – Qualitest single-handedly generated 50% of Endo's revenues and 46%, respectively, making it the principal engine of Endo's success at that time.

36.     On May 18, 2015, near the beginning of the Class Period, Endo announced that it had agreed to purchase privately-held Par Pharmaceutical Holdings Inc. from TPG Capital Management LP ("TPG") in a transaction valued at $8.05 billion, including the assumption of Par debt.  The transaction would consist of 18 million shares of Endo stock and $6.5 billion in cash consideration to Par shareholders.  Defendant Paul Campanelli, the President of Par, was to join Endo to lead the combined generics business.

37.     TPG had taken Par private in September 2012.  At that time, Campanelli was Par's Chief Operating Officer and received approximately $5.4 million for his Par stock and unvested options.  Following the going-private transaction, Campanelli entered into an employment agreement with TPG that provided him with a significant raise, elevated him to CEO of Par, and provided him with a new equity-based management incentive plan.  As a result of this incentive plan, Campanelli held 1.2% of Par's outstanding shares (9,341,403 shares in total) shortly before Endo acquired Par, and would receive at least $68.77 million in connection with Endo's purchase of Par.

38.     Par was a pharmaceutical company that specialized in developing, licensing, manufacturing, marketing and distributing generic drugs in the United States.  According to Par, it

- 9 -

focused on high-barrier-to-entry products that were difficult to formulate, difficult to manufacture, or faced complex legal or regulatory challenges.  As one former Qualitest employee put it, Par was a boutique company focusing on new technology and blockbuster-type products.

39.     Qualitest, by contrast, followed a very different business model, according to FE3 (who worked at Qualitest from 1995 to October 2015 as, *inter alia*, Director of Sales), focusing on high-volume, low-margin business.  If Par was a boutique company, selling a narrow range of more specialized products, Qualitest was a commodity-based business, selling a large range of pharmaceutical products based on price, deals, and relationships.  In contrast to Par, Qualitest provided a one-stop shopping experience for its approximately 1,500 customers, which was a large part of its attraction, particularly to large wholesale customers such as McKesson.

40.     In the press release announcing Endo's acquisition of Par (attached to a Form 8-K filed with the SEC on May 18, 2015), De Silva underscored the continued strength of Qualitest: "Our generics business, Qualitest, continues to be an extremely attractive and effective growth driver for Endo."  But the press release stressed that "[t]he ***combination*** [of Qualitest and Par] will create a leading specialty pharmaceutical company with a generics business that is one of the industry's fastest growing and among the top five as measured by US sales."[1]

41.     In that same press release, Campanelli echoed De Silva's message: "We believe our ***combination*** with Endo best positions us" "to significantly expand[] our scope, capacity and capabilities to realize the maximum value of our rich and diversified product portfolio and R&D pipeline."  Upon completion of the acquisition in the fall, Endo's generics business was expected to grow by 46%.

---

[1]      Unless otherwise noted, all emphasis in quotations is added.

42.     The press release also represented Endo's estimate that "the transaction will generate **$175 million in operational and tax synergies** that are expected to be realized within the first 12 months following the completion of the transaction . . . ."  Defendants continued to cite this $175 million figure for expected synergies for at least the next eight months, long after the Par acquisition was completed in late September 2015.

**Defendants' Campaign to Promote the Par Acquisition as a Merger of Equals**

43.     Between May 18, 2015, when Endo announced the Par acquisition, and September 25, 2015, when the transaction closed, Defendants represented that the transaction was a merger of equals, working side-by-side in their respective (and very different) spheres of business.  Although De Silva repeatedly described the acquisition as "transformational" to the scope of Endo's generics business – making it a top-five generics business – and anticipated operational and tax synergies of approximately $175 million, he did not disclose Defendants' intention to alter Qualitest's very successful, high-volume business model.

44.     During the May 18, 2015 analyst conference call that followed the announcement of the acquisition, De Silva began by acknowledging two individuals who had been instrumental to the growth and success of Endo's legacy generics business, Trey Propst ("Propst") (the son of Qualitest's founder) and Mike Reiney ("Reiney") (the son-in-law of Qualitest's founder), both of whom had strong and long-standing relationships with Qualitest customers.  De Silva stated: ". . . I want to take a moment to thank the Qualitest team and especially Mike Raney [*sic*] and Trey Propst who have played a critical role in Qualitest's success over the years.  Endo acquired Qualitest in 2010 and it has been a consistent growth driver for us with double-digit growth and expanding margins since its acquisition."

45.     During the conference call, De Silva then repeatedly emphasized the critical role of each company – Qualitest and Par – to the success of the transaction, and their complementary

- 11 -

nature.  Among other things, he stated: "***[T]he industrial logic of our combination of Qualitest with Par, it's extraordinarily clear.  These are two very complementary businesses.  We are bringing two very successful businesses together that have both grown double digits for an extended period of time, so we are combining the two Companies, both coming from a position of strength***."

46.     De Silva also made it clear what he meant by "complementary": "[O]ne of the compelling aspects of our transaction is that our business and Par's business are very complementary.  ***Very, very few overlaps***."  With "very, very few overlaps," De Silva communicated, the two businesses could easily coexist, despite their different business models.

47.     In addition, De Silva stated: ***[O]ur full intention is to make sure that we maintain the magic that both the Par teams and Qualitest's have created over the course of the last several years***."  And further: "So I think this is a deal where there's substantial industrial logic for it.  ***And I think the combination of Par and Qualitest can do a lot more than either Company could do by itself***.  So that is the fundamental basis for the value creation that we see."

48.     Campanelli reiterated the point: "***Together, I believe the combination of Endo's Generic business and Par creates a powerful generics product and R&D engine*** with a wide range of fast growing, high barrier-to-entry and market-leading product opportunities."

49.     The PowerPoint presentation Defendants used during the conference call reinforced the message of a combination of equals.  Slide 10 had the heading: "***Endo + Par***: Creates a Top 5 Generics Player."  Slide 13 had the heading: "***Endo + Par***: Broad Facilities Footprint."  Slide 19 had the heading: "***Endo + Par***: Expanded Internal Generics R&D Capabilities…"  Slides 20-23 had the heading: "***Endo + Par***: …Drive a Diversified R&D Engine."  Slide 24 had the heading: "***Endo + Par***: Significant Generics Growth Potential."  Slide 27 had the heading: "***Endo + Par***: Leading

Specialty Pharmaceutical Co."  And slide 28 had the heading: "***Endo + Par***: A Transformational Combination."

50.     Thus, investors had no reason to believe that Defendants intended, promptly upon the completion of the acquisition in late September, to fire Reiney and Propst, whom De Silva had effusively thanked and praised on May 18, and to undertake radical but undisclosed changes to Qualitest's successful business model, as alleged below.  Analyst reaction confirms this impression.

51.     Before Endo announced the acquisition, analysts had viewed Qualitest as one of the pillars of Endo's strength.  For example, on May 11, 2015 – one week before the announcement – a Deutsche Bank analyst wrote: "The Qualitest (generics) business continues to be a bright spot and we expect Endo to continue to leverage that segment via complementary transactions."

52.     After the May 18 announcement, analysts understood the transaction to be exactly what the PowerPoint presentation had described – the combination of two coequal businesses ("Endo + Par"), with $175 million of expected synergies resulting, as a UBS analyst put it on May 19, 2015, from "***back office operations***."  As a Gabelli & Company analyst wrote that same day: "We believe that ***the combination of Par and Endo's Qualitest generics business*** is a positive catalyst that will accelerate both the double-digit organic revenue growth rate and margin expansion opportunities for the generics segment."

53.     As a J.P. Morgan analyst wrote two days later: "We believe Par acquisition strategically builds out Endo's generics business.  In Qualitest, Endo has a top 3 controlled substance generics business which has generated double digit organic growth over the last several years.  ***Combining that business with Par*** will create a top 5 generics player in the US, adding critical mass and a growing generics pipeline . . . ."

54.     In the ensuing months, Defendants continued to underscore the complementary relationship between Qualitest and Par, and to reinforce investor understanding that the resulting generics business would be a true combination of the two companies, with the additional benefit of some operational and tax synergies.

55.     For example, on August 10, 2015, Endo held its second-quarter ("Q2") 2015 earnings conference call, during which De Silva described the "robust 24% year-to-date underlying growth rate in our US generics business" (Qualitest).  Although De Silva suggested that the future would be "hard on the commodities side" of the generic business, he also represented that "Qualitest continues to be an extremely attractive and effective growth driver for Endo.  The addition of Par will enable us to achieve critical mass in our generics business unit *expanding* our scale and capacity and building upon steady double-digit organic growth at Qualitest by *adding* a strong portfolio of specialty high barrier to entry products with attractive gross margins."

56.     Significantly, although De Silva represented that "[w]e are nearly done with planning for the integration of Par," he did not announce any changes to Qualitest's historical business model in light of the Par acquisition, even after an RBC Capital Markets analyst specifically asked him: "Has anything changed in terms of how you are looking about the combined Endo and Par asset?"

57.     During another conference before the Par acquisition closed on September 25, 2015 – the Canaccord Genuity Growth Conference on August 13 – De Silva described Qualitest as "extraordinarily successful" (in response to an analyst who had characterized Qualitest as "an absolute gold mine"), stated that the Par acquisition would be transformational for the entire Company by helping it "get to a double-digit growth trajectory on an organic basis," and underscored – yet again – the complementary nature of the two businesses: ". . . when you put [Par and Qualitest] together there's *very, very little overlap*.  And really it's a *very, very complementary*

- 14 -

*business in terms of types of products, capabilities, and even manufacturing footprint. So it's the*

*perfect transaction in many ways*."

## The Par Acquisition Closes

58.     On September 25, 2015, Endo completed its acquisition of Par for total consideration

of $8.14 billion, including the assumption of Par debt.  The consideration included 18,069,899

ordinary shares valued at $1.33 billion and cash consideration of $6.5 billion.

59.     To finance the Par transaction, Endo had conducted a follow-on public offering of

ordinary shares in June 2015, selling 27,627,628 ordinary shares at $83.25 per share for proceeds of

$2.3 billion.  One month later, in July 2015, Endo issued and sold $1.64 billion in aggregate

principal amount of 6.00% senior notes due July 2023 (the "2023 Notes").  The 2023 Notes were

issued in a private offering for resale for qualified institutional buyers pursuant to Rule 144A under

the Securities Act of 1933, as amended.

60.     The September 28, 2015 press release announcing the completion of the acquisition

(attached to a Form 8-K filed with the SEC that same day) states: "Endo's combined U.S. Generics

segment, which includes Par Pharmaceutical and Qualitest, will be named Par Pharmaceutical, an

Endo International Company and will be led by Paul Campanelli, former Chief Executive Officer of

Par Pharmaceutical, who will also join Endo's Executive Leadership Team."

61.     In  the  same  press  release,  De  Silva  again  described  the  transaction  as

"transform[ational]," "expanding Endo's overall corporate profile, scope and size and establishing a

powerful platform for future M&A."  De Silva also stated that, for 2015, "we've tightened our EPS

guidance to the upper end of our previous range, despite having only one quarter of Par operating

results but two quarters of the acquisition's financing effects."

62.     Accompanying the press release was a PowerPoint presentation of the same date

describing the transaction.  Like the presentation Defendants gave upon the announcement of the

transaction on May 18, 2015, this presentation characterized the acquisition as a merger of equals. Slide 4 had the heading: "***Endo + Par***: A Transformational Combination." Slide 5 had the heading: "***Qualitest + Par***: A Leader in Specialty Generics." Slide 6 at the heading: ***Addition*** of Par Generics Pipeline: Driving Near- and Long-Term Opportunities."

63.     Similarly, during the analyst conference call that same day, De Silva referred to the "***combined company***," the "***addition of Par***," and "***the combination of Endo and Par***," which "***[t]ogether***" would "become a leader in specialty generics with greater scale." Further, both CFO (and defendant) Upadhyay and De Silva emphasized that Endo was maintaining the upper end of its EPS guidance range.

64.     Although De Silva euphemistically acknowledged the likelihood of certain changes – such as "prioritizing the generics portfolio across Qualitest and Par in terms of our go-to-market model," pursuing certain "optimization" benefits with respect to the combined book of generics business, and achieving employee "synergies," he said nothing to suggest either the dramatic short-term changes alleged below – such as the almost immediate dismissal of the entire Qualitest sales force – or the longer term changes – such as the discontinuation of a variety of lower-margin Qualitest products and the closure of Qualitest's Charlotte manufacturing facility at the end of the Class Period (with a reduction in the workforce at the Huntsville facility).

65.     To the contrary, with respect to the Charlotte and Huntsville facilities, De Silva represented those plants as valuable assets of the combined company: "So with the combination of Par and Qualitest, ***we now have a very robust manufacturing network, right. We have very high volume plants like Qualitest plants in Huntsville and Charlotte*** and very specialized plants that come[] with Par both in New York, in Minnesota[,] California, in Stamford[,] Connecticut, as well as some operations in India as well."

66.     The analysts who participated in the September 28 event went away with the clear impression that Par and Qualitest – which had "very, very little overlap" in product, as Defendants repeatedly emphasized – would operate together, side-by-side, to continue achieving double-digit revenues for Endo.

67.     For example, on the same day as the announcement, a Deutsche Bank analyst wrote: "We view Par as a strong *and complementary* fit with [Endo's] Qualitest, which has been a bright spot for the company in recent years."  And the following day, a William Blair analyst wrote: "The *combination* of the Qualitest unit and Par will put Endo within the top five in the generics market as measured by domestic sales by IMS. . . .  The *combined generics unit* will have a pipeline that includes about 300 programs . . . ."

### The Aftermath of the Acquisition

68.     In the lead up to the September 25, 2015 closing of Endo's acquisition of Par, as alleged above, Defendants repeatedly represented the complementary nature of Qualitest and Par, and communicated that both Par and Qualitest would continue to operate as they had, while taking advantage of certain operational and tax synergies.  Unbeknownst to investors, however, Defendants planned to – *and immediately upon the consummation of the Par acquisition did* – fire two key Qualitest sales executives with critical customer relationships, *as well as the entire regional sales force*, abandon Qualitest's substantial retail and smaller wholesale business, and stop selling certain lower-margin products, all of which caused Endo to lose substantial revenue (contrary to Defendants' representations of growth).  Nonetheless, Defendants publicly represented that the "integration [was] going extremely well" and that the Qualitest business was "on track."  Ultimately, as detailed herein, Endo was forced to announce significant revenue and earnings shortfalls in its generics division due to sales issues at Qualitest, as detailed herein.

- 17 -

69.     FE1, who worked at Qualitest from July 2012 to February 2016, and who served in various positions, including as a wholesale account representative from August 2015 to February 2016, explained that, upon consummation of the Par acquisition, Propst and Reiney – the son and son-in-law of Qualitest's founder, both of whom had strong and long-standing relationships with Qualitest customers – were "walked out" of the Company.  That occurred on October 1 – *only three days after Endo announced the completion of the acquisition*.

70.     Propst and Reiney were not alone.  It is no coincidence that FE2, FE3, FE4, and FE5 – all of whom were in Qualitest sales or demand planning – left the Company at the end of September 2015, right after the Par acquisition, or the following month.  They – with the rest of Qualitest's regional sales force – were the victims of Endo's decision, *executed immediately after the acquisition of Par*, to eliminate Qualitest's sales force and fundamentally change its operating model.

71.     FE4, who worked as a regional sales manager from February 2012 to October 2015, stated *the entire regional sales force* (including FE4), with the exception of two people, *were let go immediately following the acquisition of Par*: "*[t]hey signed the contract on Monday and we were laid off on Tuesday*."  According to FE4, Qualitest's regional sales group had done business with independent pharmacies, independent long-term care, closed-door pharmacies, and college and university pharmacies, and had some government contracts.  FE4 stated that, after the regional sales force was let go, the Company made the decision to focus on its four biggest customers and stop selling to retail customers.

72.     FE3, who worked for Qualitest for a decade, ultimately becoming Director of Sales, confirmed that Endo laid off the entire Qualitest retail sales team (including FE3) when Endo acquired Par.  FE3 reported that the radical downsizing of the Company's sales force meant that it

- 18 -

was impossible for the Company to maintain the same number of accounts as it had before the Par acquisition.

73.     Similarly, FE5, who worked as a senior regional sales manager at Qualitest from 1995 through September 30, 2015, and was responsible for sales with wholesalers, supply companies, universities with oral contraceptive programs, retail pharmacies, government accounts, and closed-door pharmacies, confirmed that after the regional team (including FE5) was laid off, Endo ceased selling to retail pharmacies, but continued to sell to universities, wholesalers, and the big accounts.

74.     Likewise, FE1 reported that, in Q4 2015, Endo stopped selling to many small wholesalers and retail customers.  FE1 added: "[t]hey totally cut them off and stopped selling to them."  And FE6, who worked in accounts receivable at Qualitest/Par as a wholesale collections specialist from October 2000 through February 2016, corroborated the accounts of the other former employees, reporting that the Company ceased doing business with many wholesalers and retailers when Par was acquired.

75.     To give a specific example, the Company terminated its contract with Cochran Wholesale Pharmaceutical Inc.  Doug Cochran has been the owner of Cochran Wholesale Pharmaceuticals for over forty years.  Cochran confirmed that when Par was acquired, the Company moved management from Alabama to the Northeast and maintained a manufacturing division in Alabama.  Cochran stated that, although he had helped Qualitest get started when it had very few products, Qualitest stopped doing business with his company when the Par transaction was consummated.  According to Cochran, Par terminated his contract while he still had outstanding orders and without notice.  Cochran stated that the volume of his business was not enough to be retained as a customer after the buyout.

76.     The departure of Propst and Reiney was especially significant.  According to FE2, who worked as a demand planning analyst at Qualitest from May 2012 to October 2015, Propst and Reiney had important customer relationships, including with Qualitest wholesale retailers such as Wal-Mart Stores, Inc. ("Walmart") and CVS.  FE7, a Senior Manager in Qualitest's Accounting Department, agreed, stating that Propst and Reiney had strong relationships with various customers. According to FE2, Qualitest's business model put a high premium on customer service, and the Qualitest sales team always figured out a way to sell a product to a customer at the price that they were willing to pay.  FE2 was told that shortly after the Par acquisition, customers expressed dissatisfaction that Propst and Reiney were no longer with the Company.

77.     FE2 also stated that while Propst and Reiney were at the Company, the generics division met its financial goals.  FE7 agreed, stating that the Qualitest sales force, under Propst and Reiney, always made their numbers.  However, when the Company changed its business model upon acquiring Par – by eliminating retail and some wholesale contracts, as well as pharmaceutical products with lower margins – revenues declined.  According to FE2, Qualitest had approximately 1,500 customers, only four of which were major buyers (McKesson, CVS, Walmart, and Walgreens).  FE2 explained that Qualitest's retail customers were an important aspect of Qualitest's business because retailers would often take short-dated and overstocked items in addition to contract items.   FE2 also noted that the profit margins on retail contracts were greater than those on wholesale contracts.

78.     According to FE7: "The model for Mike [Reiney] and Trey [Propst] was a lot of volume, a lot of products, and getting them out the door.  Par has a more brand mindset, where it's high-dollar products with not necessarily the volume, so when you cut out all those little products, you're taking a big chunk of your profits right off the top, and you can't make that up."

79.     As FE2 explained, before the Par acquisition, Qualitest priced bids according to the "basket pricing" method, which incorporated loss leaders into customer bids.  According to the "basket pricing" method, the goal in pricing was to make a profit on the bid as a whole.  After Endo acquired Par, the Company changed the customer bidding process to eliminate loss leaders and began to price contracts according to actual manufacturing costs per item.  In addition, the Company eliminated any products that Qualitest had been selling at a loss – even though the order as a whole generated a profit – which resulted in the downsizing of two manufacturing plants.

80.     FE2 learned that when Par was acquired, Qualitest's practice of "trade loading," wherein Propst and Reiney would offer customers discounts to take leftover product at the end of the year, stopped.  FE2 was also told that Par did not understand the return aspects of the Qualitest contracts, nor did they fully understand the "chargebacks," also known as rebates, that were a part of the Qualitest contracts.  FE2 reported that data produced by the chargeback numbers was too big to fit on normal excel spreadsheets, and that Qualitest used a separate database, called "SQL," to handle the data.  FE2 explained that this database was 70 columns wide and had millions of lines of information.  The "chargebacks" were individually negotiated between Qualitest and its distributors, usually based on volumes of product sold.  FE2 was told that Par did not have its own system to handle chargebacks because Par was a low-volume, high-margin company, as opposed to Qualitest, which was a high-volume, low-margin company.

81.     FE2 stated that the price erosion that the Company described in May 2016, at the end of the Class Period, was foreseeable.  FE2 stated that Qualitest would have been aware immediately if there was a decline in prescription volume in particular drugs.  In particular, FE2 stated that it was forecasted that pain products would decline and that Qualitest's demand forecast reflected this.

According to FE2, the customer "firing" and customer "walk aways" were a significant factor in the earnings miss.

82.     FE2 also stated that after the Par acquisition, FE2 heard that the following customers had complaints about the combined generics company: Auburn Pharmaceuticals, Drogeuria Betances Inc. (Puerto Rico), Burlington Drug Co., DIK Drug Company LLC, Bloodworth Wholesale Drugs, Quest Pharmaceuticals Inc., TOP RX LLC, Richie Pharmacal Co., Inc., Genetco Inc. and Peytons.

83.     Likewise, FE1 heard that some customers had previously had bad experiences with Par or were put off by Par's selling technique of trying to force a customer to buy one of its slower moving products when it requested a popular drug.   Further, according to FE1, some of the Company's customers left because Par stopped manufacturing certain products.   FE1 stated that all these factors led to a decrease in Qualitest sales.

**Defendants Planned Their Radical Changes to Qualitest Long before the Acquisition**

84.     There can be no doubt that Defendants began planning – and had settled upon – the changes they implemented at Qualitest long before Endo's acquisition of Par closed on September 25, 2015.   Indeed, they had begun their integration planning *even before the announcement of the transaction on May 18, 2015*.

85.     The May 18, 2015 press release announcing the acquisition makes that clear.   Even at that early date, Defendants were able to estimate "$175 million in operational and tax synergies" resulting from the acquisition – *an estimate Defendant had not revised even eight months later*.   At the J.P. Morgan Healthcare Conference on January 12, 2016, De Silva stated: "As I mentioned, we are making very good progress on achieving our cost synergies.   We talked about $175 million of financial synergies, $100 million operations and $75 million tax.   We are well on the way to achieving those."

86.     That Defendants continued to cite the same $175 million synergies figure for at least eight months after the announcement of the acquisition – and almost four months after the closing – demonstrates that Defendants had already planned the changes to Qualitest – the source for the expected synergies – from the very beginning of the Class Period. ***Defendants did not revise the $175 million figure over the course of the integration in the months following the closing***.

87.     In addition, during the May 18, 2015 announcement of the acquisition, Defendants were already able to announce that Campanelli, who had been the CEO of Par, would lead the combined generics business and join Endo's Executive Leadership Team.

88.     And, as alleged above, Defendants began executing their intended changes at Qualitest ***immediately*** upon announcing the closing of the transaction on September 28, 2015 – proof that the decision to take those steps had already been made.  Only three days after announcing the closing, Qualitest's two most important sales executives, Propst and Reiney – whose "critical role in Qualitest's success" De Silva himself acknowledged on May 18, 2015 – were "walked out" of the Company, according to FE1.

89.     As numerous FEs have confirmed, Endo immediately fired the entire Qualitest regional sales team upon the acquisition, abandoned all of Qualitest's retail and smaller wholesale clients, and stopped selling lower-margin pharmaceutical products, ultimately leading to the announcement (at the end of the Class Period) of the closure of the Charlotte manufacturing facility and layoffs at the Huntsville facility.

90.     But even if Defendants had decided, the very morning the acquisition closed, to undertake the dramatic changes they immediately implemented, they nonetheless failed to disclose those changes publicly, and continued to lead investors to believe the acquisition would result in a merger of equals, working side by side, to "***maintain the magic that both the Par teams and***

- 23 -

*Qualitest's have created over the course of the last several years*" (in De Silva's words on May 18,

2015).  It was not until the end of the Class Period and beyond that investors learned the whole truth.

**Defendants Were Required to Disclose their Radical Changes at Qualitest**

91.     Endo's Class Period Forms 10-K and 10-Q failed to disclose material information

required to be disclosed therein pursuant to controlling SEC rules and regulations.

92.     The SEC created specific rules governing the content of disclosures made by public

companies in their filings with the SEC.  SEC Regulation S-K requires that every Form 10-K and

10-Q filing contain "Management's Discussion and Analysis of Financial Condition and Results of

Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R.

§229.303.  The MD&A requirements are intended to provide material historical and prospective

textual disclosures that enable investors and others to assess the financial condition and results of

operations of a company, with emphasis on that company's prospects for the future.

93.     Specifically, Item 303(a)(3) of Regulation S-K requires that the MD&A section of a

company's filings with the SEC (*i.e.*, Forms 10-Q and 10-K), among other things:

> (i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> (ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material ***favorable or unfavorable*** impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

94.     Regulation S-K also states that "[t]he discussion and analysis [section] shall focus

specifically on ***material events and uncertainties known to management that would cause reported***

***financial information not to be necessarily indicative of future operating results or of future***

*financial condition*."  According to the SEC's interpretive guidance on Item 303, issued on May 18, 1989: "*A disclosure duty exists where a* trend, demand, commitment, *event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation*."

95.     The decision to fundamentally change Qualitest's high-volume, low-margin operating model, as well as the dramatic steps taken to effect that change, constituted events and created uncertainties that were both "presently known to management" – who themselves had settled on that course of conduct – "and reasonably likely to have material effects on [Qualitest's] financial condition or results of operation" (and indeed did have those effects).

96.     Defendants violated the affirmative disclosure duties imposed by Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose in Endo's Class Period Forms 10-K and 10-Q that Endo had, immediately upon the acquisition of Par: jettisoned Qualitest's highly successful low-margin, high-volume commodities business model in favor of Par's high-margin, low-volume boutique business model; dismissed Qualitest's two most important sales executives, Propst and Rainey, who had critical customer relationships; fired Qualitest's entire regional sales force; terminated Qualitest's business relationships with all (or virtually all) of its retail and smaller wholesale customers; abandoned the basket-pricing and trade-loading techniques Qualitest had used so successfully; and chosen to stop selling Qualitest's pharmaceutical products with smaller profit margins, even though those products had materially contributed to Qualitest's bottom line.

97.     In sum, the foregoing concealed facts were required to be disclosed because they were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition;" (ii) "known trends or uncertainties that have had or that the registrant

reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations;" and/or (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

98.     As the above-quoted language from Item 303(a)(3) indicates, a company must disclose uncertainties known to management, whether management reasonably expects the material impact of those uncertainties to be positive or negative.  Thus, Defendants cannot avoid their disclosure obligation by arguing they believed the changes in question would have a favorable impact on Qualitest's net sales or revenue.

### MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

#### May 18, 2015 Press Release and Conference Call Regarding the Par Acquisition

99.     On May 18, 2015, Endo issued a press release announcing the definitive agreement under which Endo would acquire privately-held Par from TPG in a transaction valued at $8.05 billion.

100.     In the release, De Silva underscored the success of Qualitest: "Our generics business, Qualitest, continues to be an extremely attractive and effective growth driver for Endo." But the release stressed that "*[t]he combination [of Qualitest and Par]* will create a leading specialty pharmaceutical company with a generics business that is one of the industry's fastest growing and among the top five as measured by US sales."

101.     Campanelli, the Par CEO who was announced to head the combined generics business and join Endo's Executive Leadership Team, echoed this message: "We believe our *combination with Endo* best positions us" "to significantly expand[] our scope, capacity and

capabilities to realize the maximum value of our rich and diversified product portfolio and R&D pipeline."

102.    The release also communicated Endo's estimate that "the transaction will generate *$175 million in operational and tax synergies* that are expected to be realized within the first 12 months following the completion of the transaction  . . . ."

103.    Following the issuance of the release, Endo held a conference call with analysts and investors to discuss the Par acquisition.  De Silva, Upadhyay, and Campanelli participated in the call, among other members of the executive management team.

104.    During the call, De Silva repeatedly emphasized the critical role of each company – Qualitest and Par – to the success of the transaction, and their complementary nature.  Among other things, he stated: "[T]he industrial logic of *our combination of Qualitest with Par*, it's extraordinarily clear.  These are two very complementary businesses.  We are bringing two very successful businesses together that have both grown double digits for an extended period of time, *so we are combining the two Companies*, both coming from a position of strength."

105.    De Silva also explained what he meant by "complementary": "Very, very few overlaps."

106.    In addition, De Silva stated: *[O]ur full intention is to make sure that we maintain the magic that both the Par teams and Qualitest's have created over the course of the last several years*."  And further: "So I think this is a deal where there's substantial industrial logic for it.  And I think *the combination of Par and Qualitest* can do a lot more than either Company could do by itself.  So that is the fundamental basis for the value creation that we see."

107.    He also said: "Qualitest is well positioned for continued growth but we see the *addition* of Par's specialized high margin product portfolio and extremely attractive and productive

R&D pipeline as a transformational opportunity, not only for our Generics business but for Endo overall."

108.    Campanelli reiterated the point: "Together, I believe *the combination of Endo's Generic business and Par* creates a powerful generics product and R&D engine with a wide range of fast growing, high barrier-to-entry and market-leading product opportunities."

109.    Upadhyay addressed the prospective synergies associated with the business combination, stating, in pertinent part, as follows: "Our anticipated *operational and tax synergies* are projected to be approximately $175 million and we are committed to strategically maintaining R&D investments to support future growth."

110.    The PowerPoint presentation Defendants used during the conference call reinforced the message of a combination of equals.  Slide 10 had the heading: "*Endo + Par*: Creates a Top 5 Generics Player."  Slide 13 had the heading: "*Endo + Par*: Broad Facilities Footprint."  Slide 19 had the heading: "*Endo + Par*: Expanded Internal Generics R&D Capabilities…"  Slides 20-23 had the heading: "*Endo + Par*: …Drive a Diversified R&D Engine."  Slide 24 had the heading: "*Endo + Par*: Significant Generics Growth Potential."  Slide 27 had the heading: "*Endo + Par*: Leading Specialty Pharmaceutical Co."  And slide 28 had the heading: "*Endo + Par*: A Transformational Combination."

111.    The highlighted statements in ¶¶100-110 – referring to the "*combination*" of Par and Qualitest, the "*addition*" of Par to Endo/Qualitest, "*Endo + Par*," and Defendants' "*full intention . . . to make sure that we maintain the magic that both the Par teams and Qualitest's have created*" – were materially false and misleading when made because they:

(a)    falsely and misleadingly communicated that, upon the acquisition of Par, Defendants intended to operate Qualitest and Par side-by-side, as complementary businesses with

- 28 -

"very, very few overlaps," when in fact they intended to impose the Par business model on Qualitest; and

(b)      failed to disclose that, immediately upon the consummation of the Par acquisition, Endo planned to: (1) jettison Qualitest's highly successful low-margin, high-volume commodities business model in favor of Par's high-margin, low-volume boutique business model; (2) dismiss Qualitest's two most important sales executives, Propst and Rainey, who had critical customer relationships; (3) fire Qualitest's entire regional sales force; (4) terminate Qualitest's business relationships with all (or virtually all) of its retail and smaller wholesale customers; (5) abandon the basket-pricing and trade-loading techniques Qualitest had used so successfully; and (6) stop selling Qualitest's pharmaceutical products with smaller profit margins, even though those products had materially contributed to Qualitest's bottom line, all as alleged in ¶¶31-98 above.

112.    In addition, the highlighted statements in ¶¶102 and 109 regarding estimated "***operational and tax synergies***" – which failed to disclose the dramatic changes Defendants were already intending to make to Qualitest's successful business model – were materially false and misleading when made for the reasons set forth in ¶111(b) above.  Specifically, Defendants' failure to disclose their intended changes to Qualitest – through which they planned to achieve the "synergies" they represented – was materially misleading in light of Defendants' inconsistent representation that they intended to treat Par and Qualitest as two equal, complementary businesses.

113.    After the May 18 announcement, analysts understood the transaction to be exactly what the PowerPoint presentation had described – the combination of two coequal businesses ("Endo + Par"), with $175 million of expected synergies resulting, as a UBS analyst put it on May 19, 2015, from "back office operations."  As a Gabelli & Company analyst wrote that same day: "We believe that the combination of Par and Endo's Qualitest generics business is a positive catalyst that will

- 29 -

accelerate both the double-digit organic revenue growth rate and margin expansion opportunities for the generics segment."

114.    Or, as a J.P. Morgan analyst wrote two days later: "We believe Par acquisition strategically builds out Endo's generics business.  In Qualitest, Endo has a top 3 controlled substance generics business which has generated double digit organic growth over the last several years. Combining that business with Par will create a top 5 generics player in the US, adding critical mass and a growing generics pipeline . . . ."

## May 20, 2015 Conference Call

115.    On May 20, 2015, De Silva, Upadhyay, and Campanelli gave a presentation on behalf of Endo at the UBS Global Healthcare Conference.  During the presentation, De Silva reiterated the Company's prior guidance regarding the synergies stemming from the Par acquisition, stating, in pertinent part, as follows:

> We expect *operational and tax synergies of $175 million*, but just to be clear, obviously from a EBITDA standpoint, we are only including cost synergies, operational synergies, and our calculation of EBITDA and that number is likely to be in the range of around $100 million of the $175 million.

116.    Later, in response to a question by a UBS analyst, Upadhyay also addressed the synergies of the Par acquisition:

> Sure, so as Rajiv said, we're currently estimating *$175 million of total synergies with about $100 million in OpEx and $75 million in tax*.  In the OpEx synergies, that's simply cut across SG&A as well as R&D.  We do see there being significant opportunity across the G&A portions of the business obviously as you don't need to duplicate a lot of the back office sort of support within the selling aspect of the business.

117.    The highlighted statements in the previous two paragraphs regarding the estimated synergies to be derived from the Par acquisition – which failed to disclose the dramatic changes Defendants were already intending to make to Qualitest's successful business model – were materially false and misleading when made for the reasons set forth in ¶111(b).  Specifically,

- 30 -

Defendants' failure to disclose their intended changes to Qualitest – through which they planned to achieve the "synergies" they represented – was materially misleading in light of Defendants' inconsistent representation that they intended to treat Par and Qualitest as two equal, complementary businesses.

118.    When questioned by analysts about the Par acquisition, Campanelli communicated that the combination of Par and Qualitest would result in the addition of "***mass***," "***quality***," "***volume***," and a "***diversified portfolio***" to Endo's generics business:

> When I look at on a go-forward basis ***taking on the Qualitest division and adding mass, the two things that are important to me are mass and quality and I think that's two things that we're going to now have*** and better position us to – to position ourselves up against some of the consortiums.  Clearly they have buying and selling powers amongst themselves, but having strength with more product portfolios is certainly going to place us in a better position to differentiate ourselves going forward.  ***So volume, quality, and a diversified portfolio.  I think that's very important.  That's going to help and drive Par's ability to have long-term growth***.

119.    The highlighted statements in the previous paragraph – regarding the addition of "***mass***," "***quality***," "***volume***," and a "***diversified portfolio***" from the combination of Par and Qualitest – were materially false and misleading when made for the reasons set forth in ¶¶111(a) and (b).

### June 2, 2015 Offering

120.    On June 2, 2015, Endo filed a Form S-3 registration statement and prospectus using a "shelf" registration, or continuous offering process (No. 333-204657), with the SEC.

121.    On June 3, 2015, the Company filed a Prospectus Supplement with the SEC and announced that it was offering $1.75 billion ordinary shares of Endo and would use a portion of the net proceeds, together with the net proceeds of the debt financing, to finance the acquisition of Par, refinance certain outstanding debt, and to pay related fees and expenses.

122.    On June 8, 2015, Endo priced the offering at $83.25 per share and filed its final prospectus, which formed part of the registration statement, pursuant to which Endo would sell 24,024,025 ordinary shares to the public (not including the underwriters' overallotment of 3,603,603 shares).

123.    The offering was successful for the Company and the underwriters.  27,627,628 shares of Endo common stock were sold to the public at $83.25 per share, raising more than $2.3 billion in gross proceeds for Endo.

124.    The Registration Statement, including the materials incorporated therein by reference, and the final Prospectus are collectively referred to as the "Registration Statement."

125.    The Registration Statement states the following concerning the Par acquisition: "We believe *the acquisition of Par will enhance our existing generics platform [Qualitest], adding scale and diversity in products, capabilities and R&D infrastructure*."

126.    The highlighted statement in the previous paragraph – that the "*acquisition of Par*" would "*enhance*" Qualitest by "*adding scale and diversity in products, capabilities and R&D infrastructure*" – was materially false and misleading when made for the reasons set forth in ¶¶111(a) and (b).

127.    Under the rules and regulations governing the preparation of the Registration Statement, the Registration Statement was required to disclose the contrary facts detailed herein.  No such disclosure was made.

### Q2 2015 Earnings Release, Conference Call, and 10-Q

128.    On August 10, 2015, Endo issued a press release announcing its financial results for the period ended June 30, 2015.  For the quarter, Endo reported a net loss of $250.42 million, or $1.35 per diluted share, on revenue of $735.17 million, compared to net income of $21.16 million, or $0.13 per diluted share, on revenue of $592.85 million for the same period in the prior year.

129.    Commenting on these results, De Silva described the Company's "strong financial results" and represented that "[w]e are close to completing the integration planning for our acquisition of Par":

> We are close to completing the integration planning for our acquisition of Par and we remain excited by the ***strategic expansion of our product portfolio, R&D pipeline and long-term growth profile that the Par assets and Par talent <u>joining</u> Endo are expected to help provide***.

130.    The highlighted statements in ¶129 – that "***Par assets and Par talent <u>joining</u> Endo***" was expected to result in "***the strategic expansion of our product portfolio, R&D pipeline and long-term growth profile***" – was materially false and misleading when made for the reasons set forth in ¶¶111(a) and (b).

131.    Following the issuance of the earnings release, Endo held a conference call with analysts and investors to discuss the release and its business operations.  De Silva and Upadhyay participated in the call.

132.    During the course of the call, De Silva again emphasized that "[w]e are nearly done with planning for the integration of Par," and did not acknowledge any of the dramatic changes that Defendants intended to make at Qualitest, even when asked point blank by a RBC Capital Markets analyst, "Has anything changed in terms of how you are looking about the combined Endo and Par asset?"  De Silva answered, in pertinent part:

> ***As we have done more integration planning with Par, we continue to be very impressed with the business.  We are confident about our synergy numbers that we put out there which is roughly $175 million of financial synergies of which about $100 million are operational.  Plus we have now become more confident that there is further upside to that number through supply chain and cost of goods reductions which were not included in that number as well.  So net net all of that points us in the direction of being very confident about the midteens accretion for 2016 and roughly 20% accretion in 2017 and the rest of our business is progressing as expected***.

133.    The highlighted statements in the previous paragraph – omitting any reference to the changes Defendants intended to make at Qualitest immediately upon the acquisition of Par, despite a direct question from an analyst about the "combined Endo and Par asset" – were materially false and misleading when made for the reasons set forth in ¶111(b).

134.    In his opening remarks, De Silva reiterated the strength of the Company's Qualitest business, stating that "[o]ur US Generics business delivered strong underlying growth in the first half of 2015," and that "our US Generics business continued to deliver impressive results in the second quarter with sales of $338 million that contributes to year-to-date growth of 44% versus the prior year."

135.    De Silva also underscored the message of that day's earnings release that Endo's acquisition of Par would result in the addition of Par's pipeline and capacity to Qualitest's already successful business – again reinforcing the message that Qualitest and Par would work side-by-side as two complementary businesses: "Qualitest continues to be an extremely attractive and effective growth driver for Endo.  *The addition of Par* will enable us to achieve critical mass in our generics business unit *expanding* our scale and capacity and *building* upon steady double-digit organic growth at Qualitest by *adding* a strong portfolio of specialty high barrier to entry products with attractive gross margins."

136.    Along those same lines, De Silva stated: "For Endo, *the addition of Par* will help us to achieve our goal of delivering double-digit revenue growth for the overall business over the longer term."  He also referred to the "*combined* Par and Qualitest pipeline."

137.    The highlighted statements in the previous two paragraphs – concerning, *inter alia*, the "*addition of Par*" to Endo's already successful generics business, Qualitest – were materially false and misleading when made for the reasons set forth in ¶¶111(a) and (b).

138.   During the call, De Silva also repeated Endo's expectation, first communicated on the first day of the Class Period, of synergies from the Par acquisition of $175 million. "Anticipated **_financial synergies from the Par transaction of $175 million_** will help deliver that accretion and returns well in excess of our cost of capital."

139.   The highlighted statements in the previous paragraph and in ¶132 above regarding $175 million in anticipated synergies from the Par acquisition were materially false and misleading when made for the reasons set forth in ¶111(b).  Specifically, Defendants' failure to disclose their intended changes to Qualitest – through which they planned to achieve the "synergies" they represented – was materially misleading in light of Defendants' inconsistent representation that they intended to treat Par and Qualitest as two equal, complementary businesses.

140.   That same day, August 10, 2015, Endo filed its Q2 2015 Form 10-Q with the SEC. Although the Q2 2015 Form 10-Q discussed the planned Par acquisition, which was to close just over a month later, Item 2 of the filing – Management's Discussion and Analysis of Financial Condition and Results of Operations – failed to disclose Defendants' already planned changes to Qualitest and its business model, which would create an uncertainty known to management and reasonably likely to have material effects on Endo's financial condition or results of operation.  That failure violated Endo's disclosure obligation imposed by SEC Regulation S-K and Item 303, and rendered Endo's Q2 2015 Form 10-Q materially false and misleading when made.

141.   Analyst reaction to Endo's Q2 2015 results demonstrates their continued understanding that the Par acquisition would result in two complementary companies – Qualitest and Par – operating side-by-side to enhance Endo's already successful generics business.  According to the August 11, 2015 report by a William Blair analyst: "On the call, management highlighted the Par

Pharma acquisition building on the company's Qualitest business to create a top 5 U.S. generics business as measured by sales."

### August 13, 2015 Presentation

142.    On August 13, 2015, De Silva and Upadhyay made a presentation at the Canaccord Genuity Growth Conference.  Once again, De Silva represented the continued strength of Qualitest's generics business.  In response to a Canaccord Genuity analyst who described Qualitest as "an absolute gold mine" for Endo, De Silva acknowledged that "Qualitest has been extraordinarily successful as you said, one of the few generics companies of that size that has grown double digits, at least for the last five years on an organic basis."

143.    During the conference, De Silva again misled investors into believing that Defendants intended the acquisition of Par to represent the addition of a business wholly complementary to Qualitest – not that Par would supplant the successful Qualitest business model that had resulted in Qualitest being a "gold mine," in the analyst's words, and "extraordinarily successful," in De Silva's words.  De Silva represented:  "*[W]hen you put the two companies [Qualitest and Par] together there is very, very little overlap.  And really it's a very, very complementary business in terms of types of products, capabilities, and even the manufacturing footprint.  So it's the perfect transaction in many ways.*"

144.    The highlighted statement in the previous paragraph, which falsely led investors to believe Defendants intended Qualitest and Par to operate side-by-side as complementary companies with "very, very little overlap," was materially false and misleading when made for the reasons set forth in ¶111(a) and (b).

**September 28, 2015 Conference Call**
**Regarding the Par Acquisition**

145.    On September 28, 2015, the Company held a conference call with analysts and

investors to discuss the acquisition of Par, which had been completed three days before.  De Silva,

Upadhyay, and Campanelli participated in the call.

146.    During the conference call, De Silva repeatedly represented that Par's business was

complementary to Qualitest's, such that the two companies would work together to benefit Endo –

again disguising Defendants' intention, which they would begin effecting immediately, to replace

Qualitest's high-volume, low-margin business model with the low-volume, high-margin business

model of Par.  For example:

> Moving to slide 3; first, we have emphasized ***the <u>addition</u> of Par strategically
> expands our product portfolio, R&D pipeline capabilities and long-term growth
> drivers.***  We see great value in Par's extensive range of dosage forms and delivery
> systems and their focus on specialized, market leading products.
>
> Second, we expect Par to immediately accelerate Endo's growth.  Their ***<u>addition</u>
> today will help us achieve double-digit revenue growth in the mid-term*** and be
> accretive to adjusted diluted earnings per share. . . .
>
> Third, ***our new <u>combined company</u> has a strategically expanded corporate profile,
> scope and size that provide a powerful platform for future M&A*** . . . .
>
> And  fourth,  we  believe  ***the  <u>addition</u>  of  Par*** is  aligned  with  Endo's  strategy  of
> pursuing and together, that we can create shareholder value and drive benefits for
> patients and customers.
>
> Moving to slide 4, ***<u>the combination of Endo and Par</u> is transformational for our
> Company*** and enhances scale in a number of measures.  Enterprise pro forma
> revenues for 2014 were in excess of $4 billion and pro forma EBITDA for 2014 was
> more than $1.6 billion.  We now have approximately 6,300 employees globally and
> our long-term value creation is expected to be fueled by operational synergies,
> double-digit revenue growth, and a transformative M&A platform.
>
> Moving to slide 5, the combination of Qualitest and Par is transformational for our
> generics business as well.  ***<u>Together</u>, they become a leader in specialty generics with
> greater scale*** . . . .

***Combined*, *our new generics R&D pipeline includes approximately 300 programs*** . . . .

147.    Similarly, De Silva stated: "So ***with the combination of Par and Qualitest***, we now have a very robust manufacturing network, right.  We have very high volume plants like Qualitest plants in Huntsville and Charlotte and very specialized plants that come with Par both in New York, in Minnesota[,] California, in Stamford[,] Connecticut, as well as some operations in India as well."

148.    De Silva used a PowerPoint presentation to reinforce this point.  Like the presentation Defendants gave upon the announcement of the Par acquisition on May 18, 2015, this presentation characterized the acquisition as a merger of equals.  Slide 4 had the heading: "***Endo + Par***: A Transformational Combination."  Slide 5 had the heading: "***Qualitest + Par***: A Leader in Specialty Generics."  Slide 6 at the heading: ***Addition*** of Par Generics Pipeline: Driving Near- and Long-Term Opportunities."

149.    The highlighted statements in the previous three paragraphs – concerning, *inter alia*, the "***addition of Par***," "***the combination of Par and Qualitest***," the "***combined company***," and "***Qualitest + Par***" – falsely led investors to believe Defendants intended Qualitest and Par to operate side-by-side as complementary companies, and were materially false and misleading when made for the reasons set forth in ¶¶111(a) and (b).

150.    During the call, De Silva and Campanelli made certain materially misleading statements about the integration of Par and Qualitest.  De Silva stated, for example: "***[O]ne of the immediate-term things that Paul [Campanelli] is doing is really prioritizing the generics portfolio across Qualitest and Par in terms of our go-to-market model and we will likely make some decisions on our in-market portfolio in terms of what we prioritize with a view to maximizing profits and profitability*** . . . ."

151.    The highlighted statement in the previous paragraph – suggesting that Campanelli was "***really prioritizing the generics portfolio across Qualitest and Par***" – was materially false and misleading when made because Defendants were not contemplating any portfolio changes "across Qualitest and Par," as De Silva suggested, but had already determined to stop selling Qualitest's pharmaceutical products with smaller profit margins, while leaving Par's portfolio intact.  Yet Defendants failed to disclose that determination.

152.    Similarly, in responding to a question about "optimization," Campanelli said the following about the customers of Par and Qualitest: "***We're also looking at our customer base, where we're strong on the Par side versus where we were in the Qualitest side.  There is some differentiations with our customers in terms of where we both played.  I think that will play to our strength***."

153.    The highlighted statement in the previous paragraph –that the "***differentiations with our customers***" between Par and Qualitest "***will play to our strength***" – was materially false and misleading when made because Defendants had already determined to cease doing business with Qualitest's retail and smaller wholesale customers.

154.    De Silva also addressed the subject of synergies resulting from the downsizing of employees, stating: "With respect to synergies, Paul [Campanelli] and the team have done a great job in terms of planning for the close.  ***So [we'll] be in very shortly to provide information to all of our employees as to their employment status.  But there will be certain components of this synergies that happen little bit over time.  So as we've said, we're very confident about the ability to get to a full run rate within 12 months and that timeframe looks very possible, based on all the planning that both companies have done***."

- 39 -

155.    The highlighted statement in the previous paragraph – regarding determinations concerning the "employment status" of "all of our employees" – was materially false and misleading when made because Defendants had already determined to dismiss Qualitest's entire regional sales force, including its two most important sales executives, Propst and Reiney (both of whom De Silva had thanked and praised during the May 18, 2015 announcement of the Par acquisition).

156.    On the subject of "synergies," De Silva reiterated Defendants' expectation of "*deliver[ing] $175 million of financial synergies*" – the same number Defendants communicated on May 18, 2015, when they first announced the Par acquisition.

157.    The highlighted statement in the previous paragraph concerning "*$175 million of financial synergies*" was materially false and misleading when made for all the reasons set forth in ¶111(b) above.  Specifically, Defendants' failure to disclose their intended changes to Qualitest – through which they planned to achieve the "synergies" they represented – was materially misleading in light of Defendants' inconsistent representation that they intended to treat Par and Qualitest as two equal, complementary businesses.

158.    In the wake of the September 28, 2015 announcement, analysts continued to understand the acquisition of Par as a combination of equals – Par and Qualitest.  According to a September 29, 2015 report by a William Blair analyst: "The combination of the Qualitest unit and Par will put Endo within the top five in the generics market as measured by domestic sales by IMS. . . .  The combined generics unit will have a pipeline that includes about 300 programs . . . ."

159.    This understanding was incorrect, however.  As alleged in ¶¶68-83, three days after the completion of the acquisition was announced, Propst and Reiney – Qualitest's two most important sales executives – were "walked out" of Qualitest.  In addition, Defendants immediately dismissed Qualitest's entire regional sales staff, ceased doing business with Qualitest's retail and

smaller wholesale customers, and stopped selling pharmaceutical products with smaller profit margins, even though those products had substantially contributed to Qualitest's enormous success.

### Q3 2015 Earnings Release, Conference Call, and 10-Q

160.    On November 5, 2015, the Company issued an earnings release announcing its financial results for the third quarter ended September 30, 2015.  For the quarter, Endo reported a net loss of $1.05 billion, or $5.02 per diluted share, on revenue of $745.73 million, compared to a net loss of $252.08 million, or $1.59 per diluted share, on revenue of $654.12 million for the same period in the prior year.

161.    Significantly, although the Par acquisition had closed – and the full-scale integration of Par had begun – only 38 days before, Endo announced an approximately $90 million pre-tax non-cash impairment charge related to the acquisition:

> *In addition, the Company identified impairment indicators on certain other indefinite and finite-lived intangible assets based on third quarter decisions to reprioritize certain product portfolios and in-process research and development programs primarily across the Company's legacy Qualitest business assets.  This assessment resulted in a combined additional pre-tax non-cash impairment charge of approximately $90 million.*

162.    The explanation for the impairment charge in the previous paragraph was materially false and misleading when made because Defendants failed to disclose that, immediately upon the consummation of the Par acquisition, Endo; (a) jettisoned Qualitest's highly successful low-margin, high-volume commodities business model in favor of Par's high-margin, low-volume boutique business model; (b) dismissed Qualitest's two most important sales executives, Propst and Rainey, who had critical customer relationships; (c) fired Qualitest's entire regional sales force; (d) terminated Qualitest's business relationships with all (or virtually all) of its retail and smaller wholesale customers; (e) abandoned the basket-pricing and trade-loading techniques Qualitest had used so successfully; and (f) stopped selling Qualitest's pharmaceutical products with smaller profit

margins, even though those products had materially contributed to Qualitest's bottom line, all as alleged in ¶¶31-98 above.

163.    Following the issuance of the earnings release, Endo held a conference call with analysts and investors to discuss its earnings and business operations.  De Silva, Upadhyay and Campanelli participated.

164.    De Silva began by acknowledging the continued success of Qualitest in Q3 2015, before the Par acquisition: ". . . US generics continued to deliver impressive results in the third quarter, with sales of $368 million.  That contributes to year-to-date total growth of 32% versus the prior year."

165.    Nonetheless, De Silva addressed certain pressures purportedly facing Qualitest's commodity business model:

> Our view on the pricing environment within generics remains consistent.  We believe that **commodity products face pressure**, while specialty products present some strategic pricing opportunities, depending on market conditions.  Given **the focus of our US generics business and our ongoing portfolio and pipeline optimization process, which will continue to prioritize differentiated products**, we believe this business can continue to outperform the broader market.

166.    The highlighted statements in the previous paragraph, concerning the "**pressure**" faced by "**commodity products**" and Endo's "**ongoing portfolio and pipeline optimization process**," were materially false and misleading when made for the reasons set forth in ¶162 above.

167.    Despite the pressure purportedly facing commodity products, Upadhyay continued to acknowledge the success of Qualitest's generics business: "Just to reiterate on the generics piece, sequentially even excluding Par, the Qualitest business did grow from Q2 into Q3, . . . so the business fundamentally is still performing quite well."

168.    Four days later, on November 9, 2015, Endo filed its Q3 2015 Form 10-Q with the SEC.  Although the Q3 2015 Form 10-Q discussed the Par acquisition, which had closed on

September 25, 2015, Item 2 of the filing – Management's Discussion and Analysis of Financial Condition and Results of Operations – failed to disclose the radical changes Defendants had made and were continuing to make to Qualitest and its business model, which were creating an uncertainty known to management and reasonably likely to have material effects on Endo's financial condition or results of operation.  That failure violated Endo's disclosure obligation imposed by SEC Regulation S-K and Item 303, and rendered Endo's Q3 2015 Form 10-Q materially false and misleading when made.

### December 2, 2015 Presentation

169.    On December 2, 2015, De Silva and Upadhyay made a presentation at the Piper Jaffray Healthcare Conference on behalf of Endo.

170.    During the presentation, De Silva represented that the integration with Par was "***going extremely well***," and Upadhyay again cited the "***$175 million in financial synergies***" Defendants had been representing since the announcement of the acquisition on May 18, 2015, stating that the Company was "***right on track to deliver that full synergy*** . . . ."  Later in the presentation, De Silva added: "***[I]f you look at the combined Qualitest/Par portfolio it's a very broad portfolio***."

171.    The highlighted statements in the previous paragraph – concerning the success of the integration, the purportedly on-track financial synergies, and the breadth of the "***combined Qualitest/Par portfolio***" – were materially false and misleading when made for the reasons set forth in ¶162 above.  Regarding the represented "financial synergies," Defendants' failure to disclose the changes they were implementing at Qualitest – through which they planned to achieve the "synergies" they represented – was materially misleading in light of Defendants' inconsistent representation, made repeatedly during the Class Period, that they intended to treat Par and Qualitest as two equal, complementary businesses.

- 43 -

**January 5, 2016 Presentation**

172.     On January 5, 2016, De Silva made a presentation at the Goldman Sachs Healthcare Conference on behalf of Endo, during which he made numerous materially false and misleading statements regarding the Company's generics business.  As he had the previous month, De Silva stated that the integration of Qualitest and Par was "***going very well***."

173.     The highlighted statement in the previous paragraph – representing the successful progress of the integration of Par and Qualitest – was materially false and misleading when made for the reasons set forth in ¶162 above.

174.     About Qualitest in particular, De Silva represented – consistent with the Qualitest business model – that "***all the growth in Qualitest is going to come from volume***":

> So if you look at 2015, ***all the growth in Qualitest is going to come from volume***. And by and large it's because the positive price that we had is offset by some of the price penalties that we had to pay on some of the new price increases we took. ***So net-net, if you look at 2015 year-to-date, the substantial majority of our growth is volumes, not price***.

175.     The highlighted statements in the previous two paragraphs – concerning Qualitest's reliance on volume – were materially misleading when made for the reasons set forth in ¶162 above. Specifically, De Silva's statement about Qualitest's reliance on volumes was misleading because it failed to disclose that the numerous changes Defendants had made to Qualitest and its business model, summarized in ¶162 above, completely undercut Qualitest's ability to achieve the kinds of volumes that De Silva was representing.

176.     During the presentation, De Silva also represented the strategic nature of the Par acquisition, stating that Par was "***a perfect complement in terms of capabilities, portfolio, et cetera***."  Further, in response to a question about his "expectations for the Qualitest business," De Silva reiterated that the Par acquisition was a "***perfectly complementary transaction***."

177.    The highlighted statements in the previous paragraph, regarding the complementary nature of Par and Qualitest, were materially false and misleading when made for the reasons set forth in ¶162 above, and because Defendants were not operating Par and Qualitest as complementary businesses, operating side-by-side, but under the unique business model suited to Par, not Qualitest.

### January 12, 2016 Presentation

178.    On January 12, 2016, De Silva made a presentation at the J.P. Morgan Healthcare Conference on behalf of Endo.  Addressing the Par acquisition, and reiterating the "$175 million of financial synergies" Defendants had repeatedly represented since the announcement of the acquisition eight months before, De Silva stated that "*[w]e are well on the way to achieving those*" synergies.

179.    The highlighted statement in the previous paragraph – that Endo was "***well on the way to achieving***" $175 million of financial synergies – was materially false and misleading when made for the reasons stated in ¶162 above.  Specifically, Defendants' failure to disclose the changes they were implementing at Qualitest – through which they planned to achieve the "synergies" they represented – was materially misleading in light of Defendants' inconsistent representation, made repeatedly during the Class Period, that they intended to treat Par and Qualitest as two equal, complementary businesses.

### The February 29, 2016 Earnings Release, Conference Call, and 10-K

180.    On February 29, 2016, Endo issued a press release announcing its Q4 and full-year 2015 financial results.  For the quarter, Endo reported a net loss of $118.46 million, or $0.53 per diluted share, on revenue of $1.07 billion, compared to a net loss of $53.48 million, or $0.34 per diluted share, on revenue of $662.88 million for the same period in the prior year.  For 2015, Endo reported a net loss of $1.50 billion, or $7.59 per diluted share, on revenue of $3.27 billion, compared to a net loss of $721.32 million, or $4.60 per diluted share, on revenue of $2.38 billion for 2014.

181.    In the release, Endo provided revenue guidance, estimating total revenues between $4.32 billion and $4.52 billion for the year ended December 31, 2016.  Commenting on these results, De Silva was quoted as stating: "Endo delivered solid financial results this quarter and was further strengthened by our first full quarter of revenues from the acquisition of Par Pharmaceutical Holdings, Inc.  As we enter 2016, we believe our business is diversified and positioned for double-digit underlying growth over the mid- to long-term."

182.    Specifically addressing Endo's U.S. Generic Pharmaceuticals segment, the release stated: "Compared to previous 2015 expectations, *fourth quarter revenues in U.S. Generic Pharmaceuticals were unfavorably impacted by increased pricing pressures due to increased competition across pain and commoditized products within legacy Qualitest and certain non-recurring charges*."  The release also itemized the following non-cash impairment charge: "$38.4 million related to legacy Qualitest products *as part of the continued portfolio optimization process with the integration of Par Pharmaceutical* . . . ."

183.    The highlighted statements in the previous paragraph, purporting to explain the "unfavorable impact" on Q4 revenues in the U.S. Generic Pharmaceuticals segment, were materially false and misleading when made for the reasons set forth in ¶162 above.  Specifically, the highlighted statements were at best incomplete, failing to disclose the negative impact on Qualitest's revenues from Defendants' radical changes to Qualitest and its commodities business model, including, *inter alia*, the wholesale dismissal of its regional sales force, its decision to abandon retail and smaller wholesale customers, and its decision to stop selling pharmaceutical products with lower profit margins.

184.    That same day, February 29, 2016, Endo filed its 2015 Form 10-K with the SEC.  Although the 2015 Form 10-K discussed the Par acquisition, which had closed on September 25,

- 46 -

2015, Item 7 of the filing – Management's Discussion and Analysis of Financial Condition and Results of Operations – failed to disclose the radical changes Defendants had made and were continuing to make to Qualitest and its business model, which were creating an uncertainty known to management and reasonably likely to have material effects on Endo's financial condition or results of operation.  That failure violated Endo's disclosure obligation imposed by SEC Regulation S-K and Item 303, and rendered Endo's 2015 Form 10-K materially false and misleading when made.

185.     Following the issuance of the February 29, 2016 release, the Company held a conference call with analysts and investors to discuss its financial and operating results for the quarter and year ended December 31, 2015.  De Silva, Upadhyay, and Campanelli participated in the call, which other members of the executive management team joined.  In his opening remarks, Upadhyay discussed the challenges that the Company faced, but represented that Endo was poised for strong future growth:

> I would like to emphasize that 2015 was another year of transformation for Endo and one that positions us for future growth and profitability.  Specifically, it was a year where we further diversified and expanded our revenue base.  We delivered solid underlying growth in a challenging market.  We expanded margins, improved our underlying after-tax cash flow conversion, we built a strong branded and generics product pipeline, we improved our operating model and execution, and made continued progress on narrowing the tail of the [Company's] mesh-related product liability.

186.     Similarly, De Silva represented that the Company was expecting strong growth in 2016, stating, for example:

> [W]e are achieving sustainable growth with a projected double-digit underlying growth rate, increasing operating margins, strong cash flow conversion and the ability to de-lever rapidly.  2015 was a year of transformation and continued evolution for Endo.  We see 2016 as a year of execution, of delivering on the promise and potential of our business and of creating significant value for our shareholders. We look forward to achieving these goals and to your continued support.

187.    Specifically addressing Qualitest, De Silva acknowledged "volume loss and pricing pressure," which he attributed to "increased competition in multi-player categories."  De Silva explained:

> **The legacy Qualitest business**, while diversified and historically insulated from the challenging pricing environment, **did experience some volume loss and pricing pressure in the fourth quarter due to increased competition in multi-player categories**. . . .
>
> As you will note, actual full-year underlying generics growth was lower than preliminary estimates shared earlier this year.  This was due to fourth quarter actual sales of our legacy Qualitest portfolio versus our previous expectations, **part of the shortfall was driven by the number of non-recurring net charges recorded as part of our year-end processes**.
>
> While these types of customary charges – while these types of charges are customary in any given quarter, we did see a higher level in the fourth quarter of 2015.  **Also, the shortfall is driven by a combination of higher than anticipated rebates and chargebacks that came through on fourth-quarter sales identified during our year-end close processes in January and February**.

188.    Then, during the question and answer period following De Silva's prepared remarks, an RBC Capital Markets analyst asked: "[C]an you help us understand the Qualitest impact from Q4, how – if that's likely to continue and what type of erosion are you expecting in the business for this year?"  Upadhyay responded in part:

> The first thing I would say is, into the fourth quarter when we gave preliminary results around 2015 that did imply softness in 2015 fourth quarter around generics. **We did start to see the early signs of volume erosion in our more commoditized parts of our business.  And then as we closed out our final processes for the year, we did recognize higher level of chargebacks and rebates coming through, specifically around our more commoditized portfolio, as well as pain franchise**.
>
> **That in tandem with one-time charges that occurred in the fourth quarter led to a lower than expected fourth quarter**.

189.    Similarly, a Morgan Stanley analyst asked about the outlook for Qualitest: " [W]ith respect to the Qualitest outlook, just so that we understand how to model it, should we be thinking

about a 20% decline in 2016 similar to, or in the ballpark of, what was[,] of what the number was in the fourth quarter of 2015?"  De Silva responded:

> [F]irst of all, keep in mind that as Suky pointed out, ***there was some non-recurring impacts in the fourth quarter that impacted Qualitest, which should not see any roll forward impact***.  And secondly, I think back to the comment that Suky made, we are not providing guidance for Qualitest distinct from Par, simply because at this point Paul has a combined portfolio, he is negotiating customer contracts across a combined portfolio. . . .  So as a result we don't expect to provide any guidance for the legacy Qualitest portfolio going forward, other than what we already commented on, which is that for the combined business we expect to see mid to high teens underlying growth for 2016.

190.    The highlighted statements in the previous three paragraphs, purporting to explain problems in the legacy Qualitest business, were materially false and misleading when made for the reasons set forth in ¶162 above.  Specifically, the highlighted statements were at best incomplete, failing to disclose the negative impact on Qualitest's revenues from Defendants' radical changes to Qualitest and its commodities business model, including, *inter alia*, the wholesale dismissal of its regional sales force, its decision to abandon retail and smaller wholesale customers, and its decision to stop selling pharmaceutical products with lower profit margins.

191.    De Silva concluded the call by trying to quiet investor concern by highlighting the Company's expected growth, stating: "[w]e believe [that] the fundamentals of the business are very strong, strong underlying growth that will sustain us through 2016 into the medium term that we've talked about in the past.  We are positioned for growth in 2016."

192.    Despite De Silva's reassurances, neither investors nor analysts were satisfied.  In response to the news Defendants disclosed on February 29, 2016, the price of Endo stock declined from $52.94 per share to $41.81 per share – a decline of 21%, on extremely heavy trading volume.

193.    As an RBC Capital Markets analyst put it: "The 4Q Qualitest decline was hard to explain even after one-time items which, combined with commentary around commodity generic pricing softness, has impacted investor confidence in the generics business . . . ."

**March 17, 2016 Presentation**

194.    On March 17, 2016, at the Barclays Global Healthcare Conference, Defendants announced weaker-than-expected revenue guidance for the first quarter of 2016.  For the full-year 2016, however, the Company reiterated the year-end revenue guidance previously announced in the Company's 2015 earnings release.

195.    Regarding Qualitest, De Silva acknowledged – but downplayed – "price pressure," "softness," and "erosion" in the business: "*We do continue to see continued price pressure in Q1, particularly around the Qualitest business.  If you look across the portfolio of today's business between Qualitest and Par, we do see a little bit more softness in the Qualitest side of the business than we expected.  That being said, from a broader full-year perspective, our plan is well intact*."

196.    And further: "*And as we said, we do see a bit of softness in the . . . generic business but nothing that concerns us more broadly about the area in totality. . . .  [W]e clearly anticipated some continued erosion of the base in our Qualitest business that is built into our plan*."  De Silva also stated that the integration of Par and Qualitest was "*well on track*."

197.    The highlighted statements in the previous two paragraphs, downplaying the weakness in Qualitest's business and representing the success of the integration, were materially false and misleading when made for the reasons set forth in ¶162 above.

198.    Despite De Silva's assurance that "[we see] nothing that concerns us more broadly about the year in totality," the price of Endo stock declined from $33.91 per share to $30.03 per share – a decline of 11.4% on extremely heavy trading volume.

**THE END OF THE CLASS PERIOD**

199.    On May 5, 2016, after the market closed, Endo issued a press release announcing the Company's financial and operating results for the quarter ended March 31, 2016.  According to the press release, Endo reported a loss of $0.40 per diluted share, down from earnings of $0.11 per share

in the first quarter of 2015.  Additionally, Endo significantly cut its 2016 guidance, announcing

targeted revenue in the range of $3.87 billion to $4.03 billion, down from the range of $4.32 billion

to $4.52 billion that the Company had reaffirmed in March, less than two months earlier.

200.    During the Company's May 5, 2016 earnings conference call, Defendants disclosed to

the market, for the first time, the steep price erosion in the markets and the difficulty integrating Par

and the Company's legacy business, Qualitest.  Upadhyay stated: "the largest driver of the change is

the greater-than-expected erosion in our Generics base business."  Further, De Silva explained: "[i]n

our Generics segment, the base business erosion continued into the first quarter and was significantly

deeper than we expected at approximately 30%.  This was driven by continued pricing and

competitive pressures on our commoditized and pain products."

201.    For the first time, Campanelli admitted that the Par acquisition involved changing the

"operating model" of the legacy business.  Campanelli explained, in pertinent part, as follows:

> Moving to slide 16, I do want to take a few moments to discuss our ongoing
> integration of the Qualitest and Par businesses.  ***Last fall and Q1 of this year, we
> were conducting an integration of two complex generic businesses.  What became
> very clear to those of us who have been in the generic industry for some time is
> that the legacy Par operating model is better positioned to address the challenges
> of today's evolving market.  As a result, we set out to shift the legacy Qualitest
> portfolio strategy from a high-volume approach to the high-value operating model
> long practiced by legacy Par***.
>
> As part of the integration activities, we're also transitioning the legacy Qualitest
> systems and processes to the Par business platform.  The legacy Par systems offer
> more real-time and product-level data, allowing for faster analysis and reaction
> within a challenging and changing market.  While many of these improvements were
> already planned at Qualitest, the integration of our business will accelerate the
> benefits.

202.    When analyst David Risinger of Morgan Stanley asked for a breakdown with respect

to the generic pricing and competitive pressures that impacted the Company's generic segment,

Campanelli finally admitted the profound difficulties facing the Qualitest business:

David, your question on the price and the pressure, when we look at the Qualitest portfolio, which had served us well for so many years, as I said before, it is a mature portfolio, which is subject to more than normal competition.  We were very strong in pain.  A big portion of our portfolio is directed towards pain.  ***It's not quite the barrier that it once was, and as a result, the pricing pressure that we saw was about 80% tied to legacy Qualitest and about 20% tied to legacy Par.***

203.    Analysts reacted negatively to the cut in guidance and the news about the Company's generics business.  In a May 5, 2016 research report, for example, a Piper Jaffray analyst stated: "[w]e had not believed that the rebasing of expectations would be nearly this significant.  We were wrong."  The following day, a J.P. Morgan analyst wrote: "**We see the rapid deterioration of Endo's generics business as the most concerning of today's updates**." (emphasis in original)

204.    Also on May 6, 2016, a SIG Susquenhanna Financial Group, LLP analyst expressed the market's surprise at the magnitude of the reduction: the Company's "23% reduction to 2016 EPS was far beyond what we expected . . . ."

205.    That same day, a Leerink Partners LLC analyst expressed similar concerns, as follows: "We are lowering our rating to MP from OP based on the ENDP's revised business outlook, limited near-term catalysts and our lack of conviction that the mgmt. team can turnaround the business in a timely fashion."  Leerink explained that: "Based on a combination of intensifying competitive pressure to ENDP's historically high margin US generic business and underwhelming acquired brand performance, we find it increasingly difficult to be constructive on any of the company's top line growth drivers."

206.    Street.com, a news source following Endo, articulated these concerns as follows: "Many were surprised by the extent of the guidance cut.  There are a number of questions floating around, including how did management get the estimates so wrong in the first place, is something bigger on the horizon and are the revised estimates a half-measure or the true picture?"

207.    In response to this news, the price of Endo stock dropped from $26.59 per share to $16.17 per share – a decline of 39%, on heavy trading volume.

208.    Finally, on September 23, 2016, Endo issued a press release announcing that De Silva was resigning his positions at the Company and Campanelli was elevated to President and CEO of the Company.  Thus, Defendant De Silva's "turnaround" of Endo officially came to an end.

## CLASS ALLEGATIONS

209.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Endo stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

210.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Endo stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Endo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

211.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

212. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

213. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Endo;

- whether the prices of Endo stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

214. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

215. As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Endo stock and operated as a fraud or deceit on purchasers of such stock by failing to disclose and misrepresenting adverse facts. As such, as misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the

price of Endo stock declined significantly as the prior artificial inflation came out of the Company's stock price.

216.    As a result of its purchases of Endo stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Endo stock to trade at artificially inflated levels throughout the Class Period.

217.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Endo's business and future financial prospects.  When the truth about the Company was revealed to the market, the price of Endo stock fell significantly.  Such declines removed the inflation from the price of Endo stock, causing real economic loss to investors who had purchased Endo stock during the Class Period.

218.    The declines in the price of Endo stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Endo stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

219.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Endo stock and the subsequent significant declines in the value of Endo stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## NO SAFE HARBOR

220.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged.  Many of the statements herein

were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Endo who knew that those statements were false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

221.    During the Class Period, the market for Endo stock was an efficient market for the following reasons, among others:

(a)     Endo stock met the requirements for listing and were listed and actively traded on the NASDAQ;

(b)     as a regulated issuer, Endo filed periodic public reports with the SEC;

(c)     Endo regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Endo was followed by several stock analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

- 56 -

222.     As a result of the foregoing, the market for Endo stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Endo stock.  Under these circumstances, all purchasers of Endo stock during the Class Period suffered similar injury through their purchase of Endo stock at artificially inflated prices, and a presumption of reliance applies.

223.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

224.     Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

225.     During the Class Period, Defendants made, disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

226.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Endo stock.  Plaintiffs and the Class would not have purchased Endo stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

227.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Endo stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

228.     Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

229.     The Individual Defendants acted as controlling persons of Endo within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions as officers and/or directors of Endo, and their ownership of Endo stock, the Individual Defendants had the power and authority to, and did, cause Endo to engage in the wrongful conduct alleged.

230.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Endo stock during the Class Period.

231.     By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED: _____            ROBBINS GELLER RUDMAN
                                   & DOWD LLP
                                 SAMUEL H. RUDMAN
                                 DAVID A. ROSENFELD
                                 MARK T. MILLKEY
                                 VINCENT M. SERRA


                          _____
                                 SAMUEL H. RUDMAN

                                 58 South Service Road, Suite 200
                                 Melville, NY  11747
                                 Telephone:  631/367-7100
                                 631/367-1173 (fax)
                                 srudman@rgrdlaw.com
                                 drosenfeld@rgrdlaw.com
                                 mmillkey@rgrdlaw.com
                                 vserra@rgrdlaw.com

                                 *Lead Counsel for Plaintiff*